**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

NEW HOPE FAMILY SERVICES, INC.,

                  Plaintiff,

      vs.

SHEILA J. POOLE, in her official capacity
as Acting Commissioner for the Office of
Children and Family Services for the State
of New York,

                  Defendant.

---

**VERIFIED COMPLAINT FOR
INJUNCTIVE AND
DECLARATORY RELIEF**

5:18-cv-1419 (MAD/TWD)

## INTRODUCTION

1.    This is a federal civil rights action brought pursuant to 42 U.S.C. § 1983 challenging the constitutionality of the New York Office of Children and Family Services' new interpretation and application of New York Codes, Rules, and Regulations, Title 18 § 421.3(d). A copy of the regulation, which became effective on November 6, 2013, is attached as Exhibit 1.

2.    In the first century, the Apostle James exhorted Christians that "Religion that God our Father accepts as pure and faultless is this: to look after orphans and widows in their distress," and across the centuries the church has led the way in caring for orphans and abandoned children. One of the first orphanages in America was founded in pre-revolutionary times by the famous preacher George Whitfield, while shortly after the revolution the first orphanage in New York was financed by churches throughout the city.

3.    In 1958, pastor Clinton H. Tasker followed in that long tradition by founding what became New Hope Family Services as an explicitly Christian

1

ministry to care for and find adoptive homes for children whose birthmothers or parents could not care for them.

4.     Since its founding, New Hope has provided loving service to birthparents, infants, and adoptive parents in a manner consistent with its religious convictions about the created nature of women, men, and families, and about the home environment that is best for children.

5.     New Hope Family Services has placed over 1,000 children into loving adoptive homes throughout the State of New York.

6.     New York law expressly permits birthparents to specify the religion of the adoptive family with which their child will be placed, and many birthmothers and adoptive parents choose to work with New Hope precisely because they share or value its religious nature and convictions.

7.     Until recently, it was illegal for adoption providers in New York to place children for adoption with any couple except "an adult husband and his adult wife." When the legislature first authorized unmarried and same-sex partners to adopt in 2010, the Governor noted in his approval statement that "the statute is permissive" rather than mandatory, and thus "would allow for such adoptions without compelling any agency to alter its present policies."

8.     New York State has never changed its adoption laws to make it mandatory for adoption providers to place children with couples other than "an adult husband and his adult wife." Instead, unelected bureaucrats in the New York

Office of Children and Family Services have purported to do so through their adoption, interpretation, and enforcement of a new regulation.

9.     This regulation was adopted for the purpose of targeting faith-based adoption ministries, and OCFS is now actively demanding that such ministries, including New Hope, violate their religious convictions and say things that they believe to be false—or shut their doors.

10.     Following a review of New Hope's policies and procedures, OCFS wrote a letter to New Hope, stating, "It was found that the agency's policy pertaining to not placing 'children with those who are living together without the benefit of marriage' or 'same sex couples' violates Title 18 NYCRR § 421.3, and is discriminatory and impermissible."

11.     The letter provided an ultimatum that New Hope either "revise the present policy and continue the existing adoption program" or "fail to bring the policy into compliance with the regulation," in which case "OCFS will be unable to approve continuation of [New Hope's] current adoption program and [New Hope] will be required to submit a close-out plan for the adoption program."

12.     Because New Hope's policy is an exercise of its religious faith, the OCFS ultimatum has placed it in the position of having to choose either to violate its faith or cease exercising its religion by closing its adoption ministry.

13.     Because New Hope is on notice that it will be shut down if it does not violate its religious beliefs, New Hope has been unable to accept new birthparent

and adoptive-parent clients and has had to tell its current clients about the risk that it may be unable to serve them through the completion of their adoptions.

14.     New Hope has placed three children with adoptive families whose adoptions are not yet finalized. If New Hope is unable to continue its service to these families, these adoptions will likely be delayed and these families may incur additional expense due to the transfer to another agency.

15.     Because of its predicament, four of six new families who were scheduled to begin the homestudy program with New Hope have requested that their application fees be refunded.

16.     Additionally, of the approximately thirteen families who were recommended to adopt through New Hope but had not yet received placements, three families asked for their money to be refunded. The others have agreed to wait in hopes that New Hope will be able to work with them.

17.     And of the four expecting birthmothers who contacted New Hope desiring to place their children in adoptive homes, some have had to be referred elsewhere. But a few of those are anxiously hoping that New Hope will be able to work with them and find loving adoptive homes for their children.

18.     The majority of adoptions that New Hope facilitates are open adoptions, meaning that there is a contact agreement in place that New Hope facilitates between the birthparents and the adoptive parents throughout the first eighteen years of the child's life.

19.     New Hope has approximately 117 adoptions with active contact agreements that it is responsible for facilitating.

20.     Because of the ultimatum, New Hope has been placed in the impossible situation of violating its religious beliefs or losing its ability to fulfill its obligations to the children, birthparents, and adoptive parents involved in open adoptions, with whom it has longstanding relationships of care and trust.

21.     OCFS' actions threaten to destroy New Hope's ministry, deny its care to birthparents and adoptive parents who value and desire its services including its religious perspective, disrupt in-process adoptions, and most importantly slow or prevent the placement of infants into adoptive homes.

22.     But core First Amendment protections—including New Hope's free exercise and free speech rights—prohibit this attempt by OCFS to either impose its agenda on faith-based adoption providers or shut them down.

23.     OCFS' regulation and its actions threaten irreparable injury to New Hope. Accordingly, New Hope brings this lawsuit, seeking both preliminary and permanent injunctive relief.

## JURISDICTION AND VENUE

24.     This action arises under the Constitution and laws of the United States. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

25.     This Court has authority to grant the requested injunctive relief under 28 U.S.C. § 1343; the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202; and costs and attorneys' fees under 42 U.S.C. § 1988.

26.     Venue lies in the Federal District Court for the Northern District of New York pursuant to 28 U.S.C. § 1391(b). A substantial part of the actions or omissions giving rise to this case occurred within this District and at least one of the defendants resides within this District.

## PARTIES

27.     Plaintiff New Hope Family Services, Inc., is a religious not-for-profit corporation duly incorporated under the laws of New York, with its principal place of business at 3519 James Street, Syracuse, NY 13206.

28.     Defendant Sheila J. Poole is the Acting Commissioner for OCFS for the State of New York and is sued in her official capacity. Her service address is Capital View Office Park, North Building, 52 Washington Street, Rensselaer, NY 12144.

## FACTUAL BACKGROUND

### Adoption and foster care crisis

29.     There are over 440,000 children in foster care in the U.S.

30.     Over 120,000 of those children are waiting to be adopted.

31.     In federal fiscal year 2017, New York had 27,268 children served in foster care, with 19,213 in foster care on September 30, 2017.

32.     Of those, over 4,400 New York children were waiting to be adopted.

33.     During fiscal year 2017, throughout the state of New York, a total of only 1,729 children were adopted.

### New Hope's formation and history

34.     The care of orphans and infants whose parents cannot care for them has been a Christian mission since the beginning of the faith.

6

35.     St. James instructed the earliest church that "Religion that God our Father accepts as pure and faultless is this: to look after orphans and widows in their distress." James 1:27.

36.     Since America's earliest days, people of Christian faith have carried out the religious mission of caring for orphans and women in distress.

37.     One of the very first orphanages in America was founded in pre-revolutionary times by the famous preacher George Whitfield.

38.     Shortly after the revolution, the first orphanage in New York was financed by churches throughout the city.

39.     New Hope's adoption ministry is one small part of America's rich religious heritage of helping birthmothers and children through adoption.

40.     In 1958, Clinton H. Tasker, a Christian minister serving in a rescue mission, strongly sensed the call of God to open a Christian adoption ministry in New York that would care for women facing unplanned pregnancies and for their children.

41.     His vision was realized when New Hope Family Services' incorporation was approved in 1965 by the State Board of Social Welfare under the name Evangelical Family Service, Inc. A copy of New Hope's articles of incorporation as approved is attached as Exhibit 2 and a copy of New Hope's amendment to perpetual duration is attached as Exhibit 3.

42.     Its board was composed of ministers and Christian philanthropists.

43.     In 1977, New Hope amended its name to Evangelical Adoption and Family Services, Inc. to better reflect all of its services.

44.     In 1986, New Hope began operating a pregnancy resource center under its umbrella.

45.     In the early 1990s, Evangelical Adoption and Family Services, Inc., amended its name to New Hope Family Services, Inc.

46.     Over the years, OCFS has issued several letters to New Hope affirming that New Hope has the requisite corporate authority to place children for adoption and to perform adoption services. In those letters, OCFS has acknowledged that New Hope's authorization to perform adoption services is perpetual. A copy of one of those letters that was issued in 2008 is attached as Exhibit 4.

47.     Though New Hope's name has changed several times, the mission and Christian character of the organization have remained the same.

48.     Like its founding board, the current board of New Hope is composed of devout believers who are actively involved in their Christian churches, including one member who is actively pastoring a church.

49.     New Hope's mission is "to be Christ's hands extended to offer hope and help to people with pregnancy, parenting, adoption, or post-abortion needs in the Syracuse area and throughout the State of New York."

50.     Consistent with New Hope's mission, it operates as a pregnancy resource center and temporary-foster-placement and adoption provider.

51.   In order to scrupulously ensure its autonomy to operate in accordance with its religious beliefs, New Hope accepts no government funding.

**New Hope's religious character**

52.   New Hope's Christian faith and religious beliefs motivate and permeate its mission and all of its activities.

53.   All of New Hope's paid staff, board members, and counseling volunteers must be in agreement with and sign New Hope's statement of faith, must be in agreement with and supportive of New Hope's religious mission, and must conduct themselves consistent with Christian faith and belief.

54.   New Hope's board members pray at New Hope board meetings and all of New Hope's paid staff and counseling volunteers are expected to be willing to pray with any client who requests prayer or with other staff.

55.   All of New Hope's paid staff and counseling volunteers are expected to counsel consistently with biblical truth.

56.   New Hope believes that:

- God is sovereign over and involved in the creation of every human life and every human life is created in the image and likeness of God and is worthy of protection;

- Every person has inherent dignity and self-worth and should be treated with respect and love;

- The biblical model for the family as set out in the Bible—one man married to one woman for life for their mutual benefit and the benefit

of their children—is the ideal and healthiest family structure for
mankind and specifically for the upbringing of children;

- God created two sexes—male and female. And each sex has a unique
  role and gifting that is intended to benefit the other and any children
  in the family;

- An individual's sex as male or female is determined at the time of
  conception and cannot be changed;

- Caring for orphans is important to God and God desires believers to do
  so.

57.    Through its adoption program, New Hope strives to save the lives of
babies that God has created.

**New Hope as a pregnancy resource center**

58.    New Hope operates as a pregnancy resource center that exists to
lovingly serve women facing the fears and concerns of an unplanned pregnancy, and
their children.

59.    New Hope's pregnancy resource center serves approximately 700
clients per year.

60.    All of the services that New Hope provides as a pregnancy resource
center are provided without consideration of the recipient's marital status, sexual
orientation, gender identity, or religious belief.

61.    All of the services that New Hope provides its pregnancy resource
center clients are provided free of charge, including pro-life information; education

and counseling about pregnancy, birth, parenting, and childcare; clothing and supplies for infants; counseling about available social services; referrals to physicians; and more.

62.    New Hope provides its services to women in unplanned pregnancies pursuant to its pro-life viewpoint, desiring to empower the women it serves to choose life for their child by either choosing to parent or to create a loving adoption plan for their child, rather than choosing abortion.

63.    As a pregnancy resource center, New Hope regularly serves unmarried couples and those who identify as lesbian, gay, bisexual or transgender.

64.    When New Hope has a pregnancy-resource-center client who has a positive pregnancy test and is open to learning about adoption, New Hope provides the mother counseling about the adoption process. New Hope encourages her that adoption is a loving option, enabling the mother to give her baby life and to select the adoptive family with whom she feels comfortable entrusting her child.

65.    New Hope never pressures a birthmother to make an adoption plan over parenting.

66.    During the counseling process, New Hope shows the prospective birthmother profiles of some of the families with whom it has recently placed children as examples of the types of loving adoptive families that New Hope may be able to locate for her child.

67.    New Hope holds over 1,500 counseling sessions per year as a pregnancy resource center.

11

68.     New Hope's ability to serve its pregnancy-resource-center clients through its adoption program enhances its efficacy in encouraging women to choose life for their babies instead of abortion.

69.     In addition, New Hope networks with other faith-based pregnancy resource centers throughout the State of New York, none of which are licensed adoption agencies. These centers refer clients to New Hope who are open to learning about adoption.

70.     New Hope's ability to serve other pregnancy resource centers and the pregnant women those centers serve is enhanced by its ability to directly facilitate the creation of adoption plans and adoptive placements.

**New Hope as adoption provider: birthparent services**

71.     New Hope operates as a New York voluntary adoption provider and is authorized to place children with New York state residents.

72.     New Hope serves individuals from all over the state through its adoption program.

73.     New Hope has been placing children in loving homes since 1965 and has placed over 1000 children.

74.     In recent years, New Hope has placed between eight and twelve children in adoptive homes per year.

75.     New Hope is unique in New York as an adoption provider because it also operates as a pregnancy resource center.

76.     New Hope's primary focus is providing placements for newborns, infants, and toddlers up to two years of age. It is of the greatest urgency that these youngest children be placed into foster or adoptive homes as quickly as possible. OCFS' data indicates that "children less than one year of age are most likely to be involved in a report to the [Statewide Central Register of Abuse and Maltreatment], and the allegations within those reports are most likely to be substantiated."

77.     New Hope is a relatively small adoption provider and takes a personal "arm-around-the-shoulder" approach to the services it provides to its adoption clients, walking birthparents through the journey of creating an adoption plan and providing guidance and counsel to prospective adoptive families through each step of the application, homestudy, placement, supervision, and finalization process.

78.     Almost all of the adoptions New Hope handles are considered open adoptions, meaning that New Hope facilitates some degree of communication between the adoptive parents and birthparents about the child even after the adoptions are finalized.

79.     New Hope allows birthparents and adoptive families to determine the level of openness they desire in the adoption, which includes issues such as (1) meeting the adoptive family before placement, (2) exchanging letters and photos with the adoptive family, (3) sending gifts to the child on holidays or birthdays, and/or (4) having one or two in-person visits per year with the child and adoptive family.

80.     The chosen level of openness must be included in a Post Adoption Contact Agreement between the birthparents and adoptive parents, and is facilitated through New Hope until the child turns 18 years of age.

81.     Even when birthparents and adoptive parents mutually agree to meet or communicate directly, New Hope remains available as a mediator should they develop a disagreement.

82.     New Hope allows birthparents to choose a closed adoption if they prefer. In a closed adoption, there is no information sharing or communication from the adoptive parent to the birthparent regarding the child after the placement.

83.     Many of New Hope's prospective birthmothers are referred to New Hope from other pregnancy resource centers throughout the state.

84.     Many of New Hope's prospective birthparents contact New Hope directly because they have become aware of New Hope's adoption program and are interested in placing their unborn child for adoption through New Hope.

85.     Many of New Hope's prospective birthparents are referred to New Hope by hospital social workers following the child's birth. Many of these clients are seeking immediate foster care placement for their child until an adoption can be arranged. New Hope provides this short-term foster care through its Tender Loving Care program.

86.     Regardless of how a prospective birthparent is connected to New Hope, New Hope provides counseling concerning adoption and the adoption process to its prospective birthparents.

14

87.     During the counseling process, New Hope discusses with birthparents their desires for the adoptive family with whom they would place their baby.

88.     Consistent with state law and regulations, this includes discussing the birthparents' religious beliefs and whether they desire their baby to be placed in a home that practices those beliefs.

89.     Consistent with state law and regulations, New Hope also discusses birthparents' race, ethnicity, and/or color and whether they desire the child to be placed with adoptive parents of similar race, ethnicity, or color.

90.     During this process, birthmothers or birthfathers may also make statements to New Hope's birthparent caseworker about the age or sex of individuals with whom they would be willing to place their child.

91.     During this process, birthmothers or birthfathers may also make statements about the family structure they would desire for their child's placement, such as a preference or aversion for the child to be placed in a home that already has other biological or adopted children, or a preference for the child to be placed in a home with a married mother and father.

92.     During the process, birthmothers and birthfathers may also make statements about the type of community demographics or cultural characteristics they would desire for their child's upbringing.

93.     During the process, birthmothers and birthfathers may also make statements about the educational or cultural backgrounds of individuals with whom they would be willing to place their child.

15

94.     Based on the birthparent's desired characteristics for an adoptive family, New Hope reviews its list of prospective adoptive parents.

95.     New Hope meets with birthparents, once a birthmother is approximately seven months along in her pregnancy, to show them actual parent profiles created by its current list of prospective adoptive parents.

96.     If a birthmother has already given birth to the child, the child's actual characteristics are considered during these discussions.

97.     New Hope typically shows five parent profiles to its prospective birthparents and ensures that the profiles match the birthparents' desires as well as the adoptive parents' willingness to adopt a child with the anticipated characteristics of the specific child.

98.     New Hope generally has between 14 and 20 prospective adoptive families on its list that it has recommended for adoption.

99.     All of the birthparents who have placed a child through New Hope have been able to find a family with whom they were comfortable placing their child for adoption from the profiles that New Hope provided during this process.

100.    In some instances, a birthmother does not want to select the adoptive family with whom her child will be placed for personal reasons.

101.    In those instances, New Hope considers the prospective adoptive parents on its list in light of the best interest of the child.

102.    New Hope has never had a delay in placement because of consideration of these requirements.

**New Hope as adoption provider: adoptive-family services**

103.   New Hope receives inquiries about its adoption program from prospective adoptive parents from all over the state of New York.

104.   New Hope invites those parents to attend one of its periodic orientation sessions to learn about New Hope, its program, and the adoption process.

105.   During the orientation presentation, New Hope makes its nature as a religious ministry clear, opening the meeting with prayer, and providing information about the organization's history and religious mission. New Hope also explains scripture passages and principles about children, including that Jesus loves children, that children are to be valued as gifts from God, and that Christians are told to have faith like a child.

106.   New Hope also instructs prospective adoptive parents about its vision that adoption is intended to meet the needs of the child by providing a loving home, and that the role of a child should never be to meet the needs of the adoptive parent.

107.   At the orientation meeting, prospective adoptive parents are given New Hope's application packet. Completion of this application puts an applicant on New Hope's waiting list to begin the homestudy process.

108.   Usually within six months of receipt of the initial application, the applicant is mailed an invitation to begin the homestudy process and must resubmit an updated application to accept.

109.    The first session of the homestudy process—Session One—is an all-day session that begins with prayer. The first portion is a group session with several other applicants. It is followed by individual meetings in the afternoon with an adoptive-parent caseworker.

110.    In Session One, applicants receive a homestudy packet with various documents they need in order to complete the homestudy process.

111.    At the end of Session One, New Hope provides prospective adoptive families a little booklet entitled "Steps to Peace with God."

112.    Session One includes, among other things, an exploration of applicants' motivations to adopt, including discussion relating to infertility, grief, and loss, and how faith in God can help applicants through these issues.

113.    Homestudy Session Two takes approximately two and a half hours and takes place on site at the applicant's home.

114.    Session Two includes an in-depth interview by the New Hope caseworker to explore the prospective adoptive parents' experience with children, family support, parenting philosophy, ability to parent a child of a different race or culture, faith and religious practice, and family dynamics, including interviews of any children in the home.

115.    Homestudy Session Three is perhaps the most intensive and takes approximately four hours at New Hope's facility.

116.    In Session Three, the caseworker further interviews the applicant or applicants. Married applicants are interviewed separately as well as together.

18

117.    The purpose of Session Three is to explore the applicants' strengths and weaknesses in more detail, and to explore the following subjects: family of origin, family dynamics, thoughts on discipline and affection, work responsibilities, marital stability including sensitive topics like pornography use, mental-health history, financial stability, and parenting philosophy.

118.    In the case of a married couple, New Hope is concerned about the importance of ensuring the intimacy and strength of the marriage for the benefit of any child placed with them.

119.    New Hope views any discrepancies it discovers through these interviews to potentially be cause for concern regarding the marital relationship.

120.    New Hope's primary concern during Session Three is ensuring that the home of the applicant(s) will be a safe, stable environment for the child.

121.    Following Session Three, the caseworker and the Executive Director meet to review the entire contents of the case file. During this meeting the Executive Director and the caseworker consider all of the documentation submitted and make a determination to approve or disapprove the applicants as prospective adoptive parents. In making this determination, New Hope is always focused on the best interest of any child who may be placed in the home.

122.    Only those who are recommended for placement will be invited to participate in Session Four.

123.    Homestudy Session Four is a teaching session that is done in a group setting.

19

124.    During Session Four, New Hope discusses how to talk to your child about adoption and other issues that are common to adopted children and families.

125.    During Session Four, New Hope also shows examples of adoptive-parent profiles to prospective adoptive parents and instructs them about how to create their own profile, which will be the picture and message that connects them with the birthparent.

126.    After Session Four, adoptive parents are given a month or so to make a profile. They first complete a draft profile, including pictures and wording, which they submit to New Hope for review.

127.    New Hope's adoptive-parent caseworker and birthparent caseworker both review this draft, make suggested edits, and provide the adoptive parents with helpful feedback. Upon receiving that feedback, adoptive parents may collaborate further with New Hope on edits to their parent profile before finalizing them in a scrapbook format.

128.    Once adoptive parents have finalized their profile, they are placed on the list for consideration by birthparents when a child is in need of an adoptive home.

129.    Shortly after adoptive parents have submitted their profile, the New Hope caseworker discusses again in more detail the characteristics and legal risks of a child they are willing to adopt.

130.    Consistent with state law and regulation, this discussion will include preferences for a child of a specific sex, race, color, or ethnicity.

20

131.    New Hope will also discuss the adoptive parents' willingness to be involved in an open adoption.

132.    Prior to making a placement with adoptive parents, New Hope educates them on sudden infant death syndrome, vaccinations, safe sleep environments for children, caring for premature infants, and the placement, supervision and finalization process.

133.    The shortest length of time allowed by law for finalization after placement is three months, but the process usually takes between six months and one year to complete. During that time New Hope maintains legal custody of the child while the adoptive parents have physical guardianship.

134.    After a child is placed, New Hope remains in close contact with the adoptive family to ensure that the child is receiving proper medical care and feeding, among other things.

135.    New Hope places phone calls to the family and follows up with in-person visits at least two or three times during a period of about six months, and usually once every quarter thereafter if necessary.

136.    These supervisory visits are intended to gather information about the child's growth, health, and development as well as to assess the degree of attachment developing between the adoptive parents and the child.

137.    New Hope's caseworkers also assess how the level of openness agreed to in the Contact Agreement is playing out in actuality for the adoptive parents and how they are coping with it emotionally.

21

138.    The caseworker's goal is to ensure the child's safety but also to help facilitate the adjustment of the adoptive parents to the child's placement in the home.

139.    New Hope caseworkers are required to complete field reports reporting on their supervisory visits for inclusion in the case file and formal supervisory report.

140.    In preparation for finalization, the homestudy report—which serves as New Hope's official recommendation of an adoptive family—must be notarized.

141.    Before finalization, the homestudy update and supervisory reports are also prepared and notarized. These reports include information about the child's placement in the home and the child's adjustment to the family. These reports serve as New Hope's official recommendation of the adoptive family for the adoption of the specific child.

142.    Following the finalization of an adoption, because of Contact Agreements, New Hope remains involved with the majority of its clients until the child turns 18 years of age.

143.    New Hope facilitates letters, photos, and/or gifts being passed back and forth between the adoptive family and birthparents.

144.    Depending on the level of openness, New Hope may also supervise and facilitate up to two in-person visits per year.

**New Hope as foster placement provider: Tender Loving Care**

145.   Under certain circumstances, New Hope provides temporary foster placements.

146.   New Hope calls its foster-care services Tender Loving Care homes.

147.   In general these temporary placements occur when either (1) a birthmother working with New Hope has delivered in a hospital and has not decided between parenting or placement for adoption, or (2) a birthparent is referred to New Hope by a hospital social worker because she has not yet made an adoption plan and desires to do so.

148.   New Hope recruits foster families that are willing to take in newborns on short notice.

149.   For the same reasons previously set forth, New Hope typically seeks married husband and wife couples to serve as foster parents.

150.   New Hope certifies its foster families for placements in accordance with the state regulatory process.

151.   Similar to the adoption homestudy process, that process requires New Hope to interview and collect information on applicants in order to explore applicants' reasons for wanting to foster, their marital stability, family structure, religious affiliation, family background, and life history, among other things.

152.   New Hope neither receives nor distributes any government funding in connection with its Tender Loving Care foster program.

**New Hope's practices with respect to married and unmarried prospective adoptive parents**

153.   Because of New Hope's religious beliefs detailed above, New Hope will not recommend or place children with unmarried couples or same-sex couples as adoptive parents.

154.   New Hope's "Special Circumstances" policy, formalizes this policy and practice and states in part:

> If the person inquiring to adopt is single . . . The Executive Director will talk with them to discern if they are truly single or if they are living together without the benefit of marriage. . . . because New Hope is a Christian Ministry it will not place children with those who are living together without the benefit of marriage.
>
> If the person inquiring to adopt is in a marriage with a same sex partner . . . (The Executive Director will . . . explain that because New Hope is a Christian Ministry, we do not place children with same sex couples).

155.   New Hope has worked with unmarried individuals who are truly single in the past and remains willing to work with such individuals.

156.   Because New Hope handles inquiries from unmarried couples and same-sex couples pursuant to the policy and practice described above, New Hope has never denied an unmarried couple or same-sex couple's application. Whenever a same-sex couple or unmarried couple is interested in a referral, New Hope refers them to the appropriate county social services office or another provider. On information and belief, no same-sex couple or unmarried couple who has inquired with New Hope about adoption has ever complained to OCFS about how New Hope handled their inquiry.

**New York law concerning selection of adoptive parents and OCFS' lawless regulatory changes**

157.   Until recently, New York adoption law required that authorized agencies could *only* place children for adoption with "an adult unmarried person or an adult husband and his adult wife." NY Dom. Rel. Law § 110 (2009).

158.   In September 2010, New York amended its law to allow authorized agencies to place children for adoption with "an adult unmarried person, an adult married couple together, or any two unmarried adult intimate partners together." NY Dom. Rel. Law § 110 (2011).

159.   The Sponsor of the bill that amended the law, used permissive language throughout the Introducer's Memorandum in Support, and throughout the memo, including in the purpose, summary, and justification sections the words "permit," "may adopt" and "allow" were used to explain the need for the law. New York Bill Jacket, 2010 S.B. 1523, Ch. 509.

160.   OCFS provided a letter in support of S.1523-A, in which it explained that "The bill . . . clarif[ies] that two unmarried adult intimate partners may adopt a child together even where neither person is the child's biological parent." The letter further stressed that "[t]his legislation permits . . . adoptions" by "two single persons . . . together where neither person is the biological parent of the child." New York Bill Jacket, 2010 S.B. 1523, Ch. 509.

161.   In signing the bill into law, the New York Governor emphasized the permissive nature of the law—"since the statute is permissive, it would allow for such adoptions without compelling any agency to alter its present policies."

25

Approval Memorandum No. 25, Chapter 509. The Governor further stated the law "expands the rights of New Yorkers, without in any way treading on the views of any citizen or organization." *Id.* A copy of the Governor's Approval Memorandum is attached as Exhibit 5.

162.   Shortly after this change, OCFS issued an informational letter explaining the new law in which it emphasized that the amendment "does not change or alter the standards currently in place for the approval of an individual as an adoptive parent or the eligibility requirements for adoption subsidies." Office of Children & Family Services, Informational Letter, 11-OCFS-INF-01 (January 11, 2011).

163.   New York has *never* amended its law to *require* authorized agencies to place children for adoption with "an adult unmarried person," a same-sex "adult married couple together," or "two unmarried adult intimate partners together."

164.   But OCFS is attempting to use regulations to require exactly that: on July 11, 2011, OFCS issued a second letter that purported to clarify, but in fact materially changed, the adoption regulations then found in 18 NYCRR 421.16 and subpart (h). In that letter, OCFS declared that "the intent of" subpart (h) "is to prohibit discrimination based on sexual orientation in the adoption study assessment process. In addition, OCFS cannot contemplate any case where the issue of sexual orientation would be a legitimate basis, whether in whole or in part, to deny the application of a person to be an adoptive parent." Office of Children & Family Services, Informational Letter, 11-OCFS-INF-05 (July 11, 2011).

165.     In 2013, OCFS amended the adoption regulations, declaring that authorized agencies,

> providing adoption services shall … (d) prohibit discrimination and harassment against applicants for adoption services on the basis of race, creed, color, national origin, age, sex, sexual orientation, gender identity or expression, marital status, religion, or disability….

N.Y. Comp. Codes R. & Regs. tit. 18, § 421.3 (2018 ).

166.     During the rulemaking process that led to this change, OCFS issued various statements and comments on the rule change, including that, "[t]he proposed regulation is needed to allow OCFS to fully implement LGBTQ best practices in child welfare . . ." OCFS asserted that the amendments were needed to "eliminate *archaic* regulatory language, which implies that the sexual orientation of gay, lesbian and bisexual prospective adoptive parents . . . is relevant to evaluating their appropriateness as adoptive parents." (emphasis added).

167.     Following these 2013 changes, OCFS issued another informational letter in 2016 which stated:

> [T]his policy directive requires the formalization of any existing nondiscrimination and harassment policies and procedures, and possibly the revision of such policies and procedures, by requiring that . . . [voluntary agencies] . . . not engage in or condone discrimination . . . on the basis of race, creed, color, national origin, sex, religion, sexual orientation, gender identity or expression, marital status or disability against . . . applicants for adoption services, . . . prospective foster parents, foster parents, or children in foster care.

168.     OCFS promulgated these new regulations purporting to require adoption providers to place children with unmarried and same-sex couples in

complete disregard for the law, the scope of OCFS' authority, and the rights of adoption providers.

169.   New York has never enacted any law requiring any adoption provider to facilitate or participate in any adoption by unmarried or same-sex couples, or indeed to participate in any adoption that the agency believes is not in the best interests of the child. Instead, New York law leaves all such matters to the judgment and beliefs of individual adoption providers.

170.   New York Social Services Law § 373 required children to be placed "when practicable" with "an authorized agency under the control of persons of the same religious faith as that of the child."  Through its new regulations, OCFS is directly frustrating, rather than complying with, this statutory law.  By shuttering religious adoption ministries that adhere to biblically based beliefs about marriage and family, OCFS is making it *impossible* to place children of birthparents who share this faith "with an authorized agency under the control of persons of the same faith as that of the child."

171.   New York adoption regulations repeatedly recognize the extensive, intimate, and important speech of the adoption provider that is involved in the adoption-placement process. *See, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 18, § 421.1 ("counseling"), N.Y. Comp. Codes R. & Regs. tit. 18, § 421.4 ("discussion"), N.Y. Comp. Codes R. & Regs. tit. 18, § 421.8 ("parent training", "interviews", "counseling"), N.Y. Comp. Codes R. & Regs. tit. 18, § 421.17 ("communication . . . agreement").

172.    New York regulations require authorized agencies to recruit based on "ethnic, racial, religious or cultural characteristics similar to those of the children identified annually by the department as composing the largest number of waiting children." N.Y. Comp. Codes R. & Regs. tit. 18, § 421.10.

173.    New York regulations require authorized agencies to use an application form "to elicit the following information from adoptive applicants: . . . (2) age, race, and religion of members of the household; .. . (4) characteristics of the child(ren) sought to be adopted." N.Y. Comp. Codes R. & Regs. tit. 18, § 421.12.

174.    New York regulations require authorized agencies to give priority processing to "applicants seeking children having" the "characteristics" of the "largest proportion of waiting children" including consideration of the children's "age, race, handicap and other significant characteristics." N.Y. Comp. Codes R. & Regs. tit. 18, § 421.13.

175.    New York regulations permit authorized agencies to "consider[] . . . the age of the child and of the adoptive parent(s); . . . the cultural, ethnic, or racial background of the child and the capacity of the adoptive parent to meet the needs of the child with such background as one of a number of factors used to determine best interests. Race, color or national origin of the child or the adoptive parent may be considered only where it can be demonstrated to relate to the specific needs of an individual child." N.Y. Comp. Codes R. & Regs. tit. 18, § 421.18.

176.    New York regulations state that "a preference to adopt a child of a particular gender, where found necessary and appropriate, shall be carried out

29

openly." N.Y. Comp. Codes R. & Regs. tit. 18, § 421.16.

177.   New York Social Services Law § 373 requires courts to "when practicable . . . give custody through adoption, only to a person or persons of the same religious faith as that of the child." It further dictates that those requirements "so far as consistent with the best interests of the child, and where practicable, be applied so as to give effect to the religious wishes of the birth mother and of the birth father . . ."

178.   That section defines religious wishes as follows:

> Religious wishes of a parent shall include wishes that the child be placed in the same religion as the birth parent or in a different religion from the birth parent or with indifference to religion or with religion a subordinate consideration. Expressed religious wishes of a birth parent shall mean those which have been set forth in a writing signed by the birth parent, except that, in a non-agency adoption, such writing shall be an affidavit of the birth parent. In the absence of expressed religious wishes, as defined in this subdivision, determination of the religious wishes, if any, of the birth parent, shall be made upon the other facts of the particular case, and, if there is no evidence to the contrary, it shall be presumed that the birth parent wishes the child to be reared in the religion of the birth parent.

N.Y. Soc. Serv. Law § 373 (McKinney).

179.   New York state regulations require adoption agencies to "[m]ake an effort to place each child in a home as similar to and compatible with his or her religious background as possible . . ." N.Y. Comp. Codes R. & Regs. tit. 18 § 441.11.

180.   New York regulations require that adoption agencies perform a rigorous assessment of prospective adoptive parents before placing children in their care.

181.    Many individuals who may want to adopt may not be able to meet New York's requirements.

## The Office of Children and Family Services targets New Hope and other faith-based adoption providers for threats and closure

182.    In January or February of 2018, Suzanne Colligan of OCFS called New Hope's then Acting Executive Director, Judith A. Geyer. During the call, Ms. Colligan conveyed that, under a new policy implemented in 2018, OCFS would be conducting comprehensive on-site reviews of each private provider's procedures.

183.    On July 18, Ms. Colligan sent an email to Ms. Geyer to schedule the adoption program review and included a list of things she needed to review, including New Hope's policies and procedures.

184.    Based on Ms. Colligan's direction that she would need a copy of New Hope's policies and procedure manual, Ms. Geyer updated New Hope's formal policies and procedures on adoption into one consolidated manual.

185.    On August 28, Ms. Geyer received an email from Ms. Colligan, stating in part:

> I also thought that it might be helpful for you to see the application we use with agencies requiring reauthorization for corporate authority. Since you are authorized in perpetuity, your agency is **not** required to complete/submit this form. However, I will be asking many of the program questions on it, so you may find it helpful in preparing for my visit.

186.    On September 6, 2018, Ms. Colligan met with Ms. Geyer and Kathy Decesare, New Hope's Center Director, and took a copy of New Hope's policy and procedure manual with her when she left.

187.   On October 1, 2018, OCFS sent a letter to Ms. Geyer as an attachment to an email. The email and October 1, 2018 letter are attached as Exhibit 6. The letter praised a number of strengths in New Hope's program, thanked New Hope for its professionalism during the meeting, and suggested a follow-up meeting to discuss a few minor opportunities for improvement.

188.   On or about October 9, 2018, Ms. Geyer received a call from Ms. Colligan. During the call, Ms. Colligan stated that she had been reading New Hope's policies and procedures manual and that New Hope's policy not to place children with those who are living together without the benefit of marriage or with same-sex couples violated Title 18 NYCCR § 421.3 and was impermissible.

189.   Ms. Colligan told Ms. Geyer that New Hope would have to comply with § 421.3 by placing children with unmarried couples and same-sex couples.

190.   Ms. Colligan said that if New Hope did not comply, New Hope would be "choosing to close."

191.   Ms. Geyer responded that New Hope would be unwilling to violate its religious beliefs by placing children with unmarried or same-sex couples.

192.   During the phone call, Ms. Colligan stated that "[s]ome Christian ministries have decided to compromise and stay open."

193.   Ms. Geyer affirmed again that New Hope would be unwilling to violate its beliefs and stated that "[w]e will never choose to close. You will be forcing us to close." Ms. Geyer also stated that New Hope's religious freedom was being violated.

32

194.   Ms. Colligan told Ms. Geyer that she would be getting a letter from

OCFS mandating compliance by a specific date.

195.   Ms. Colligan emailed Ms. Geyer on October 11, 2018, stating in part:

> You will be receiving a letter from our office soon requesting
> a formal written response regarding your agency's position.
> When OCFS receives written notification of an agency's
> intention to close a program, OCFS will respond with written
> instructions to the agency with the steps they must take.
> These steps include the agency's responsibility to seek and
> obtain agreement with another NYS authorized agency to
> maintain and store their adoption records, of which includes
> the handling of activities outlined in the legally bound
> agreements with birth parents.

196.   On October 12, 2018, Ms. Colligan sent an email to Ms. Geyer stating

in part:

> We will put Monday's follow up meeting [to discuss a few
> minor improvements identified during the visit] on hold for
> now. The purpose of the follow up meeting would be to work
> on the necessary changes to your agency policy manual.
> Based on our recent phone call, the follow up meeting for
> those purposes does not appear needed at this time.

197.   On October 17, 2018, Ms. Colligan indicated in email to Ms. Geyer that

she had mailed out a certified letter. That email stated in part:

> Once the letter is returned providing us with written notice
> of your intent, we will send out a letter outlining our
> expectations around the handling of those that you are
> currently providing services and the adoption records.

198.   On October 26, 2018, Ms. Geyer received an electronic copy of the

letter to which Ms. Colligan had referred. The letter stated that New Hope's policy

pertaining to "not placing 'children with those who are living together without the

benefit of marriage' or 'same-sex couples' violates Title 18 NYCRR § 421.3." The

letter further stated:

> OCFS hereby requests a formal written response from [New
> Hope] stating the agency's position in regard to revising this
> policy to eliminate those portions that violate the above-cited
> regulation. Please respond within 15 days of receipt of this
> letter indicating specifically whether [New Hope] intends to
> revise the present policy and continue the existing adoption
> program, or that [New Hope] will not revise the policy so as
> to comply with the above-cited regulation.

> Please be aware that should the agency fail to bring the
> policy into compliance with the regulation, OCFS will be
> unable to approve continuation of [New Hope's] current
> adoption program and [New Hope] will be required to submit
> a close-out plan for the adoption program.

A copy of the letter is attached as Exhibit 7.

199. New Hope was given until November 30, 2018, to respond to OCFS'

ultimatum.

200. OCFS' threat to prohibit New Hope from continuing to provide

adoption services is not only entirely unjustified, it is lawless. New Hope was

granted a perpetual authorization by the State of New York to act as an adoption

agency. The New York Social Services Law section 388 preserves the authority of

authorized agencies that is given in their charters. The New York Social Services

Law section 385 permits OCFS to issue an order barring an authorized agency from

providing adoption services only in enumerated circumstances—specifically, when

"any disposition of a child under this title has been made for purposes of gain, or

without due inquiry as to the character and reputation of the person with whom

such child is placed, or in such manner that such child is subjected to cruel or

improper treatment or neglect or immoral surroundings, or in such manner that the religious faith of the child is not preserved and protected as provided by this title."

201.   OCFS has made no finding—and could not make a finding—that New Hope has engaged in any one of these prohibited practices.

202.   On information and belief, several voluntary faith-based authorized agencies that were listed on OCFS' website in January of 2018 as authorized to make adoption placements, including several Catholic providers, a Jewish provider, an LDS provider, and a Muslim provider, have been removed by OCFS from that posted list of authorized agencies as of the date of this Complaint.

203.   On information and belief, several of those faith-based providers share similar beliefs to New Hope concerning life, marriage, the family, and human sexuality.

204.   OCFS spokeswoman Monica Mahaffey was quoted in The Buffalo News as saying "New York State law is clear . . . Discrimination of any kind is illegal and in this case OCFS will vigorously enforce the laws designed to protect the rights of children and same sex couples. In New York State, we welcome all families who are ready to provide loving and nurturing homes to foster or adoptive children. There is no place for providers that choose not to follow the law."

205.   On information and belief, one of those religious adoption agencies that is no longer authorized by New York, had begun referring clients to New Hope before New Hope received the ultimatum from OCFS.

206.    According to OCFS' website "In New York State, there are more than 130 adoption agencies. Each of New York's 58 social services districts has an adoption unit, and more than 70 authorized voluntary agencies statewide work with adopting families." The Adoption Process, N.Y. Office of Children & Family Servs., https://ocfs.ny.gov/adopt/process.asp.

207.    The vast majority of New York's adoption agencies will place with unmarried and same-sex couples.

**Irreparable injury suffered by New Hope and its clients**

208.    Without violating its religious beliefs, New Hope is unable to comply with the OCFS ultimatum to recommend unmarried couples and same-sex couples as foster and adoptive parents, to counsel unmarried and same-sex couples concerning adoptive parenthood and related relational issues, and to place children with unmarried couples and same-sex couples.

209.    In fulfillment of its longstanding mission pursued in obedience to the faith of its staff and board, New Hope desires to continue taking on new adoptive parents, birthparents, foster parents, and children for placement in foster care and adoption, but the state now threatens to absolutely prevent New Hope from doing so by terminating New Hope's perpetual license and prohibiting it from serving in all of these ways.

210.    At the time of the State's ultimatum, New Hope had approximately thirteen prospective adoptive families on its list that had completed the homestudy process and were waiting for a child to be placed with them.

211.   New Hope had a homestudy Session One meeting scheduled for October 29, 2018, to begin the homestudy process with six more prospective adoptive families. Because it had been told that it would have to violate its beliefs or shut down, New Hope was forced to cancel the homestudy Session One meeting. New Hope advised those families of what the state was requiring. Four of the families requested a refund of their application fees.

212.   Since receiving the demand from OCFS that New Hope violate its beliefs or cease adoptions, four additional prospective adoptive families have contacted New Hope about beginning the adoption process. Because of OCFS' threats, New Hope was obliged to tell them that it may not be able to complete an adoption plan for their child and has had to refer some elsewhere.

213.   New Hope desires to contact these prospective adoptive parents and work with them to place children in need of loving homes.

214.   Since receiving the demand from OCFS that New Hope violate its beliefs or cease adoptions, four expectant birthmothers contacted New Hope asking for help in placing their children for adoption. But New Hope was obliged to tell them that that it has suspended taking on new birthparents and children to work with towards adoption because of OCFS' threats.

215.   New Hope desires to work with these prospective birthparents to help them find loving homes for their children.

216.   New Hope has three active foster families that are willing to accept placements, but it has similarly had to advise them that its program is on hold due

to the uncertainty caused by the OCFS ultimatum.

217.   New Hope had a training session concerning adoption scheduled for October 18, 2018, for center directors from several pregnancy resource centers from around the state. Because of OCFS' threat to terminate New Hope's authorization to provide adoption services, New Hope was forced to cancel the training.

218.   If New Hope were to violate its religious beliefs and place children with unmarried couples and same-sex couples, the pregnancy resource centers that it currently serves through trainings and referrals would be less inclined to refer to New Hope, and may no longer refer to New Hope at all, because they are faith-based organizations that share New Hope's religious beliefs regarding the nature of marriage and family.

219.   On information and belief, if New Hope were to violate its beliefs, it would lose some of its clients, including birthmothers, adoptive families, and foster families, who choose to work with New Hope because of their shared Christian faith.

220.   If New Hope is unable to place children for adoption or in foster care, its ability to effectively minister to and help women who are facing unplanned pregnancies through its pregnancy resource center will be impaired.

221.   New Hope currently retains legal custody of three children that it has placed with three separate adoptive families this year.

222.   New Hope continues to actively supervise those placements but has advised those families of what the state is requiring and that it is unsure if it will

be able to continue to handle the finalization of their adoptions. If New Hope is unable to do so, finalization of these adoptions will be delayed because of being transferred to another provider.

223.   Because the majority of New Hope's adoptions are open adoptions, if New Hope is unable to continue its adoption program, it will have to transfer 117 adoptive families and 117 birthparent families that it has worked with over the past 18 years, to another provider to facilitate those Contact Agreements.

224.   If New Hope loses its authorization to place children, it will have to transfer all fifty-three years of its adoptive family and birthparent files to another provider.

225.   If New Hope loses its authorization to place children in adoptive homes or foster care, it will likely have to terminate the employment of five of its employees.

226.   At all times relevant to this Complaint, each and all of the acts alleged here are attributable to Defendant, who acted under color of a statute, regulation, custom, or usage of the State of New York.

227.   New Hope currently suffers imminent and irreparable harm because of Defendant's regulation and ultimatum applying that regulation, which violate New Hope's constitutional rights.

228.   New Hope has no adequate or speedy remedy at law for the loss of its constitutional rights.

229.    Unless Defendant's conduct is enjoined, New Hope will continue to suffer irreparable injury.

## FIRST CAUSE OF ACTION

### First Amendment: Free Exercise of Religion

230.    New Hope repeats and re-alleges each allegation contained in paragraphs 1–229 of this Complaint as if fully set forth here.

231.    New Hope is a religious organization that can and does exercise religion in its provision of information and services, and in the way in which it chooses to speak and not speak during its provision of information and services.

232.    The First Amendment to the United States Constitution protects New Hope's rights to speak about, publish, and freely exercise its religious beliefs.

233.    The First Amendment prevents the government from excluding New Hope from a public benefit based solely on its religious beliefs.

234.    The First Amendment prevents the government from interfering with New Hope's faith and mission.

235.    The First Amendment protects New Hope from government hostility, targeting, and discrimination because of its religious beliefs and practices.

236.    Defendant's interpretation and enforcement of § 421.3(d) targets, shows hostility toward, and discriminates against New Hope because of its religious beliefs and practices.

237.    The First Amendment requires Defendant to act in a neutral and generally applicable manner toward New Hope and its religious beliefs and practices and bars even subtle departures from neutrality on matters of religion.

40

This First Amendment protection applies upon even slight suspicion that state actions stem from animosity to religion or distrust of its practices.

238.   The First Amendment prevents the government from burdening religion with a law that is neither neutral nor generally applicable.

239.   New Hope has sincerely held religious beliefs that motivate and require it to operate its ministry in accordance with biblical teachings.

240.   New Hope has sincerely held religious beliefs that motivate and require it to care for orphans and other children whose parents cannot care for them.

241.   New Hope has sincerely held religious beliefs that motivate and require it to care for women facing unplanned pregnancies and their unborn children.

242.   OCFS has conditioned New Hope's perpetual authorization to perform adoption services on New Hope's willingness to renounce or violate its religious beliefs pertaining to marriage and family.

243.   New Hope's existence as a religious organization is dependent on and inseparable from its ability to perform adoption services—that is the reason and purpose for which it was created.

244.   Application of section 421.3(d) to New Hope interferes with New Hope's ability as a religious non-profit to carry out its religious doctrine, faith and mission.

245.   Application of section 421.3(d) to New Hope imposes a substantial burden on New Hope's religious exercise and coerces it to change or violate its religious beliefs.

246.   Forcing New Hope to revise its policies and place children with unmarried couples and/or same-sex couples substantially burdens New Hope's exercise of its religious beliefs as it is forced to choose between violating its beliefs and losing its perpetual authorization to perform adoption services.

247.   Forcing New Hope to revise its policies and place children with unmarried couples and/or same-sex couples also substantially burdens New Hope's exercise of its religious beliefs because it undermines its religious message and its ability to save the lives of babies whose mothers are contemplating abortion.

248.   Section 421.3(d) is not neutral or generally applicable as applied because it targets New Hope's disfavored religious beliefs for punishment, it imposes special disabilities on the basis of stating or exercising disfavored religious views, and the statutory and regulatory scheme provides exemptions for secular, nonreligious purposes.

249.   Because state statutes and regulations allow adoption providers to consider protected characteristics when making placements consistent with the best interests of the child, and allows parents to consider such characteristics for any reason, the law also involves a system of individualized assessments.

250.   In adopting section 421.3(d) OCFS removed section 421.16 (h)(2) which allowed consideration of sexual orientation as it related to the best interests of

adoptive children. The removal of that provision created an absolute bar against consideration of sexual orientation in the homestudy process. This categorically different treatment of this class as compared to the others without justification demonstrates OCFS' hostility toward New Hope's religious beliefs about marriage and the best family environment for children.

251.   OCFS' adoption of section 421.3(d) contrary to law demonstrates OCFS' hostility towards New Hope's religious beliefs about marriage and the best family environment for children.

252.   OCFS' enforcement of section 421.3(d) through threatening revocation of New Hope's authorization—something that OCFS is not empowered by law to do under the circumstances—demonstrates OCFS' hostility towards New Hope's religious beliefs about marriage and the best family environment for children.

253.   The First Amendment prohibits the government from punishing the profession of a religious belief or imposing special disabilities on the basis of stating disfavored religious views.

254.   Defendant issued the ultimatum because of New Hope's expression of its religious belief in its internal policy and procedures manual.

255.   Defendant's ultimatum was targeted to exclude New Hope from participating as an adoption provider in the State of New York so long as New Hope maintained its disfavored religious views and expression.

256.   Defendant's ultimatum and regulation impose special disabilities on New Hope due to New Hope's religious beliefs about marriage.

257.    Defendant's ultimatum and regulation has chilled and continues to chill New Hope's religious exercise.

258.    Applying section 421.3(d) to New Hope also violates the hybrid-rights doctrine by implicating free exercise rights in conjunction with other constitutional protections like the rights to free speech and equal protection.

259.    Applying section 421.3(d) to New Hope does not serve any compelling, significant, legitimate, or even valid interest.

260.    Forcing New Hope to place children with same-sex couples or unmarried couples, in violation of its religious beliefs, does not serve any interest in a narrowly tailored way.

261.    Defendant has alternative, less restrictive means to achieve any legitimate interests rather than forcing New Hope to abandon its First Amendment rights.

262.    Section 421.3(d) also is underinclusive because there are numerous exemptions to several forms of prohibited discrimination, including the bar on sexual orientation and marital status discrimination.

263.    Accordingly, as applied to New Hope, Section 421.3(d) violates the First Amendment right to free exercise of religion.

## SECOND CAUSE OF ACTION

### First Amendment: Free Speech and Expressive Association

264.    New Hope repeats and re-alleges each allegation contained in paragraphs 1–229 of this Complaint as if fully set forth here.

265.    The First Amendment prevents the government from compelling

44

people to express, support, or promote a message not of their own choosing or to speak when they would rather remain silent.

266.    The First Amendment protects the right of persons to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

267.    The First Amendment bars the government from compelling persons to expressively associate with others in the process of creating and disseminating speech.

268.    The First Amendment protects New Hope's right to speak, to freely associate, to be free not to speak, and to not associate.

269.    New Hope desires to recommend married opposite-sex couples and truly single individuals as adoptive parents.

270.    New Hope conveys a system of values about life, marriage, family and sexuality to both birthparents and adoptive parents through its comprehensive evaluation, training, and placement programs.

271.    Applying section 421.3(d) to New Hope requires New Hope to engage in speech and expression that it does not wish to convey—speech and expression that violates its core religious beliefs—by compelling it to recommend same-sex couples or unmarried couples as adoptive parents.

272.    Applying section 421.3(d) to New Hope harms New Hope's ability to promote its beliefs and values about religion, marriage, sexuality, and family by

45

requiring it to associate with prospective-adoptive parents who promote a view of marriage and family that contradicts its own.

273.    Including unmarried or same-sex couples in New Hope's comprehensive evaluation, training, and placement programs and adoptive-parent profiles would change New Hope's message and counseling to adoptive families and birthparents.

274.    Applying section 421.3(d) to New Hope does not serve any compelling, significant, legitimate, or even valid interest.

275.    Forcing New Hope to recommend and facilitate placement with same-sex couples or unmarried couples, in violation of its religious beliefs, does not serve any interest in a narrowly tailored way.

276.    Defendant has alternative, less restrictive means to achieve any legitimate interests rather than forcing New Hope to abandon its First Amendment rights.

277.    Section 421.3(d) also is underinclusive because there are numerous exemptions to several forms of prohibited discrimination, including the bar on sexual orientation and marital status discrimination.

278.    Accordingly, as applied to New Hope, Section 421.3(d) violates the First Amendment right to free speech.

### THIRD CAUSE OF ACTION

### <u>Fourteenth Amendment: Equal Protection</u>

279.    New Hope repeats and re-alleges each allegation contained in paragraphs 1–229 of this Complaint as if fully set forth here.

280.    The Fourteenth Amendment to the United States Constitution guarantees equal protection of the laws.

281.    Under the Equal Protection Clause, the government may not treat New Hope differently than similarly situated persons and organizations.

282.    Section 421.3(d) treats New Hope's speech and exercise of its religious views differently from persons similarly situated to it because faith-based or secular adoption providers who hold different views on marriage, the family, and human sexuality are permitted to continue operating.

283.    Section 421.3(d) treats New Hope's speech and exercise of its religious views differently from persons similarly situated to it because parents adopting children are permitted to take into account protected classes and characteristics but in facilitating the adoption New Hope is not.

284.    Section 421.3(d) violates New Hope's fundamental rights, including its free exercise, free speech, and expressive-associational rights.

285.    Applying section 421.3(d) to New Hope does not serve any compelling, significant, legitimate, or even valid interest.

286.    Forcing New Hope to recommend and facilitate placement with same-sex couples or unmarried couples, in violation of its religious beliefs, does not serve any interest in a narrowly tailored way.

287.    Defendant has alternative, less restrictive means to achieve any legitimate interests rather than forcing New Hope to abandon its First Amendment rights.

47

288.   Section 421.3(d) also is underinclusive because there are numerous exemptions to several forms of prohibited discrimination, including the bar on sexual orientation and marital status discrimination.

289.   In addition, there is no rational basis for requiring New Hope to violate its religious beliefs in order to continue performing adoption services.

290.   Accordingly, as applied to New Hope, Section 421.3(d) violates its Fourteenth Amendment right to equal protection of the laws.

## FOURTH CAUSE OF ACTION

## <u>Unconstitutional Conditions</u>

291.   New Hope repeats and re-alleges each allegation contained in paragraphs 1–229 of this Complaint as if fully set forth here.

292.   The unconstitutional conditions doctrine prohibits the government from conditioning the receipt of a government benefit on the relinquishment of a constitutional right.

293.   The government violates this unconstitutional conditions doctrine when it pressures a person to give up constitutional rights in order to obtain a public benefit.

294.   The government also violates this doctrine when it denies a person a benefit because that person exercised his or her constitutional rights.

295.   Defendant has violated the unconstitutional conditions doctrine by conditioning New Hope's perpetual authorization to provide adoption services on its willingness to relinquish its First Amendment rights.

## PRAYER FOR RELIEF

New Hope respectfully requests that this Court enter judgment against Defendant and provide New Hope with the following relief:

(A) Preliminary and permanent injunctive relief to stop Defendant and any person acting in concert with her from enforcing section 421.3(d) as applied to bar New Hope from engaging in its constitutionally protected practices;

(B) A declaration that section 421.3(d) as applied to New Hope violates the First and Fourteenth Amendments to the United States Constitution and the unconstitutional conditions doctrine;

(C) That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter in controversy here so that these declarations shall have the force and effect of a final judgment;

(D) That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

(E) That this Court award New Hope costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988;

(F) That this Court issue the requested injunctive relief without a condition of bond or other security being required of New Hope; and

(G) That this Court grant any other relief that it deems equitable and just in the circumstances.

Respectfully submitted this 6th day of December, 2018.

> *s/Jon Scruggs*
> Robert Genant, Bar No. 105257
> 3306 Main Street, Ste. B
> Mexico, NY  13114
> (315) 963-7296
> (315) 963-8274 (Fax)
> bgenant@genantlaw.com
> *Local Counsel*
>
> Erik Stanley, AZ Bar No. 030931*
> estanley@ADFlegal.org
> Jon Scruggs, AZ Bar No. 030505
> jscruggs@ADFlegal.org
> Roger Brooks, NY Bar No. 2260537
> rbrooks@adflegal.org
> Jeremiah Galus, AZ Bar No. 030469*
> jgalus@ADFlegal.org
> Jeana Hallock, AZ Bar No. 032678*
> jhallock@ADFlegal.org
> Alliance Defending Freedom
> 15100 N. 90th Street
> Scottsdale, AZ 85260
> (480) 444-0020
> (480) 444-0028 (Fax)
> *Pro Hac Vice application forthcoming
>
> David Cortman, Bar No. 502661
> dcortman@ADFlegal.org
> Alliance Defending Freedom
> 1000 Hurricane Shoals Road, N.E.
> Suite D-1100
> Lawrenceville, GA  30043
> (770) 339-0774
> (770) 339-6744 (Fax)
>
> *Attorneys for Plaintiff*

## VERIFICATION OF COMPLAINT

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the

foregoing factual allegations are true and correct to the best of my knowledge.

Executed this 6th day of December, 2018, at Syracuse, New York.

_____  *Judith A. Geyer*
Judith A. Geyer

STATE OF NEW YORK )
                  ) ss.:
COUNTY OF Onondaga )

On the 6th day of December, 2018, before me, the
undersigned, a Notary Public in and for said state, personally appeared
Judith A. Geyer, personally known to me or proved to me on the
basis of satisfactory evidence to be the person whose name is subscribed to the within
instrument and acknowledged to me that he executed the same in his capacity, and
that by his signature on the instrument, the person or the entity upon behalf of which
the person acted, executed the instrument.

_____  *Kathryn Decesare*
Notary Public

KATHRYN DECESARE
NOTARY PUBLIC-STATE OF NEW YORK
NO. 01-DE6065549
QUALIFIED IN ONONDAGA COUNTY
MY COMMISSION EXPIRES 10-22-20 21