**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

NEW HOPE FAMILY SERVICES, INC.,

Plaintiff,

vs.

SHEILA J. POOLE, in her official capacity as Acting Commissioner for the Office of Children and Family Services for the State of New York,

Defendant.

---

No.: 5:18-cv-1419 (MAD/TWD)

**MEMORANDUM OF LAW IN SUPPORT OF NEW HOPE FAMILY SERVICES' MOTION FOR PRELIMINARY INJUNCTION**

Oral Argument Requested

# TABLE OF CONTENTS

Table of Authorities ...................................................................................... iii

Introduction .................................................................................................. 1

Background .................................................................................................. 3

    A.    Faith-based care for orphaned and abandoned children has been a religious mission since time immemorial. ............................................ 3

    B.    New Hope Family Services is a Christian ministry created to care for women and children............................................................................ 4

    C.    New Hope provides adoption services as an exercise of its religious beliefs..................................................................................... 6

    D.    The Office likes New Hope's work, but not its religious beliefs. ........... 8

    E.    The Office's ultimatum: New Hope must violate its religious beliefs or shut down its adoption program. ............................................ 9

Relevant Legal Standard............................................................................... 9

Argument ..................................................................................................... 10

I.    New Hope is entitled to a preliminary injunction because the Regulation violates its free exercise rights. ................................................... 10

    A.    The Regulation violates the Free Exercise Clause because it would exclude organizations from a long-established religious ministry because of their faith convictions. .......................................... 11

    B.    The Free Exercise Clause prohibits the Office from requiring New Hope to renounce its religious beliefs to receive a public benefit for which it is otherwise qualified. ...................................................... 13

    C.    The Office's application of the Regulation to New Hope does not survive strict scrutiny. ........................................................................ 16

        1.    The Office's application of the Regulation to New Hope triggers strict scrutiny under a *Smith* analysis. ........................ 16

        2.    The Office's application of the Regulation to New Hope is not "narrowly tailored" to "further" a "compelling" state interest. .................................................................................... 19

i

II.    The Regulation violates New Hope's free speech rights because it would force New Hope to recommend and counsel, contrary to its convictions, that children be placed with unmarried and same-sex couples. ..................... 21

III.   The Regulation likewise violates New Hope's expressive-associational rights. ................................................................................................................ 23

IV.    A preliminary injunction would prevent New Hope from suffering irreparable harm, result in no harm to anyone, and be in the public interest. ............................................................................................................ 24

Conclusion ............................................................................................................. 25

## TABLE OF AUTHORITIES

### <u>Cases</u>

*ACLU v. Clapper,*
    804 F.3d 617 (2d Cir. 2015) ...................................................................... 9, 10

*Agency for International Development v. Alliance for Open
    Society International,*
    570 U.S. 205 (2013) ...................................................................................... 13

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000) ................................................................................ 15, 23

*Broker Genius, Inc. v. Zalta,*
    280 F. Supp. 3d 495 (S.D.N.Y. 2017) ........................................................ 10

*Bronx Household of Faith v. Board of Education of City of New York,*
    331 F.3d 342 (2d Cir. 2003) ................................................................... 24, 25

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ................................................................................ 16–20

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master
    Fund Ltd.,*
    598 F.3d 30 (2d Cir. 2010) ........................................................................... 10

*Effie Film LLC v. Pomerance,*
    909 F. Supp. 2d 273 (S.D.N.Y. 2012) ........................................................... 4

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................................................ 24, 25

*Employment Division v. Smith,*
    494 U.S. 872 (1990) .......................................................................... 11, 16, 19

*Eng v. Smith,*
    849 F.2d 80 (2d Cir. 1988) ........................................................................... 10

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark,*
    170 F.3d 359 (3d Cir. 1999) ................................................................... 18, 19

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006) ...................................................................................... 20

*Horne v. Department of Agriculture,*
    135 S. Ct. 2419 (2015) .................................................................................. 14

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
        565 U.S. 171 (2012) ................................................................. 11, 12

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
        515 U.S. 557 (1995) ........................................................................ 20

*Janus v. American Federation of State, County, & Municipal
        Employees, Council 31,*
        138 S. Ct. 2448 (2018) .................................................................... 20

*Koontz v. St. Johns River Water Management District,*
        570 U.S. 595 (2013) .................................................................. 12, 13

*Leebaert v. Harrington,*
        332 F.3d 134 (2003) ........................................................................ 19

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
        138 S. Ct. 1719 (2018) ...................................................... 11, 14, 16

*McDaniel v. Paty,*
        435 U.S. 618 (1978) ........................................................................ 20

*Memorial Hospital v. Maricopa County,*
        415 U.S. 250 (1974) ........................................................................ 13

*Miller v. Reed,*
        176 F.3d 1202 (9th Cir. 1999) ....................................................... 19

*National Institute of Family & Life Advocates v. Becerra,*
        138 S. Ct. 2361 (2018) ......................................................... 15, 21–23

*New York Progress & Protection PAC v. Walsh,*
        733 F.3d 483 (2d Cir. 2013) ................................................. 10, 24, 25

*North American Soccer League, LLC v. United States Soccer
        Federation, Inc.,*
        883 F.3d 32 (2d Cir. 2018) ............................................................... 9

*Obergefell v. Hodges,*
        135 S. Ct. 2584 (2015) ...................................................................... 5

*Perry v. Sindermann,*
        408 U.S. 593 (1972) ........................................................................ 13

*Roberts v. United States Jaycees,*
        468 U.S. 609 (1984) ........................................................................ 23

*Sherbert v. Verner,*
        374 U.S. 398 (1963) ........................................................................... 12

*Spence-Chapin Adoption Service v. Polk,*
        274 N.E.2d 431 (N.Y. 1971) .......................................................... 18

*Torcaso v. Watkins,*
        367 U.S. 488 (1961) .......................................................................... 14

*Town of Greece v. Galloway,*
        572 U.S. 565 (2014) .......................................................................... 11

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
        137 S. Ct. 2012 (2017) ................................................... 11, 13, 15, 18

*West Virginia State Board of Education v. Barnette,*
        319 U.S. 624 (1943) .......................................................................... 20

*Wisconsin v. Yoder,*
        406 U.S. 205 (1972) .......................................................................... 20

## Constitutional Provisions

U.S. Const. art. VI, cl. 3 .................................................................................. 14

## Statutes and Regulations

N.Y. Comp. Codes R. & Regs. tit. 18, § 421.3(d) ................................... 8, 17

N.Y. Comp. Codes R. & Regs. tit. 18, § 421.10(a) ...................................... 17

N.Y. Dom. Rel. Law § 110 ............................................................................ 18

N.Y. Soc. Serv. Law § 373(2) ....................................................................... 17

N.Y. Soc. Serv. Law § 373(7) ....................................................................... 18

## Other Authorities

Approval Memorandum No. 25, Chapter 509 (2010) ...................................... 1

Anne Lester, Lost but not yet Found: Medieval Foundlings and their
        Care in Northern France, 1200-1500, *Journal of the Western Society for*
        *French History*, Vol. 35, 2007, https://bit.ly/2E6HkLG ....................... 3

Br. of Christian Legal Society, et al., as Amici Curiae in Supp. of Petitioners,
        *Masterpiece*, 138 S. Ct. 1719 (2018) (No. 16-111), 2017 WL 4005662 ............. 14

"Collection Proposed for the Benefit of the Orphan Asylum Society,"
New York Evening Post, June 5, 1807, reprinted in Robert Bremner, ed.,
*Children & Youth in America, a Documentary History*, Vol. I (Harvard
University Press, 1970)......................................................................... 3, 4

Elisabetta Povoledo, *Updating an Old Way to Leave the Baby on the Doorstep*,
N.Y. Times (Feb. 28, 2007), https://nyti.ms/2Rq7Lii ......................................... 3

*George Whitfield's Journals* (London, 1960),
reprinted in Robert Bremner, ed., *Children & Youth in America, a
Documentary History*, Vol. I (Harvard University Press, 1970) ...................... 3

Holly Caldwell, "Orphanages and Orphans,"
*The Encyclopedia of Greater Philadelphia*, https://bit.ly/2zvBFun.................. 3

The Adoption Process, N.Y. Office of Children & Family Services,
https://ocfs.ny.gov/adopt/process.asp.................................................................... 2

The Bible:

    *James* 1:27 ........................................................................................................ 3

    *Matthew* 25:44-45 ............................................................................................ 6

## INTRODUCTION

Organized care for orphans and abandoned infants was—in Western society and in our nation—essentially created by faith-based organizations. Today, religious organizations like New Hope Family Services continue to be key players in the American child-welfare system. They are highly successful in recruiting and training adoptive families and providing thousands of loving homes each year for vulnerable children.

Shortly after its founding in 1965, New Hope received a perpetual authorization to perform adoption services. Across its fifty-plus years of service, New Hope has placed more than 1,000 children in "forever homes." The State has benefited from New Hope's many strengths, and has received no complaint about New Hope from anyone. And when then-Governor David Paterson signed legislation allowing adoption by unmarried and same-sex couples eight years ago, he gave written assurance that this "would allow for such adoptions without compelling any agency to alter its present policies" and would not "in any way tread[ ] on the views of any citizen or organization." Approval Memorandum No. 25, Chapter 509 (2010) (*see* Verified Compl., Ex. 5).

Now, despite those facts and that history, based on nothing more than an administrative regulation, New York's Office of Children and Family Services seeks to shut New Hope down, punishing it and the children and families it serves because of its faith-driven beliefs about the function of marriage and the nature of a healthy family environment.

The Office's ultimatum is as unwise as it is unconstitutional. It will not help a single child in need find a loving home. It will instead remove effective providers from the system, depriving vulnerable children of adoptive families. Indeed, New Hope is a voluntary adoption provider that primarily places newborns, infants, and toddlers with adoptive families, and has many birthparents contact it directly for counsel and guidance about adoption. (Geyer Aff. ¶¶ 52, 57.) Not surprisingly, birthparents and adoptive parents alike have proceeded with adoption precisely because New Hope shares their Christian beliefs and values about marriage and the family. (*See* Stultz Aff. ¶ 31; J. Bleuer Aff. ¶ 16; Johnston Aff. ¶ 14; E. Bleuer Aff. ¶ 10). Meanwhile, there are today 58 state-run adoption agencies (and many more private ones) that actively recruit and provide adoption services to unmarried and same-sex couples.[1]

As explained below, the Regulation violates New Hope's constitutional rights. Because a preliminary injunction is needed to preserve New Hope's constitutional freedoms during the pendency of this litigation, and prevent the Office from revoking New Hope's authorization to perform much-needed adoption services, this Court should grant New Hope's motion.

---

[1] "In New York State, there are more than 130 adoption agencies. Each of New York's 58 social services districts has an adoption unit, and more than 70 authorized voluntary agencies statewide work with adopting families." The Adoption Process, OCFS, https://ocfs.ny.gov/adopt/process.asp.

## BACKGROUND

### A.    Faith-based care for orphaned and abandoned children has been a religious mission since time immemorial.

The Apostle James instructed the earliest church that caring for orphans is central to the "religion that God our Father accepts as pure and faultless" (James 1:27), and the central role of churches and religious orders in caring for orphans and abandoned infants across centuries in Western culture is well documented.[2] That religious mission crossed the Atlantic. What was likely one of the earliest orphanages in the American British colonies was founded in 1740 in Georgia by George Whitfield, the preacher who drove what historians call the "first great awakening."[3] In 1797, The Catholic Sisters of St. Joseph founded the first "Orphan Asylum" in Pennsylvania—St. Joseph's Orphan Asylum.[4] Similarly, the first orphanage in New York City—founded in 1807—was funded in its early years by collections taken up by "the venerable Clergy of New-York" each of whom agreed to "appoint in his own congregation the day proper for taking up the desired

---

[2] *See, e.g.*, Elisabetta Povoledo, *Updating an Old Way to Leave the Baby on the Doorstep*, N.Y. Times (Feb. 28, 2007), https://nyti.ms/2Rq7Lii; Anne Lester, "Lost but not yet Found: Medieval Foundlings and their Care in Northern France, 1200-1500," *Journal of the Western Society for French History*, Vo. 35, 2007, https://bit.ly/2E6HkLG.

[3] *See George Whitfield's Journals* (London, 1960), pp. 395–97, reprinted in Robert Bremner, ed., *Children & Youth in America, a Documentary History*, Vol. I p. 272 (Harvard University Press, 1970)

[4] Holly Caldwell, "Orphanages and Orphans," *The Encyclopedia of Greater Philadelphia*, https://bit.ly/2zvBFun.

contributions."[5] In short, without attempting a detailed history, it will be uncontroversial, and this Court may take judicial notice,[6] that from the earliest years of our nation the care of orphaned and abandoned children was a religious mission and obligation.

### B.    New Hope Family Services is a Christian ministry created to care for women and children.

In 1958, Clinton H. Tasker, a Christian minister, felt called by God to follow this tradition by opening an adoption ministry to serve women facing unplanned pregnancies who felt unable to keep and care for their children. (Geyer Aff. ¶ 13.) He traveled the State of New York speaking to churches, service organizations, and missionary committees to raise funds. (*Id.* ¶ 14.) In 1965, his vision was finally realized, when New Hope was formed under the name Evangelical Family Service, Inc., and authorized to perform adoption services. (*Id.* ¶ 15.)

Today, New Hope operates as a pregnancy resource center, temporary-foster-placement agency, and adoption provider. (*Id.* ¶ 28.) As a distinctly Christian organization, its mission is "to be Christ's hands extended to offer hope and help to people with pregnancy, parenting, adoption, or post-abortion needs in the Syracuse

---

[5] "Collection Proposed for the Benefit of the Orphan Asylum Society," New York Evening Post, June 5, 1807, reprinted in Bremner Vol. I at 280.

[6] *See Effie Film LLC v. Pomerance*, 909 F. Supp. 2d 273, 299 (S.D.N.Y. 2012), quoting *Weinstein's Federal Evidence,* § 201.12[5] at 201–44 ("Courts may take judicial notice of historical facts revealed in authoritative writings when there is no dispute about the authenticity of the materials and judicial notice is limited to factual matters that are incontrovertible.") and 1 *Jones on Evidence* § 2:51 ("Notice has been taken of historic facts relating to religious history and practice, politics, international and foreign history, and a variety of other subjects.").

area and throughout the State of New York." (*Id.* ¶ 22.) Its paid staff and counseling volunteers must agree with New Hope's religious mission and Statement of Faith and must be willing and able to pray with and present the gospel to New Hope's clients. (*Id.* ¶ 31.) Similarly, New Hope's board is composed of devout Christians who are actively involved in their local churches. (*Id.* ¶ 21.) And New Hope holds regular times of worship and prayer for its employees and volunteers. (*Id.* ¶ 33.)

New Hope also believes the Bible is the inspired and authoritative word of God and strives to follow its commands. (*Id.* ¶ 35.) Specifically, New Hope believes in and adheres to the biblical model for family—one man married to one woman for life for their mutual benefit and the benefit of their children. (*Id.* ¶ 36.) New Hope further believes that God created two sexes—male and female—and that each sex has a unique role and gifting intended to benefit the other and the family.  (*Id.*) The Supreme Court recently described such beliefs as "decent and honorable" and held "in good faith by reasonable and sincere people." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2594, 2602 (2015). Consistent with these beliefs, New Hope does not place children with unmarried or same-sex couples, but instead refers such couples to other adoption agencies. (Geyer Aff. ¶ 137.) New Hope has worked with unmarried individuals who are truly single, however, and remains willing to work with such individuals. (*Id.* ¶ 139.)

Moreover, the services New Hope offers through its pregnancy resource center—such as clothing and supplies for infants, referrals to physicians, and education and counseling about pregnancy, birth, parenting, and childcare—are

provided free of charge and without consideration of the recipient's marital status, sexual orientation, religious belief, or other characteristics. (*Id.* ¶¶ 40–42.) New Hope thus regularly serves unmarried couples and those who identify as LGBT. (*Id.* ¶ 44.)

### C.    New Hope provides adoption services as an exercise of its religious beliefs.

Since its founding in 1965, New Hope's religious mission to care for the "least of these" has resulted in more than 1,000 children being placed into adoptive homes. (*Id.* ¶ 54.)[7] With an "arm-around-the-shoulder" approach to adoption (*id.* ¶ 58), birthparents and adoptive parents describe New Hope as special and unlike other adoption agencies. (*See* Stultz Aff. ¶¶ 11–15; Johnston Aff. ¶ 14; J. Bleuer Aff. ¶¶ 3–5, 16; E. Bleuer Aff. ¶¶ 6–9.). For birthparents facing unwanted pregnancies, New Hope provides timely information about adoption and patiently guides and counsels them through the journey of creating an adoption plan. (Geyer Aff. ¶ 45.)

For prospective adoptive parents, New Hope walks with them side-by-side through the application, homestudy, placement, supervision, and finalization process. (*Id.* ¶ 58.) This is a very lengthy and intimate process. New Hope conducts several in-depth interviews with the prospective adoptive parents, provides counseling and education about parenting and childrearing, and performs a home safety inspection, among other things. (*Id.* ¶¶ 84–104.) New Hope then studies this

---

[7] *See* Matthew 25:44–45 (NIV) ("They also will answer, 'Lord, when did we see you hungry or thirsty or a stranger or needing clothes or sick or in prison, and did not help you?' He will reply, 'Truly I tell you, whatever you did not do for one of the least of these, you did not do for me.'").

information and provides the State with an official recommendation as to whether the prospective parents should be approved for adoption. (*Id.* ¶¶ 124–25.) If approved, New Hope then assists and collaborates with the prospective parents to develop a "parent profile," which essentially is a scrapbook containing personal details and pictures to be considered by birthparents as they choose adoptive parents for their child. (*Id.* ¶¶ 107–09; *see also* Stultz Aff. ¶¶ 19–20; Johnston Aff. ¶ 7; J. Bleuer Aff. ¶ 14.)

New Hope remains in close contact with the adoptive parents even after placement, making calls and visits to ensure that the child and adoptive parents are adjusting well. (Geyer Aff. ¶¶ 118–20.) And because almost all of the adoptions New Hope handles are "open" adoptions, New Hope facilitates communication between the adoptive parents and birthparents long after finalization, which usually occurs about one year after placement. (*Id.* ¶¶ 117, 126–28.)

New Hope's religious beliefs permeate these relationships and the entire process. For example, during orientation for prospective adoptive parents, New Hope shares information about its history and religious mission. (*Id.* ¶ 86.) It also begins every orientation, homestudy, and education class with prayer. (*Id.* ¶¶ 86, 90, 94, 105.) And it regularly shares scripture passages and biblical principles about raising children with both birthparents and adoptive parents. (*Id.* ¶ 86; Stultz Aff. ¶¶ 12–15.) New Hope regularly attracts both birthparents and adoptive parents who want and value its faith-based approach to the profound, intensely personal, and often painful decisions surrounding giving up a child, or adopting a child into a

family. (*See* Stultz Aff. ¶¶ 15–18, 31; Johnston Aff. ¶¶ 4, 14; J. Bleuer Aff. ¶¶ 16–17; E. Bleuer Aff. ¶ 10.) Indeed, many birthparents and prospective adoptive parents are reluctant to take even the first step towards adoption because they fear red tape, an inefficient bureaucracy, and intrusions into their daily lives. As a religious adoption provider, New Hope is particularly good at assuaging these concerns and providing emotional and spiritual support that other agencies simply cannot offer. (*See, e.g.*, Stultz Aff. ¶¶ 12–15; E. Bleuer Aff. ¶¶ 6–10.).

### D.   The Office likes New Hope's work, but not its religious beliefs.

In September 2018, the Office conducted a lengthy and comprehensive on-site review of New Hope's policies and procedures. (Geyer Aff. ¶ 142–53.) The Office raised no major issues during the review. On the contrary, it sent a follow-up letter to New Hope commending it on the "number of strengths" it has "in providing adoption services within the community," including "the strong emphasis on assisting the birth parents in making an informed decision for their newborn, providing them time to make the decision, along with a supportive and detailed adoptive family selection process." (Verified Compl., Ex. 6.) The Office also stated that it "look[s] forward to working with [New Hope] as [it] continue[s] to provide adoption services." (*Id.*)

But about a week later, the Office's tone changed dramatically. The Office called New Hope, and informed it that had been reviewing New Hope's written policies and saw that New Hope's religious beliefs prohibit it from placing children with unmarried and same-sex couples. (Geyer Aff. ¶ 156.) The Office claimed that New Hope's religiously based policy violates 18 NYCCR § 421.3(d), a five-year-old

8

regulation that prohibits, among other things, sexual orientation and marital status discrimination (the "Regulation"). (*Id.* ¶ 156.) The Office then told New Hope that it would be "choosing to close" if it did not change the policy. (*Id.* ¶ 158.) After New Hope said it could not violate its religious beliefs, the Office replied, "some Christian ministries have decided to compromise and stay open." (*Id.* ¶ 160.) "Compromise," to the Office, apparently means "violate your convictions."

### E. The Office's ultimatum: New Hope must violate its religious beliefs or shut down its adoption program.

A couple of weeks later in October, New Hope received another letter from the Office. That letter reiterated the Office's assertion that New Hope could not follow its religious beliefs without also violating the Regulation. (Verified Compl., Ex. 7.) The letter required New Hope to respond as to whether it "intends to revise the present policy and continue the existing adoption program." (*Id.*) It also promised closure if New Hope does not compromise its religious beliefs:

> Please be aware that should the agency fail to bring the policy into compliance with the regulation, [the Office] will be unable to approve continuation of [New Hope's] current adoption program and [New Hope] will be required to submit a close-out plan for the adoption program.

(*Id.*) Being unable to renounce its religious beliefs, New Hope now turns to this Court for a preliminary injunction.

### RELEVANT LEGAL STANDARD

A preliminary injunction preserves the status quo pending resolution of the case. *N. Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). To obtain a preliminary injunction, the moving party must show: (1) a

likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) the balance of hardships tips in its favor; and (4) an injunction is in the public interest. *ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).

In the First Amendment context, "the likelihood of success on the merits is the dominant, if not dispositive, factor." *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). To demonstrate a likelihood of success, New Hope "need not show that success is absolute certainty." *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 510 (S.D.N.Y. 2017) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)). Rather, it must demonstrate that "the probability" of prevailing "is better than fifty percent." *Id.* Moreover, New Hope "may alternatively receive an injunction upon a showing that there are 'sufficiently serious questions going to the merits to make them a fair ground for litigation,' and that the 'balance of hardships tip[s] decidedly toward the party requesting the preliminary relief." *Broker Genius*, 280 F. Supp. 3d at 523–24 (quoting *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)).

## ARGUMENT

### I.   New Hope is entitled to a preliminary injunction because the Regulation violates its free exercise rights.

A preliminary injunction is warranted because the Office's application of the Regulation violates New Hope's free exercise rights under the First Amendment. It also seeks to impose unconstitutional conditions on New Hope's exercise of its constitutional freedoms. No concrete harm will be suffered by anyone if New Hope is permitted to continue its services during the pendency of this litigation.

**A.    The Regulation violates the Free Exercise Clause because it would exclude organizations from a long-established religious ministry because of their faith convictions.**

In some settings, the boundary line between government power and the Free Exercise Clause is traced by the test articulated in *Employment Division v. Smith*, 494 U.S. 872 (1990). But the Supreme Court has rejected the idea "that any application of a valid and neutral law of general applicability is necessarily constitutional under the Free Exercise Clause." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 n.2 (2017).

In fact, the Supreme Court has stated that "[t]he contention that *Smith* forecloses recognition of" well-established historical religious practices "rooted in the Religion Clauses has no merit." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012). And it has explained that, notwithstanding what might be required of secular officiants through "neutral and generally applicable" laws, it would be unconstitutional to compel clergy "to perform [a same-sex wedding] ceremony." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018). Similarly, the Court has held that "the Establishment Clause must be interpreted by reference to historical practices and understandings," and that "[a]ny test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Town of Greece v. Galloway*, 572 U.S. 565, 576–77 (2014).

Thus, in *Hosanna-Tabor*, the Supreme Court *unanimously* held that the Religion Clauses bar the government from applying a neutral and generally applicable nondiscrimination law to a religious organization when doing so would

interfere with the organization's selection of its teachers and ability to operate consistently with its faith convictions. 565 U.S. 171 (2012). To permit otherwise, the Court explained, would impermissibly "affect[ ] the faith and mission of the [religious organization] itself." *Id.* at 190.

As reviewed above, religious organizations and individuals have created and engaged in faith-based care for abandoned children since ancient times. And they continued that tradition in this continent in the period leading up to and surrounding the adoption of the First Amendment. They were serving children because of—and in manners consistent with—their faith long before the state involved itself in "licensing" the care and adoption of orphans and abandoned children. If the free exercise of religion means anything at all outside the walls of a church—and it does—it means that the State cannot at this late date flex its licensing power to step in and prevent New Hope from continuing to pursue its 50-year-old adoption ministry in a manner consistent with its faith convictions and past practices. Simply put, the Office cannot "secularize" the whole area and push religious organizations off the field.

Nor can the Office force New Hope to a *choice* of violating its faith convictions or abandoning its historic ministry and reason for being. Indeed, "[g]overnmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine." *Sherbert v. Verner*, 374 U.S. 398, 404 (1963). The unconstitutional conditions doctrine likewise teaches that that "the government may not deny a benefit to a person because he exercises a constitutional right."

12

*Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013); *see also*

*Perry v. Sindermann*, 408 U.S. 593 (1972) (refusal by public college to renew

professor's contract because he was an outspoken critic of the college's

administration violates his free speech rights); *Memorial Hospital v. Maricopa*

*County*, 415 U.S. 250 (1974) (limiting healthcare benefits only to those who have

been residents of the county for a year imposes an unconstitutional condition by

burdening the right to travel); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570

U.S. 205, 220–21 (2013) (denying access to grants to organizations that fail to adopt

a policy opposing prostitution and sex trafficking imposes an unconstitutional

condition on the organization's free speech rights).

**B.**     **The Free Exercise Clause prohibits the Office from requiring New Hope to renounce its religious beliefs to receive a public benefit for which it is otherwise qualified.**

In addition to the above, the Free Exercise Clause prevents the government

from excluding a religious organization from a public benefit based solely on its

religious beliefs. In *Trinity Lutheran*, the Supreme Court held that the State of

Missouri could not exclude a church-operated preschool and daycare from a

playground safety grant program because of its religious nature. 137 S. Ct. at 2025.

The Court explained that the Free Exercise Clause prohibits the government from

requiring an organization "to renounce its religious character in order to participate

in an otherwise generally available public benefit program, for which it is fully

qualified." 137 S. Ct. at 2024. To do so "imposes a penalty on the free exercise of

religion that must be subjected to the most rigorous scrutiny." *Id.*

13

Yet that is precisely what the Office's application of the Regulation threatens here. While a religious organization should not have to be a supplicant to the state to live out its ministry and mission, once a licensing regime is in place, the state-issued license is the most valuable government benefit possible for the ministry—indeed, it is essential to its existence and fulfilment of its faith-motivated ministry. *Cf. Horne v. Dep't of Agriculture*, 135 S. Ct. 2419, 2430 (2015) (describing a license as a "valuable Government benefit"). The Office has unconstitutionally conditioned this government benefit on New Hope's willingness to renounce its religious beliefs and character as it pertains to marriage and family.

Moreover, the Office's application of the Regulation effectively imposes a "religious test" on the right to provide adoption services—excluding all whose religiously based views of marriage and the family clash with New York State's current dogma. The First Amendment forbids this. The Framers lived under British laws that excluded Catholics and others outside the Church of England from holding civil, military, academic, or municipal office. *See* Br. of Christian Legal Soc'y, et al., as Amici Curiae in Supp. of Pet'rs at 32–33, *Masterpiece*, 138 S. Ct. 1719 (2018) (No. 16-111), 2017 WL 4005662 (detailing relevant history). So "abhorrent" did they consider this practice, *Torcaso v. Watkins*, 367 U.S. 488, 491 (1961), that the Framers adopted the Religious Test Clause, *see* U.S. Const. art. VI, cl. 3. Religious tests must not be allowed to creep back in under the guise of licensing requirements and regulations.

The Office may not revoke New Hope's 50-plus-year-old, perpetual authorization solely because New Hope acts consistently with its religious beliefs. If that alone could justify license revocations, the government's power would be boundless, giving it free reign to use licensing regimes to pressure religious organizations into conformity with state-approved orthodoxy on sensitive and important social issues and pushing to the margins of society those who will not bend or break. *Cf. National Institute of Family & Life Advocates v. Becerra* (*NIFLA*), 138 S. Ct. 2361, 2375 (2018) (States cannot give themselves "unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement").

The Office's attempt to do so here is anathema to the *free exercise* of religion; it "is odious to our Constitution" and "cannot stand." *Trinity Lutheran*, 137 S. Ct. at 2025; *see also id.* at 2026 (Gorsuch, J., concurring) ("I don't see why it should matter whether we describe the benefit, say, as closed to Lutherans (status) or closed to people who do Lutheran things (use). It is free exercise either way."). And the fact that New Hope now holds disfavored views about marriage and family is more, not less, reason to protect it carefully. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000) ("[T]he fact that an idea may be embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view.").

15

C.   **The Office's application of the Regulation to New Hope does not survive strict scrutiny.**

As explained above, it is not necessary to engage in a *Smith* analysis to conclude that the Regulation is unconstitutional as applied to New Hope. But it is also true that such an analysis would lead to the same conclusion.

1.   **The Office's application of the Regulation to New Hope triggers strict scrutiny under a *Smith* analysis.**

At the threshold, the Regulation must be subjected to strict scrutiny because it is not "neutral." The Free Exercise Clause bars even "subtle departures from neutrality" on matters of religion, and a law is not neutral if its practical effect or "object" is to "infringe upon or restrict practices because of their religious motivation." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533–34 (1993).

Here, the Regulation's effect is to single out beliefs and practices followed primarily or only by faith-based adoption providers—as the Office's agent perhaps inadvertently confirmed when she urged that "some *Christian* ministries have decided to compromise and stay open." (Geyer Aff. ¶ 160.) Because the purpose and function of the Regulation is to put "Christian ministries" to that improper choice, the Office has violated its "duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint." *Masterpiece*, 138 S. Ct. at 1731.

The Regulation also is not "of general applicability." In *Lukumi*, the Supreme Court faced an ordinance that was crafted to prohibit ritual animal sacrifice called for by the Santeria religion while allowing slaughter of animals in many other

16

contexts. There, the Court held that a law is not generally applicable if it exempts *non*religious conduct that undermines the government's interests "in a similar or greater degree than [religious conduct] does." 508 U.S. at 543–44.

Here, the Regulation is radically underinclusive with respect to the government's purported interest in "prohibit[ing] discrimination … against applicants for adoption services." 18 NYCRR § 421.3(d). In fact, the Regulation and related laws permit and even require multiple types of "discrimination" in the adoption process that "endanger" the government's interest as much or more than New Hope's faith-driven selections do. *See Lukumi* at 543–44. Yet the Office has selectively threatened New Hope (and other "Christian ministries") with closure because their choices in selecting potential adoptive parents are guided by religious convictions of which the State disapproves.

For example, New York law expressly allows—and in fact *requires*—adoption agencies, including all 58 state-run agencies, to make distinctions based on race and religion when placing children with adoptive parents. Agencies must, "when practicable," place children with persons "of the same religious faith as that of the child." N.Y. Soc. Serv. Law § 373(2). Similarly, adoption agencies must direct their recruiting efforts towards "communities of populations which have ethnic, racial, religious, or cultural characteristics similar to those of … the largest number of waiting children." 18 NYCRR § 421.10(a).

Further, the law permits birthparents to make distinctions based on whatever they think is in the best interest of their child when selecting adoptive

parents, and requires adoption agencies to "give effect" to the "religious wishes" of birthparents. N.Y. Soc. Serv. Law § 373(7); *see also Spence-Chapin Adoption Serv. v. Polk*, 274 N.E.2d 431, 436 (N.Y. 1971) ("[T]hat the mother should have the say on issues of race and religion seems reasonable and is accepted doctrine, so long as she has not abandoned the child or is unfit."). No law or regulation prevents birthparents from giving consent only to heterosexual, married adoptive parents.

What is more, New York law permits adoption agencies to decline and refer applicants for a myriad of other nonreligious reasons. An agency may, for example, decline applicants for "poor health" or "limited life expectancy." N.Y. Dom. Rel. Law § 110. And it may of course decline or refer applicants based on geographic convenience, capacity, and personality, among other things.

This underinclusiveness with respect to the state's supposed aims is fatal. *See Lukumi*, 508 U.S. at 543 (the "government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief"). The message these exemptions send is loud and clear: declining applicants is impermissible only when based on the *adoption agency's religious beliefs about the nature and importance of marriage*. But the government may not "regulate or outlaw conduct because it is religiously motivated." *Trinity Lutheran*, 137 S. Ct. at 2021. Because the numerous exemptions identified above undermine the government's purported interest in prohibiting "discrimination" against prospective adoptive parents, strict scrutiny must apply. *Lukumi*, 508 U.S. at 543–44; *see also Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366

18

(3d Cir. 1999) (Alito, J.) ("[W]hen the government makes a value judgment in favor of secular motivations, but not religious motivations, the government's actions must survive heightened scrutiny.").

Finally, strict scrutiny is called for under *Smith* because this case presents a "hybrid situation" in which, as detailed below, New Hope's free-exercise claim is linked with "other constitutional protections, such as freedom of speech." *Smith*, 494 U.S. at 881–82. Nevertheless, because New Hope presents much more than a merely "colorable claim" that its free exercise rights have been violated, it is not necessary to decide whether a "hybrid rights" claim triggers strict scrutiny, *see Leebaert v. Harrington*, 332 F.3d 134, 144 (2003), although New Hope contends that the Circuits that have concluded it does are correct. *See, e.g., Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir. 1999).[8]

>    **2.    The Office's application of the Regulation to New Hope is not "narrowly tailored" to "further" a "compelling" state interest.**

No compelling governmental interest exists that could justify the violation of New Hope's free exercise rights. As noted above, New York law contains numerous exemptions requiring adoption agencies to make distinctions in the recruitment and placement of children with adoptive parents. Application of the Regulation thus "cannot be regarded as protecting an interest of the highest order" because the

---

[8] Recognizing that this Court is bound by the Second Circuit's contrary ruling in *Leebaert*, New Hope raises this argument to preserve the issue for any potential appeal.

existing exemptions already permit "appreciable damage to that supposedly vital interest." *Lukumi*, 508 U.S. at 547.

Application of the Regulation is not narrowly tailored for the same reason. When exemptions from the law already exist, and no less than 58 state-run agencies (and many more private ones) provide ready alternatives and are available to receive referrals, forcing New Hope to choose between its religious beliefs and serving vulnerable children is, quite frankly, unnecessary. *See Lukumi*, 508 U.S. at 546 (holding that "underinclusive" ordinances could not be considered narrowly tailored). Moreover, strict scrutiny requires the Office to prove that applying the Regulation to New Hope *in these particular circumstances* "advance[s] 'interests of the highest order' and [is] narrowly tailored in pursuit of those interests." *Lukumi*, 508 U.S. at 546 (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)). This Court must "look[ ] beyond broadly formulated interests" and instead "scrutinize [ ] the asserted harm of granting specific exemptions to [New Hope]." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006).

Further, violating New Hope's rights will not materially further any governmental interest, even if one existed. In *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972), the Supreme Court exempted Amish children from a compulsory school attendance law, despite recognizing the government had a "paramount" interest in education. The Court explained that the government needs "to show with more particularity how its admittedly strong interest … would be adversely affected by granting an exemption *to the Amish*." *Id.* at 236 (emphasis added). The Office also

cannot make that showing. Preventing New Hope from performing adoption

services does not help same-sex or unmarried couples become adoptive parents.

They already have numerous channels through which to do so. It will simply result

in fewer families recruited and fewer children being placed in permanent and loving

homes. The government can provide no justification for such a tragic result, let

alone a compelling one.

**II.   The Regulation violates New Hope's free speech rights because it
would force New Hope to recommend and counsel, contrary to its
convictions, that children be placed with unmarried and same-sex
couples.**

The Office's application of the Regulation also would require New Hope to

convey messages with which it disagrees—that is, that children *should* be placed

with unmarried and same-sex couples. But a long line of U.S. Supreme Court cases

has established that the government may not "compel [an individual] to utter what

is not in his mind," *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943),

"compel affirmance of a belief with which the speaker disagrees," *Hurley v. Irish-

American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995), or

"[c]ompel[ ] individuals to mouth support for views they find objectionable." *Janus v.

Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018).

Just this year, in *NIFLA*, the Supreme Court criticized California for forcing

pro-life pregnancy resource centers to publish notices containing messages they

opposed. 138 S. Ct. 2361 (2018). The Court explained that, "[b]y compelling

individuals to speak a particular message," the laws at issue "alter[ed] the content

of [their] speech." *Id.* at 2371. This content-based application triggered strict scrutiny. *See id.* at 2375.

The Office's application of the Regulation triggers strict scrutiny for the same reason, because it would necessarily compel speech contrary to New Hope's religious convictions. Adoption agencies such as New Hope are actively involved in evaluating and recommending prospective adoptive parents, and therefore must communicate their views about the prospective parents to both birthparents and the State. This includes *written assessments* and *recommendations* as to whether a child should be placed with prospective adoptive parents. (*See* Geyer Aff. ¶¶ 115, 116, 124, 125.) Not only would the Office's application of the Regulation prohibit New Hope from voicing its religious objections and concerns about placing a child with unmarried and same-sex couples, but it would require New Hope to affirmatively recommend them—*in writing*—as adoptive parents, contrary to its religious convictions about the best environment for children. Compliance with the Regulation also would force New Hope into a counseling relationship with unmarried or same-sex prospective adoptive parents in which it would either have to speak contrary to its beliefs or express those beliefs honestly, no doubt triggering a different set of accusations of "discrimination" from the Office.

The Office's refusal to accommodate New Hope thus creates an untenable and unconstitutional situation. To remain an authorized volunteer adoption agency, New Hope must provide the State with written assessments and recommendations that explicitly contradict its religious beliefs about marriage and family. Because

22

this necessarily would "alter the content of [New Hope's] speech," it triggers strict scrutiny. *NIFLA*, 138 S. Ct. at 2371 (citation omitted). For the reasons already detailed above, the Regulation as applied against New Hope by the Office cannot satisfy that test.

## III.   The Regulation likewise violates New Hope's expressive-associational rights.

Besides protecting the right to speak (or not speak), the First Amendment also protects the right to "associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

In considering New Hope's expressive association claim, the Court must first determine whether New Hope in fact "engages in 'expressive association.'" *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000). The Supreme Court has explained that an association "engages in expressive activity" when it "seeks to transmit … a system of values." *Id.* at 650. Here, New Hope plainly engages in expressive association because it conveys a system of values about life, marriage, family, and sexuality to both birthparents and adoptive parents. (*See, e.g.*, Loscombe Aff. ¶ 13; Stultz Aff. ¶¶ 11–15; Johnston Aff. ¶¶ 6, 14; J. Bleuer Aff. ¶¶ 5, 9–10; E. Bleuer Aff. ¶¶6–10.)

Next, the Court must consider whether requiring New Hope to alter its practices "would significantly affect [its] ability to [express its] public or private viewpoints." *Dale*, 530 U.S. at 650. It undeniably would. As noted above, New Hope has specific religious beliefs about marriage, family, and sexuality, and

intentionally conveys those beliefs to employees, birthparents, adoptive parents, pregnancy resource centers, and everyone else with whom it associates. Forcing New Hope to endorse and facilitate placement with same-sex and unmarried couples would send the message that New Hope supports such home environments for children when in fact it does not. As explained by those with whom New Hope has worked most closely, such a compromising of beliefs "would mean a significant change in New Hope's identity," causing birthparents and adoptive parents "to question whether [New Hope's] faith was genuine." (E. Bleuer Aff. ¶ 10; Stultz Aff. ¶ 31; *see also* J. Bleuer Aff. ¶ 17.)

Because this would violate New Hope's expressive-associational rights, strict scrutiny again applies. The Office cannot satisfy that heightened standard of review for the reasons identified above.

## IV.   A preliminary injunction would prevent New Hope from suffering irreparable harm, result in no harm to anyone, and be in the public interest.

In the First Amendment context, "the likelihood of success on the merits is the dominant, if not dispositive, factor." *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Even so, the remaining preliminary injunction factors—irreparable harm, balance of equities, and public interest—also weigh in favor of granting New Hope a preliminary injunction.

To begin, New Hope would suffer irreparable harm in the absence of a preliminary injunction because its First Amendment rights would be violated and it would be forced to shut down its adoption ministry. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury." *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 349 (2d Cir. 2003) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The balance of equities likewise weighs in favor of New Hope because a preliminary injunction would protect it from suffering constitutional violations and the Office can have no legitimate interest in applying an unconstitutional law. *See N.Y. Progress*, 733 F.3d at 488 ("[T]he Government does not have an interest in the enforcement of an unconstitutional law."). Furthermore, the unmarried and same-sex couples that the Office purportedly seeks to protect by shutting down New Hope would remain free to adopt and avail themselves of the adoption services provided by numerous other agencies that do not share New Hope's religious views, including 58 agencies operated directly by the State.

Finally, protecting constitutional rights, including New Hope's First Amendment rights, is always in the public interest. *See N.Y. Progress*, 733 F.3d at 488 ("[S]ecuring First Amendment rights is in the public interest.").

## CONCLUSION

The State's position here is unnecessary. New Hope is just one adoption provider among many and holds no monopoly power. Moreover, the Office has long been aware of New Hope's religious beliefs, and has previously embraced New Hope's religious charity until the political winds shifted. Because the First Amendment prohibits the Office from forcing New Hope to choose between its religious beliefs and serving vulnerable children, this Court should grant New Hope's request for a preliminary injunction.

Dated: December 12, 2018

>    *s/Jonathan Scruggs*
>    Robert Genant, Bar No. 105257
>    Genant Law Office
>    3306 Main Street, Ste. B
>    Mexico, NY  13114
>    (315) 963-7296
>    (315) 963-8274 (Fax)
>    bgenant@genantlaw.com
>    *Local Counsel*
>
>    Erik Stanley, AZ Bar No. 030931*
>    estanley@ADFlegal.org
>    Jonathan Scruggs, AZ Bar No. 030505
>    jscruggs@ADFlegal.org
>    Roger Brooks, NY Bar No. 2260537**
>    rbrooks@adflegal.org
>    Jeremiah Galus, AZ Bar No. 030469*
>    jgalus@ADFlegal.org
>    Jeana Hallock, AZ Bar No. 032678*
>    jhallock@ADFlegal.org
>    Alliance Defending Freedom
>    15100 N. 90th Street
>    Scottsdale, AZ 85260
>    (480) 444-0020
>    (480) 444-0028 (Fax)
>    *\*Pro Hac Vice application pending*
>    *\*\*Pro Hac Vice application forthcoming*
>
>    David Cortman, Bar No. 502661
>    dcortman@ADFlegal.org
>    Alliance Defending Freedom
>    1000 Hurricane Shoals Road, N.E.
>    Suite D-1100
>    Lawrenceville, GA  30043
>    (770) 339-0774
>    (770) 339-6744 (Fax)
>
>    *Attorneys for Plaintiff*