**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**NEW HOPE FAMILY SERVICES, INC.,**

                           **Plaintiff,**

    **vs.**                                    **5:18-CV-1419**
                                                    **(MAD/TWD)**

**SHEILA J. POOLE,** _in her official capacity as Acting_
_Commissioner for the Office of Children and Family_
_Services for the State of New York_**,**

                           **Defendant.**
_____

**APPEARANCES:**                   **OF COUNSEL:**

**ALLIANCE DEFENDING FREEDOM**    **DAVID A. CORTMAN, ESQ.**
1000 Hurricane Shoals Road, NE         **JONATHAN A. SCRUGGS, ESQ.**
Suite D1100                          **JEANA HALLOCK, ESQ.**
Lawrenceville, Georgia 30078          **ERIK W. STANLEY, ESQ.**
Attorneys for Plaintiff                **JEREMIAH GALUS, ESQ.**

**OFFICE OF ROBERT E. GENANT**     **ROBERT E. GENANT, ESQ.**
3306 Main Street, Suite B
P.O. Box 480
Mexico, New York 13114
Attorneys for Plaintiff

**OFFICE OF THE NEW YORK**         **ADRIENNE J. KERWIN, AAG**
**STATE ATTORNEY GENERAL**
The Capitol
Albany, New York 12224
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff New Hope Family Services, Inc. ("New Hope") commenced this civil rights

action on December 6, 2018 challenging the constitutionality of the New York Office of Children

and Family Services ("OCFS") interpretation and application of 18 N.Y.C.R.R. § 421.3(d). *See* Dkt. No. 1. Currently before the Court are Plaintiff's motion for a preliminary injunction and Defendant's motion to dismiss. *See* Dkt. Nos. 15 & 34.

## II. BACKGROUND

### A.    Regulatory Scheme

In September 2010, New York State amended its Domestic Relations Law to codify the right to adopt by unmarried adult couples and married couples regardless of sexual orientation or gender identity. *See* 2010 S.B. 1523, Ch. 509; N.Y. Dom. Rel. Law § 110. In January 2011, the OCFS informed authorized adoption agencies in New York that the amendment brought the Domestic Relations Law into compliance with existing case law and was "intended to support fairness and equal treatment of families that are ready, willing and able to provide a child with a loving home." After providing further guidance, adoption agencies were advised that, among other things, "discrimination based on sexual orientation in the adoption study assessment process is prohibited."

In November 2013, OCFS promulgated 18 N.Y.C.R.R. § 421.3(d) which, in accordance with existing law, prohibits "discrimination and harassment against applicants for adoption services on the basis of race, creed, color, national origin, age, sex, sexual orientation, gender identity or expression, marital status, religion, or disability" and requires that agencies authorized by New York to provide adoption services "shall take reasonable steps to prevent such discrimination or harassment by staff and volunteers, promptly investigate incidents of discrimination and harassment, and take reasonable and appropriate corrective or disciplinary action when such incidents occur." 18 N.Y.C.R.R. § 421.3(d).

2

Agencies authorized to provide adoption services in New York must receive and respond to inquiries from, conduct orientation sessions for, and offer OCFS-approved applications to prospective parents. *See* 18 N.Y.C.R.R. § 421.15. After an adoption application is received, an adoption study must be completed. *See id.* at § 421.13. An adoption study must explore the following characteristics of prospective parents:

> (1) capacity to give and receive affection;
>
> (2) ability to provide for a child's physical and emotional needs;
>
> (3) ability to accept the intrinsic worth of a child, to respect and share his past, to understand the meaning of separation he has experienced, and to have realistic expectations and goals;
>
> (4) flexibility and ability to change;
>
> (5) ability to cope with problems, stress and frustration;
>
> (6) feelings about parenting an adopted child and the ability to make a commitment to a child placed in the home; and
>
> (7) ability to use community resources to strengthen and enrich family functioning.

*Id.* at § 421.16(a). An application may only be rejected if (1) an applicant does not cooperate with the adoption study; (2) an applicant is "physically incapable of caring for an adoptive child;" (3) an applicant is "emotionally incapable of caring for an adopted child;" or (4) an applicant's approval "would not be in the best interests of children awaiting adoptions." *Id.* at § 421.15(g). Once an application is approved, the agency must add the applicant to the adoptive parent registry. *See id.* at §§ 421.15(i), 424.3(a).

Whether the adoption of a particular child by a particular prospective adoptive parent should be approved must be made "on the basis of the best interests of the child." 18 N.Y.C.R.R. § 421.18(d). In making placement decisions, the agency must consider, among other things, (1)

3

the ages of the child and prospective parent(s); (2) "the physical and emotional needs of the child in relation to the characteristics, capacities, strengths and weaknesses of the adoptive parent(s);" (3) "the cultural, ethnic or racial background of the child and the capacity of the adoptive parent to meet the needs of the child with such a background;" and (4) the ability of a child to be placed in a home with siblings and half-siblings. *See id.* Additionally, agencies must

> [m]ake an effort to place each child in a home as similar to and compatible with his or her religious background as possible with particular recognition that section 373(3) of the Social Services Law requires a court, when practicable, to give custody through adoption only to persons of the same religious faith as that of the child.

*Id.* at § 421.18(c). Further, the Social Services Law provides that, "so far as consistent with the best interests of the child, and where practicable," the religious wishes of the birth parents should be honored. *See* N.Y. Soc. Serv. Law § 373(7).

**B.     New Hope Family Services**

When an entity seeks to facilitate adoptions in New York, it must qualify as an "authorized agency" under the law before it may provide those services. *See* N.Y. Soc. Serv. Law § 371(10)(a); N.Y. Soc. Serv. Law § 374(2). New Hope is an "authorized agency" with the authority to "place out or to board out children...," N.Y. Soc. Serv. Law § 371(10)(a), and "receive children for purposes of adoption." N.Y. Dom. Rel. Law § 109(4). As an "authorized agency," New Hope must be "incorporated or organized under the laws of this state with corporate power or empowered by law to care for, to place out or to board out children ... [and] shall submit and consent to the approval, visitation, inspection and supervision of such office as to any and all acts in relation to the welfare of children performed or to be performed under this title." N.Y. Soc. Serv. Law § 371(10)(a). Additionally, OCFS must approve an agency's certificate of incorporation. *See id.* at § 460-a.

4

## C.     The Complaint

In 1958, Pastor Clinton H. Tasker founded what became New Hope Family Services as a

Christian ministry to care for and find adoptive homes for children whose birth parents could not

care for them. *See* Dkt. No. 1 at ¶ 3. New Hope dedicates a considerable portion of the complaint

setting forth its religious beliefs, which the Court will not fully recount here. The Court fully

accepts that New Hope and its employees have these sincerely held religious beliefs.

It is because of these religious beliefs that "New Hope will not recommend or place

children with unmarried couples or same sex couples as adoptive parents." *Id.* at ¶ 153. New

Hope's "Special Circumstances" policy states in part as follows:

> If the person inquiring to adopt is single . . . [t]he Executive
> Director will talk with them to discern if they are truly single or if
> they are living together without the benefit of marriage . . . because
> New Hope is a Christian Ministry it will not place children with
> those who are living together without the benefit of marriage.
>
> If the person inquiring to adopt is in a marriage with a same sex
> partner . . . ([t]he Executive Director will . . . explain that because
> New Hope is a Christian Ministry, we do not place children with
> same sex couples).

*Id.* at ¶ 154.

New Hope claims that it has worked with unmarried individuals who are truly single in

the past and remains willing to work with such individuals. *See id.* at ¶ 155. Further, New Hope

claims that because it "handles inquiries from unmarried couples and same-sex couples pursuant

to the policy and practice described above, New Hope has never denied an unmarried couple or

same-sex couple's application." *Id.* at ¶ 156. "Whenever a same-sex couple or unmarried couple

is interested in a referral, New Hope refers them to the appropriate county social services office or

another provider." *Id.*

Until recently, New York adoption law required that authorized agencies could only place children for adoption with "an adult unmarried person or an adult husband and his adult wife." N.Y. Dom. Rel. Law § 110 (2009). As mentioned above, in September 2010, New York amended its law to allow authorized agencies to place children for adoption with "an adult unmarried person, an adult married couple together, or any two unmarried adult intimate partners together." N.Y. Dom. Rel. Law § 110 (2010). New Hope notes that permissive language is used throughout the amended law and claims that "New York has *never* amended its law to *require* authorized agencies to place children for adoption with 'an adult unmarried person,' a same-sex 'adult married couple together,' or 'two unmarried adult intimate partners together.'" Dkt. No. 1 at ¶ 163 (emphasis in original). New Hope contends that "OCFS is attempting to use regulations to require exactly that: on July 11, 2011, OCFS issued a second letter that purported to clarify, but in fact

materially changed, the adoption regulations then found in 18 NYCRR 421.16 and subpart (h). In that letter, OCFS declared that 'the intent of' subpart (h) 'is to prohibit discrimination based on sexual orientation in the adoption study assessment process. In addition, OCFS cannot contemplate any case where the issue of sexual orientation would be a legitimate basis, whether in whole or in part, to deny the application of a person to be an adoptive parent.'" *Id.* at ¶ 164 (quoting Office of Children & Family Services, Informational Letter, 11-OCFS-INF-05 (July 11, 2011)).

In 2013, OCFS amended the adoption regulations, declaring that authorized agencies, "providing adoption services shall … (d) prohibit discrimination and harassment against applicants for adoption services on the basis of race, creed, color, national origin, age, sex, sexual orientation, gender identity or expression, marital status, religion, or disability…." 18

N.Y.C.R.R. § 421.3 (2018). Following the 2013 changes, OCFS issued another informational letter in 2016 which stated as follows:

> [T]his policy directive requires the formalization of any existing nondiscrimination and harassment policies and procedures, and possibly the revision of such policies and procedures, by requiring that . . . [voluntary agencies] . . . not engage in or condone discrimination . . . on the basis of race, creed, color, national origin, sex, religion, sexual orientation, gender identity or expression, marital status or disability against . . . applicants for adoption services, . . . prospective foster parents, foster parents, or children in foster care.

Dkt. No. 1 at ¶ 167. New Hope claims that OCFS promulgated these new regulations "purporting to require adoption providers to place children with unmarried and same-sex couples in complete disregard for the law, the scope of OCFS' authority, and the rights of adoption providers." *Id.* at ¶ 168.

In January or February of 2018, Suzanne Colligan of OCFS called New Hope's then Acting Executive Director, Judith A. Geyer. *See id.* at ¶ 182. During the call, Ms. Colligan conveyed that, under a new policy implemented in 2018, OCFS would be conducting comprehensive on-site reviews of each private provider's procedures. *See id.* On July 18, Ms. Colligan sent an email to Ms. Geyer to schedule the adoption program review and included a list of things she needed to review, including New Hope's policies and procedures. *See id.* at ¶ 183. Based on Ms. Colligan's direction that she would need a copy of New Hope's policies and procedure manual, Ms. Geyer updated New Hope's formal policies and procedures on adoption into one consolidated manual. *See id.* at ¶ 184.

On August 28, Ms. Geyer received an email from Ms. Colligan, stating in part:

> I also thought that it might be helpful for you to see the application we use with agencies requiring reauthorization for corporate authority. Since you are authorized in perpetuity, your agency is not required to complete/submit this form. However, I will be

> asking many of the program questions on it, so you may find it
> helpful in preparing for my visit.

Dkt. No. 1 at ¶ 185.

On September 6, 2018, Ms. Colligan met with Ms. Geyer and Kathy Decesare, New

Hope's Center Director, and took a copy of New Hope's policy and procedure manual with her

when she left. *See id.* at ¶ 186. On October 1, 2018, OCFS sent a letter to Ms. Geyer that praised

a number of strengths in New Hope's program, thanked New Hope for its professionalism during

the meeting, and suggested a follow-up meeting to discuss a few opportunities for improvement.

*See id.* at ¶ 187. On or about October 9, 2018, Ms. Geyer received a call from Ms. Colligan.

During the call, Ms. Colligan stated that she had been reading New Hope's policies and

procedures manual and that New Hope's policy not to place children with those who are living

together without the benefit of marriage or with same-sex couples violated 18 N.Y.C.R.R. §

421.3. *See id.* at ¶ 188. New Hope claims that Ms. Colligan told Ms. Geyer that New Hope

would have to comply with § 421.3 by placing children with unmarried couples and same-sex

couples. *See id.* at ¶ 189. Further, Ms. Colligan stated that if New Hope did not comply, New

Hope would be "choosing to close." *Id.* at ¶ 190. Ms. Geyer responded that New Hope would be

unwilling to violate its religious beliefs by placing children with unmarried or same-sex couples.

*See id.* at ¶ 191. Ms. Colligan responded by stating that "'[s]ome Christian ministries have

decided to compromise and stay open.'" *Id.* at ¶ 192. Ms. Colligan informed Ms. Geyer that she

would be getting a letter from OCFS mandating compliance by a specific date. *See id.* at ¶ 194.

On October 11, 2018, Ms. Colligan emailed Ms. Geyer, stating in part as follows:

> You will be receiving a letter from our office soon requesting a
> formal written response regarding your agency's position. When
> OCFS receives written notification of an agency's intention to close
> a program, OCFS will respond with written instructions to the
> agency with the steps they must take. These steps include the

> agency's responsibility to seek and obtain agreement with another
> NYS authorized agency to maintain and store their adoption
> records, of which includes the handling of activities outlined in the
> legally bound agreements with birth parents.

*Id.* at ¶ 195.

On October 12, 2018, Ms. Colligan sent an email to Ms. Geyer stating that "[w]e will put Monday's follow up meeting [to discuss a few minor improvements identified during the visit] on hold for now. The purpose of the follow up meeting would be to work on the necessary changes to your agency policy manual. Based on our recent phone call, the follow up meeting for those purposes does not appear needed at this time." *Id.* at ¶ 196. On October 17, 2018, Ms. Colligan indicated in an email to Ms. Geyer that she had mailed out a certified letter. That email stated that "[o]nce the letter is returned providing us with written notice of your intent, we will send out a letter outlining our expectations around the handling of those that you are currently providing services and the adoption records." *Id.* at ¶ 197.

On October 26, 2018, Ms. Geyer received an electronic copy of the letter to which Ms. Colligan had referred. The letter stated that New Hope's policy pertaining to "not placing 'children with those who are living together without the benefit of marriage' or 'same-sex couples' violates Title 18 NYCRR § 421.3." Dkt. No. 1 at ¶ 198. The letter further stated:

> OCFS hereby requests a formal written response from [New Hope]
> stating the agency's position in regard to revising this policy to
> eliminate those portions that violate the above-cited regulation.
> Please respond within 15 days of receipt of this letter indicating
> specifically whether [New Hope] intends to revise the present
> policy and continue the existing adoption program, or that [New
> Hope] will not revise the policy so as to comply with the
> above-cited regulation. Please be aware that should the agency fail
> to bring the policy into compliance with the regulation, OCFS will
> be unable to approve continuation of [New Hope's] current adoption
> program and [New Hope] will be required to submit a close-out
> plan for the adoption program.

*Id.* (quoting Dkt. No. 1-7).  New Hope was given until November 30, 2018 to respond to OCFS' letter.  *See id.* at ¶ 199.

**D.      Procedural History**

On December 6, 2018, filed its complaint alleging that OCFS has violated various constitutional rights protected by the First and Fourteenth Amendments.  *See* Dkt. No. 1.  In its first cause of action, New Hope contends that OCFS' interpretation and enforcement of 18 N.Y.C.R.R. § 421.3(d) "targets, shows hostility toward, and discriminates against New Hope because of its religious beliefs and practices" in violation of the First Amendment's Free Exercise Clause.  *See id.* at ¶¶ 230-263.  In its second cause of action, New Hope argues that applying "section 421.3(d) to New Hope requires New Hope to engage in speech and expression that it does not wish to convey – speech and expression that violates its core religious beliefs – by compelling it to recommend same-sex couples or unmarried couples as adoptive parents" in violation of the First amendment.  *See id.* at ¶¶ 264-278.  In its third cause of action, New Hope contends that section 421.3(d) treats New Hope's speech and exercise of its religious views differently from persons similarly situated to it in violation of the Equal Protection Clause of the Fourteenth Amendment.  *See id.* at ¶¶ 279-290.  Finally, in its fourth cause of action, New Hope alleges that OCFS "has violated the unconstitutional conditions doctrine by conditioning New Hope's perpetual authorization to provide adoption services on its willingness to relinquish its First Amendment rights."  *Id.* at ¶¶ 291-95.

On December 12, 2018, New Hope filed a motion for a preliminary injunction.  *See* Dkt. No. 15.  On January 14, 2019, OCFS moved to dismiss the complaint in its entirety.  *See* Dkt. No. 34.  On February 19, 2019, after the motions were fully briefed, the Court held oral arguments on

both pending motions. For the reasons set forth below, the Court grants OCFS's motion to dismiss the complaint and denies New Hope's motion for a preliminary injunction as moot.

## III. DISCUSSION

**A. Standard of Review**

### 1. Motion to Dismiss

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

### 2. Preliminary Injunction

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co.*, 409 F.3d 506, 510 (2d Cir. 2005) (citation omitted). "A decision to grant or deny a preliminary injunction is committed to the discretion of the district court." *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 78 (2d Cir. 1994) (citation omitted).

A party seeking a preliminary injunction must establish "'a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party.'" *Allied Office Supplies, Inc. v. Lewandowski*, 261 F. Supp. 2d 107, 108 (D. Conn. 2005) (quoting *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003)). Moreover, in certain circumstances, an even higher standard applies. "The moving party must make a 'clear' or 'substantial' showing of a likelihood of success where (1) the injunction sought 'will alter, rather than maintain, the status quo' – *i.e.*, is properly characterized as a 'mandatory' rather than 'prohibitory' injunction; or (2) the injunction sought 'will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the

defendant prevails at a trial on the merits.'" *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996)

(quoting *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2d Cir.

1995).[1]  "Irreparable harm is the single most important prerequisite for the issuance of a

preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir.

1999) (internal quotations omitted).

The Supreme Court has observed that the decision of whether to award preliminary

injunctive relief is often based on "procedures that are less formal and evidence that is less

complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

Consonant with this view, the Second Circuit has held that a district court may consider hearsay

evidence when deciding whether to grant preliminary injunctive relief.  *See Mullins v. City of

New York*, 626 F.3d 47, 52 (2d Cir. 2010).  Therefore, the strict standards for affidavits under the

Federal Rules of Evidence and in support of summary judgment under Rule 56(c)(4) of the

Federal Rules of Civil Procedure requiring that an affidavit be made on personal knowledge are

not expressly applicable to affidavits in support of preliminary injunctions.  *See Mullins v. City of

New York*, 634 F. Supp. 2d 373, 384 (S.D.N.Y. 2009) (citations omitted).  Nevertheless, courts

have wide discretion to assess the affidavit's credibility and generally consider affidavits made on

information and belief to be insufficient for a preliminary injunction.  *See* 11A Charles Alan

Wright et al., Federal Practice and Procedure § 2949 (2d ed. 1995); *Mullins*, 634 F. Supp. 2d at

373, 385, 390 n.115 (declining to fully credit the "defendants' hearsay affidavit" and noting that

while the court "may consider hearsay evidence in a preliminary injunction hearing . . . , a court

---

[1] As the Second Circuit has noted, "'[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities or critics,' . . . and that in a close case an injunction can be framed in mandatory or prohibitory terms[.]" *Jolly*, 76 F.3d at 473-74 (internal quotations and citation omitted).

may weigh evidence based on whether such evidence would be admissible under the Federal Rules of Evidence").

In the Second Circuit "there is no hard and fast rule . . . that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it." *Maryland Cas. Co. v. Realty Advisory Bd. of Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997) (quoting *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 259 (2d Cir. 1989)). "Generally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when essential facts are not in dispute." *Id.*

Even if the plaintiff demonstrates irreparable harm and a likelihood of success on the merits, however, the remedy of preliminary injunctive relief may still be withheld if equity so requires. "An award of an injunction is not something a plaintiff is entitled to as a matter of right, but rather it is an equitable remedy issued by a trial court, within the broad bounds of its discretion, after it weighs the potential benefits and harm to be incurred by the parties from the granting or denying of such relief." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999) (citation omitted).

**B.      Free Exercise Claim**

OCFS contends that the Court must dismiss New Hope's free exercise claim because 18 N.Y.C.R.R. § 421.3(d) is a neutral law of general applicability that only incidentally imposes a burden on the exercise of religion. *See* Dkt. No. 34-1 at 12-14. Therefore, OCFS alleges that the law only needs to be supported by a rational basis, which is easily met in this case. *See id.* New Hope, however, responds that "cases teach that even a genuinely 'neutral law of general applicability' cannot be applied when to do so would interfere in historically respected areas of

religious autonomy." Dkt. No. 36 at 9-10 (quoting *Hosannah-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012)). Additionally, New Hope argues that even assuming that the test in *Employment Division, Dep't of Human Resources of Or. v. Smith*, 494 U.S. 872 (1990) applies, it is still likely to succeed on this claim because it is alleged that the "'regulation was adopted for the purpose of targeting faith-based adoption ministries.'" *Id.* at 11 (quoting Dkt. No. 1 at ¶ 9). Therefore, New Hope argues that the regulation is not neutral or generally applicable as applied. *See id.* (citing Dkt. No. 1 at ¶ 248). "Further, given that 'there are ... many ways of demonstrating that the object or purpose of a law is the suppression of ... religious conduct,' *Lukumi*, 508 U.S. at 533, New Hope has made extensive factual allegations that support a reasonable inference of a 'targeting' purpose, all of which must be accepted as true for purposes of this motion." *Id.* at 11-12.

"'At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons.'" *Commack Self-Service Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 210 (2d Cir. 2012) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993)). "Nonetheless, 'the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Id.* (quoting *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 879, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990)). "'[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest.'" *Id.* (quoting *Lukumi*, 508 U.S. at 533, 113 S. Ct. 2217) (internal citation omitted).

"However, 'a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.'" *Id.* (quoting *Lukumi*, 508 U.S. at 531, 113 S. Ct. 2217).

In *Employment Division v. Smith*, 494 U.S. 872 (1990), the Supreme Court held that the Free Exercise Clause "means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Id.* at 877.

> Thus, the First Amendment obviously excludes all governmental regulation of religious *beliefs* as such. The government may not compel affirmation of religious belief, punish the expression of doctrines it believes to be false, impose special disabilities on the basis of religious views of religious status, or lend its power to one or the other side in controversies over religious authority or dogma.

*Id.* (internal citations and question marks omitted) (emphasis in original). Likewise, it forbids government acts specifically designed to suppress religiously motivated practices or conduct. *See id.* at 877-78. The Court concluded that the Free Exercise Clause does not, however, "relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Id.* at 879 (quotation omitted).

In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), the City of Hialeah, Florida had adopted an ordinance prohibiting the slaughtering of animals except in certain recognized circumstances. The history of the law's adoption made plain, however, that this was no earnest piece of animal welfare legislation, but rather an attempt to suppress the practice of Santeria, a religion that incorporates animal sacrifice in many of its rituals. *See Lukumi*, 508 U.S. at 524. The Supreme Court noted that the emergency sessions that led to the ordinance, held immediately after a Santeria church first tried to open in town, were rife with unrestrained hostility. Council members referred to supposed Biblical prohibitions on animal

sacrifice except for consumption and asked "What can we do to prevent the Church from opening?" *Id.* at 541. Further, the audience cheered these remarks and taunted the president of the Church, and the chaplain of the city police department called Santeria "an abomination to the Lord." *Id.* at 541-42.

Additionally, the Supreme Court found that, although the ordinance itself was ostensibly concerned with animal welfare, it clearly reflected the hostility demonstrated during the emergency sessions. Its restriction on animal killing was limited to "sacrifice," and was further limited to the context of "a public or private ritual or ceremony." *Id.* at 527. Although it did not apply if the killing was "for the primary purpose of food consumption," or if the animals were "specifically raised for food purposes," the ordinance did apply to ritual sacrifice even if the animal was eaten during the ritual, as would often happen in Santeria rituals. *Id.* at 527-28. As the Supreme Court noted, the "net result" of these definitions was that "few if any killings of animals are proscribed other than Santeria sacrifice. ... Indeed, careful drafting ensured that, although Santeria sacrifice is prohibited, killings that are no more necessary or humane in almost all other circumstances are unpunished." *Id.* at 536. This "gerrymander" of the ordinance, *id.*, along with the striking hostility at the public meetings, left the Court with only "one conclusion: The ordinances had as their object the suppression of religion." *Id.* at 542.

In *Fulton v. City of Philadelphia*, 320 F. Supp. 3d 661 (E.D. Pa. 2018), the plaintiff, Catholic Social Services ("CSS"), and the defendant, the Philadelphia Department of Human Services ("DHS"), entered into a contract for CSS to provide foster care services to the city in exchange for public funding, such services to include screening, training, and certifying resource caregivers (foster parents) to "provide certified resource homes." *Fulton*, 320 F. Supp. 3d at 670. The contract included some limited reasons that CSS might refuse to provide services, along with

the following provision: "Provider is in compliance with the laws, ordinances, regulations and executive orders" including the Fair Practices Ordinance ("FPO"), which states that "[provider shall not] discriminate or permit discrimination against individuals in ... public accommodation practices whether by direct or indirect practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, differentiation or preference in the treatment of a person on the basis of ... sex, sexual orientation, gender identity, marital status, familiar [sic] status." *Id.* at 671. Breach of this covenant would permit DHS to suspend the contract. *Id.*

In March 2018, DHS became aware that CSS was refusing to provide services to same-sex couples. James Amato from CSS acknowledged "that CSS would not provide these services on religious grounds" and that under CSS policy they "(1) would not certify same-sex couples as prospective foster parents even if [they] were otherwise eligible ... and (2) would not provide a same-sex couple with a home study as part of [their] application for adoption." *Id.* DHS suspended CSS's intake of new referrals. CSS filed suit alleging, among other things, that DHS' suspension of referrals of new children to CSS' care violated its free speech rights. *See id.* at 669.

In denying the motion for preliminary injunctive relief, the district court first found that the Fair Practices Ordinance that was incorporated into the services contract was, on its face, a neutral law of general applicability under *Smith* and, therefore, rational basis review applied to determine its constitutionality. *See id.* at 682-83. Initially, the court concluded that the Services Contract and the Fair Practices Ordinance were neutral with respect to religion because there was no evidence that either were drafted or enacted with the object "'to infringe upon or restrict practices <u>because of</u> their religious motivation.'" *Id.* at 683 (quoting *Lighthouse Inst. for Evangelism, Inc.*, 510 F.3d at 275) (emphasis in original). The court found that both demonstrated neutrality in that no reference to religion was made other than that they both

prohibited discrimination on the basis of religion. *See id.* Further, the court looked to the legislative history of the Fair Practices Ordinance in finding that it was a neutral law. *See id.*

In finding that the Services Contract and Fair Practices Ordinance were generally applicable, the court noted that they do not "'proscribe particular conduct only or primarily when religiously motivated;' they proscribe only CSS's ability to turn away qualified Philadelphians on the basis of particular character traits without regard to secular or religious reasons." *Id.* (quoting *Lighthouse Inst. for Evangelism, Inc.*, 510 F.3d at 275) (other citation omitted). "As applied in this case, the Services Contract and Fair Practices Ordinance were, in fact, implemented in a general manner. Not only has DHS confirmed that it would not permit any foster agency under contract, faith-based or not, to turn away potential foster parents for the foster parents' characteristics under the Services Contract and Fair Practices Ordinance, DHS also closed intake of new referrals by CSS and Bethany Christian Services for the same reason. This evidence supports the conclusion that DHS and Philadelphia are not applying the Services Contract or the Fair Practices Ordinance to target particular religious denominations for any religious reason." *Id.* at 684.

Having concluded that the Services Contract and Fair Practices Ordinance were facially neutral and generally applicable, and that they were applied in a neutral and generally applicable manner, the court in *Fulton* found that they were rationally related to a number of legitimate government objectives. *See id.* These objectives included the following: (1) ensuring that when contractors agree to terms in a government contract, the contractors adhere to those terms; (2) ensuring that when its contractors voluntarily agree to be bound by local laws, those laws are enforced; (3) ensuring that when DHS and Philadelphia employ contractors to provide governmental services, the services are accessible to all Philadelphians who are qualified for the

services; (4) ensuring that the pool of foster parents and resource caregivers is as diverse and broad as the children in need of foster parents and resource caregivers; (5) ensuring that individuals who pay taxes to fund government contractors are not denied access to those services; and (6) avoiding likely Equal Protection Clause and Establishment Clause claims that would result if it allowed its government contractors to avoid compliance with the all-comers, nondiscrimination provisions of the Fair Practices Ordinance by discriminating against same-sex married couples. *See id.* at 684-85. As such, the court found that the Services Contract and Fair Practices Ordinance survived rational basis review and denied the application for preliminary injunctive relief. *See id.*

After the district court denied the motion for injunctive relief, CSS appealed. On April 22, 2019, the Third Circuit upheld the district court's decision. *See Fulton v. City of Philadelphia*, ___ F.3d ___, 2019 WL 1758355 (3d Cir. 2019). In affirming the district court, the Third Circuit rejected CSS's claims that the application of the anti-discrimination clause is impermissible under *Smith* and its progeny. *See id.* at *7-*9. In those cases, the courts have found ostensibly neutral government action unconstitutional because it was motivated by ill will toward a specific religious group or otherwise impermissibly targeted religious conduct. *See id.* at *7 (citing *Masterpiece Cakeshop*, 138 S. Ct. 1719); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993)). The Third Circuit found that these cases "clarify *Smith* by reaffirming that the government may not conceal an impermissible attack on religion behind a cloak of neutrality and general application." *Id.* Therefore, a challenger under the Free Exercise Clause must show that it was treated differently because of its religion. *See id.* "Put another way, it must show that it was treated more harshly than the

government would have treated someone who engaged in the same conduct but held different religious views." *Id.*

Summarizing the issue to be decided and its ultimate conclusion, the Third Circuit held as follows:

> The question in our case, then, is whether CSS was treated differently because of its religious beliefs. Put another way, was the City appropriately neutral, or did it treat CSS worse than it would have treated another organization that did not work with same-sex couples as foster parents but had different religious beliefs? Based on the record before us, that question has a clear answer: no. The City has acted only to enforce its non-discrimination policy in the face of what it considers a clear violation.

*Id.* at *10.

As the cases above make clear, evolving First Amendment jurisprudence suggests that courts should consider the historical and social context underlying a challenged government action to determine whether the action was neutral or motivated by hostility toward religion. "Factors relevant to the assessment of governmental neutrality include the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, ___ U.S. ___, 138 S. Ct. 1719, 1731 (2018) (internal quotation marks and citation omitted); *see id.* at 1729-31 (citing hostile comments from members of the Colorado Civil Rights Commission and the commission's inconsistent treatment of religious discrimination and sexual-orientation discrimination to conclude that the commission's treatment of a cake shop owner "violated the [s]tate's duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint"); *Trump v. Hawaii*, ___ U.S. ___, 138 S. Ct. 2392,

2417 (2018) (considering extrinsic evidence of anti-Muslim animus when determining the constitutionality of a presidential proclamation).

In the present matter, contrary to New Hope's assertions in its motion for preliminary injunctive relief and response to the motion to dismiss, 18 N.Y.C.R.R. § 421.3(d) is, on its face, "neutral and generally applicable" and, therefore, subject to rational basis review. In its complaint, New Hope alleges that the "regulation was adopted for the purpose of targeting faith-based adoption ministries," that OCFS promulgated the regulation for the purpose of suppressing faith-based policies such as those of New Hope, which it found objectionable, and that the regulation is "not neutral or generally applicable as applied." Dkt. No. 1 at ¶¶ 9, 204, 248.

On its face, 18 N.Y.C.R.R. § 421.3(d) is generally applicable and it is plainly not the object of the regulation to interfere with New Hope's, or any other agency's, exercise of religion. The regulation states that "[a]uthorized agencies providing adoption services shall ... prohibit discrimination and harassment against applicants for adoption services on the basis of race, creed, color, national origin, age, sex, sexual orientation, gender identity or expression, marital status, religion, or disability, and, shall take reasonable steps to prevent such discrimination or harassment by staff and volunteers, promptly investigate incidents of discrimination and harassment, and take reasonable and appropriate corrective or disciplinary action when such incidents occur." 18 N.Y.C.R.R. § 421.3(d). The regulation applies to all authorized agencies, regardless of any religious affiliation.

Moreover, section 421.3(d) is neutral. In determining the neutrality of a law or regulation, a court may consider, among other things, "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members

of the decisionmaking body." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 540 (1993) (citation omitted). "These objective factors bear on the question of discriminatory object." *Id.* (citation omitted).

Nothing before the Court supports the conclusion that section 421.3(d) was drafted or enacted with the object "to infringe upon or restrict practices because of their religious motivation." *Id.* at 533. The plain language of the regulation demonstrates its neutrality, which makes no reference to religion, other than to prohibit religious discrimination. Further, as discussed in more detail above, the actions of OCFS leading up to the promulgation of section 421.3(d) further support a finding of neutrality. After New York codified the right to adopt by unmarried adult couples and married adult couples regardless of sexual orientation or gender identity, the communications from OCFS indicate that it could not "contemplate any case where the issue of sexual orientation would be a legitimate basis, whether in whole or in part, to deny the application of a person to be an adoptive parent." Moreover, in discussing the purpose of the regulation, OCFS stated that it was to "[p]rohibit[ ] discrimination on the basis of sexual orientation, gender identity or expression in essential social services." N.Y.S. Register, Nov. 6, 2013, p.3.

The rule making documents and subsequent OCFS Information Letters clearly set forth the intent of section 421.3(d). When read in connection with the explicit intended purpose of the regulation and the established law relating to adoption, the allegations that New Hope's religious beliefs are incidentally affected by the regulation are insufficient for the Court to find that New Hope has pled a plausible First Amendment free exercise claim. Absent from the complaint and submissions in support of the motion for a preliminary injunction are any allegations of type of hostility or bias demonstrated in *Masterpiece Cakeshop* or *Lukumi*. Rather, the facts before the

Court more closely align with *Fulton*, where the Third Circuit found that the plaintiff was unlikely to succeed on its claim because the record demonstrated that the defendant respected the plaintiff's sincerely held beliefs while enforcing the anti-discrimination provision at issue.

New Hope further argues that "the Regulation is not neutral or 'generally applicable' because it exists within a framework that makes numerous exceptions to OCFS's supposed antidiscrimination policy, permitting and even requiring 'discrimination' in many contexts based on many factors including secular, religious, and racial, as well as based on the very wide individualized discretion of the evaluating agency concerning the fitness of the would-be adoptive parents, all in service of the foundational goal of the best interests of the child." Dkt. No. 36 at 13 (citing Dkt. No. 1 at ¶¶ 172-81, 248-49, 262). Contrary to New Hope's suggestion, these "exceptions" to the anti-discrimination policy do not render the regulation non-neutral or generally applicable. New Hope cites to provisions in the regulations that require authorized agencies to consider things such as the "age of the child and of the adoptive parent(s); ... the cultural, ethnic, or racial background of the child and the capacity of the adoptive parent to meet the needs of the child with such background as one of a number of factors used to determine best interests." 18 N.Y.C.R.R. § 421.18. However, as the Third Circuit found in *Fulton*, there are significant differences between New Hope's refusal to recommend or place children with unmarried couples or same sex couples as adoptive parents and the requirement for authorized agencies to consider such things as the race of the child and prospective adoptive parents in determining the best interests of the child. *See Fulton*, 2019 WL 1758355, at *11. Most significantly, unlike New Hope's practice, the cited provisions do not permit authorized agencies to refuse to work with individuals because of their membership in a protected class. Instead, the cited provisions are clearly intended to find the best fit for each child, "taking the whole of that

24

child's life and circumstances into account." *Id.* Further, nothing in the record suggests that OCFS has knowingly permitted any other authorized agency to discriminate against members of a protected class.

New Hope also contends that "the *enforcement* of the Regulation has been decidedly non-neutral, 'target[ing] and show[ing] hostility towards ... New Hope because of its religious beliefs and practices,' ... demanding that New Hope 'compromise' its beliefs as a condition of staying open, ... and revoking approval of multiple faith-based agencies because of their faith-based policies concerning the families with whom they place children." Dkt. No. 36 at 13-14 (quoting Dkt. No. 1 at ¶¶ 236, 192, 202-03). Further, New Hope contends that "OCFS's targeting of and hostility towards New Hope because of its faith-based policy is further demonstrated by OCFS's threat to revoke New Hope's license even though this threat is contrary to law – which authorizes OCFS to order a licensed agency to cease providing services *only* in the event that it makes findings of abuse which OCFS has not made – and could not make – with respect to New Hope." *Id.* at 14 (citing Dkt. No. 1 at ¶¶ 200, 251).

This is a common theme present throughout New Hope's submissions. Basically, New Hope's argument can be broken down as follows: OCFS is targeting New Hope because it discriminates against same-sex couples and unmarried opposite-gender couples; New Hope is discriminating against same-sex couples and unmarried opposite-gender couples because of its religious beliefs; therefore, OCFS is targeting New Hope for its religious beliefs. This syllogism, however, runs directly counter to the premise of *Smith* that, while religious belief is always protected, religiously motivated conduct enjoys no special protections or exemption from neutral, generally applied legal requirements. The fact that New Hope's conduct springs from sincerely held and strongly felt religious beliefs does not imply that OCFS's decision to regulate that

conduct springs from antipathy to those beliefs. "If all comment and action on religiously motivated conduct by those enforcing neutral, generally applicable laws against discrimination is construed as ill will against the religious belief itself, then *Smith* is a dead letter, and the nation's civil rights laws might be as well." *Fulton*, 2019 WL 1758355, at *12.

Having concluded that section 421.3(d) is facially neutral and generally applicable, and that it has been neutrally and generally applied in this case, the Court concludes that OCFS's enforcement of it is rationally related to a number of legitimate government objectives. These legitimate government interests include the following: (1) ensuring that when OCFS authorizes agencies to provide important governmental services, those services are accessible to all New York State citizens who are otherwise qualified for those services; and (2) in the context of foster care and adoption, ensuring that the pool of foster parents and resource caregivers is as diverse and broad as the children in need of foster parents and resource caregivers. *See Fulton*, 320 F. Supp. 3d at 684-85.

In sum, New Hope has failed to plausibly allege a free exercise claim. 18 N.Y.C.R.R. § 421.3(d) has not been "gerrymandered" as in *Lukumi*, and there is no history of ignoring widespread secular violations as in *Tenafly* or the kind of animosity against religion found in *Masterpiece Cakeshop*. As such, OCFS's motion to dismiss is granted as to New Hope's free exercise claim and New Hope's motion for preliminary injunctive relief is denied as moot.

**C.      Free Speech**

Although far from clear, in its complaint, New Hope appears to assert violations of its rights to be free from compelled speech and expressive association. *See* Dkt. No. 1 at ¶¶ 264-78. The Court will address each claim in turn.

*1. Compelled Speech*

In support of its First Amendment claim, New Hope contends that 18 N.Y.C.R.R. § 421.3(d) is unconstitutional as applied to it insofar as it forces New Hope to change the content of its message. *See* Dkt. No. 36 at 19 (citing *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943)). New Hope alleges that its beliefs lead it to "recommend married opposite-sex couples and truly single individuals as adoptive parents, *see* Dkt. No. 1 at ¶ 269, and that because of those same beliefs it cannot endorse "unmarried couples or same-sex couples as adoptive parents." *Id.* at ¶ 153. "The Regulation, as OCFS seeks to apply it against New Hope, would compel New Hope to radically alter the content of its speech, forcing New Hope to say to both the State and to birthmothers, 'We do believe that adoption by this unmarried or same-sex couple would be in the best interests of this child,' when in fact New Hope believes it would not be." Dkt. No. 36 at 20 (quoting Dkt. No. 1 at ¶¶ 153, 269-273).

The Supreme Court has advised that courts must examine the purpose of a government program when analyzing whether a government condition to participate in the program is constitutional under the First Amendment. *See Legal Services Corp. v. Velazquez*, 531 U.S. 533, 542 (2001). Where the purpose of the program is to facilitate private speech, rather than to promote a government message, the restriction violates the First Amendment if speech is a prerequisite of participation in the program. *See id.* at 542-43.

In *Velazquez*, a group of lawyers employed by the New York City Legal Services Corporation, sought a declaration that Congress's imposition of a funding condition on legal services under the Legal Services Corporation Act was an unconstitutional restriction of their freedom of speech. *See Velazquez*, 531 U.S. at 536. Congress' funding condition prohibited legal services corporations' use of federal funds to "amend or otherwise challenge existing welfare law." *Id.* In ruling that the funding condition of the Legal Services Corporation Act was

unconstitutional, the Supreme Court focused on the purpose of the law. The law was "designed to facilitate private speech, not promote a governmental message." *Id.* at 542. Indeed, advice from legal services corporation attorneys to their clients, the Supreme Court concluded, "cannot be classified as governmental speech even under a generous understanding of the concept." *Id.* at 543.

In the present matter, OCFS's purpose in authorizing agencies to provide adoption and foster care services is for such agencies to provide adoption and foster care services. The process of authorizing such agencies here, in contrast to *Velazquez*, is not intended to create a forum for private speech or to facilitate private speech. Adoption agencies like New Hope were authorized to perform governmental functions for OCFS. That New Hope's work as an authorized agency is governmental in nature is further supported by the fact that OCFS provides regular oversight of its authorized agencies and, in fact, provides the same services through state operated adoption agencies. As the court found in *Fulton*, New Hope's work as an authorized agency is an extension of OCFS's own work and New Hope's speech, to the extent any is required when performing its services as an authorized agency, constitutes governmental speech under *Velazquez*. *See Fulton*, 320 F. Supp. 3d at 697; *see also Teen Ranch v. Udow*, 389 F. Supp. 2d 827, 840 (W.D. Mich. 2005), *aff'd*, 479 F.3d 403 (6th Cir. 2007). Therefore, OCFS is permitted to "take legitimate and appropriate steps to ensure that its message," that adoption and foster care services are provided to all New Yorkers consistent with anti-discrimination policy set forth in 18 N.Y.C.R.R. § 421.3(d), was and is "neither garbled nor distorted by" New Hope.

Further, the Court finds that, even assuming *Velazquez* does not apply to the present matter, New Hope's compelled speech claim must still be dismissed because OCFS and the regulation simply do not compel speech. New Hope argues that "requiring New Hope to work

with, counsel, and recommend unmarried and same-sex couples 'would, at the very least, force [New Hope] to send a message, both to [other adoptive parents, to birthparents] and to the world, that [New Hope] accepts' such relationships as appropriate and believes that adoption by such couples can be in the best interests of the child." Dkt. No. 36 at 24 (quoting *Dale*, 530 U.S. at 653). Contrary to New Hope's contention, no such message is being compelled. Rather, application of section 421.3(d) to New Hope simply prohibits discrimination against potential adoptive parents on the basis of marital status and sexual orientation. In approving an unmarried or same sex couple for adoption, the only message that would be conveyed is that, applying the regulatory criteria set forth above, placement with such a couple would be in the child's best interest.

Although not entirely clear from the face of the complaint, at oral argument, New Hope's counsel clarified that the free speech claim that they are attempting to raise is not that the adoption itself is the expressive activity, but rather the "ministry" that New Hope engages in on an ongoing basis. *See* Transcript of Oral Argument dated Feb. 19, 2019 ("Tr.") at 27. However, as the complaint and other evidence before the Court makes clear, OCFS is not prohibiting New Hope's ongoing ministry in any way or compelling it to change the message it wishes to convey. New Hope is not being forced to state that it approves of non-married or same sex couples. Rather, the only statement being made by approving such couples as adoptive parents is that they satisfy the criteria set forth by the state, without regard to any views as to the marital status or sexual orientation of the couple.

Given the extensive religious ministry and information provided to potential adoptive parents, there is no doubt that New Hope's general disapproval of cohabiting unmarried couples and same sex couples will continue to be made clear. Indeed, nothing is preventing New Hope

from continuing to share its religious beliefs throughout the entire process. All that is forbidden is discrimination against prospective adoptive parents on the basis of their marital status and/or sexual orientation. *See Telescope Media Group v. Lindsey*, 271 F. Supp. 3d 1090, 1119 (D. Minn. 2017) ("The simple ability to disclaim support for same-sex marriage sets this case apart from *Hurley*, where there was not a practicable way to disclaim support of participants' messages in the context of a moving parade") (citing *Hurley*, 515 U.S. at 576-77, 115 S. Ct. 2338).

Based on the foregoing, the Court grants OCFS's motion to dismiss as to New Hope's compelled speech claim.

### 2. Expressive Association

Implicit in the First Amendment freedoms of speech, assembly, and petition is the freedom to gather together to express ideas—the freedom to associate. *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006) ("F.A.I.R."); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647-48 (2000); *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984); *Healy v. James*, 408 U.S. 169 (1972). The freedom to associate assures that the majority (or a powerful or vocal minority) cannot force its views on groups that choose to express unpopular ideas. *See Dale*, 530 U.S. at 647-48. Government action may impermissibly burden the freedom to associate in a variety of ways; two of them are "impos[ing] penalties or withold[ing] benefits from individuals because of their membership in a disfavored group" and "interfer[ing] with the internal organization or affairs of the group." *Roberts*, 468 U.S. at 623.

The Supreme Court has held that "[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." *Id.* Freedom to associate "plainly presupposes a freedom not to associate." *Dale*, 530 U.S. at 648 (quoting *Roberts*, 468 U.S. at 623, 104 S. Ct. 3244). When the

government forces a group to accept for membership someone the group does not welcome and the presence of the unwelcome person "affects in a significant way the group's ability to advocate" its viewpoint, the government has infringed on the group's freedom of expressive association. *Dale*, 530 U.S. at 648. However, "the freedom of expressive association, like many freedoms, is not absolute." *Id.*; *see also Roberts*, 468 U.S. at 623. Infringements on expressive association are subject to strict scrutiny; the right of expressive association "may be overridden 'by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Dale*, 530 U.S. at 648 (quoting *Roberts*, 468 U.S. at 623, 104 S. Ct. 3244).

In *Dale*, the Boy Scouts revoked the membership of an "adult scout" who was openly gay, and the scout sued under New Jersey's Law Against Discrimination ("LAD"), which prohibits discrimination based on sexual orientation in places of public accommodation. *See Dale*, 530 U.S. at 645. The Boy Scouts argued that the LAD violated its First Amendment right to associate for expressive purposes. *Id.* at 643. Applying a three-step analysis, the Supreme Court held that the First Amendment protected the Boy Scouts' right to control its membership. First, it determined that the Boy Scouts was an expressive association because its purpose was to "instill values in young people." *Id.* at 649-50. Next, the Court evaluated "whether the forced inclusion of [the expelled scout] would significantly affect the Boy Scouts' ability to advocate public or private viewpoints." *Id.* at 650. It determined that the Boy Scouts' official position was that homosexuality was immoral and that requiring the Boy Scouts to admit the expelled scout would "interfere with the Boy Scout's choice not to propound a point of view contrary to its beliefs." *Id.* at 655-56. Finally, the Court analyzed whether the LAD was narrowly tailored to a compelling interest. *See id.* at 656-57. Although the Supreme Court noted that eliminating discrimination

can be a compelling state interest, it concluded that the "state interests embodied in New Jersey's public accommodations law do not justify such a severe intrusion on the Boy Scout's freedom of expressive association." *Id.* at 654.

Similarly, in *Hurley*, the Court held that Massachusetts' public accommodations law could not be constitutionally applied to force a Boston St. Patrick's Day parade organization to accept a parade unit marching under the banner of an Irish gay and lesbian group. The Court held that "[w]hen the law is applied to expressive activity in the way it was done here, its apparent object is simply to require speakers to modify the content of their expression to whatever extent beneficiaries of the law choose to alter it with a message of their own." *Hurley*, 515 U.S. at 578. This, the Court said, "is a decidedly fatal objective." *Id.* at 579.

In the present matter, the Court finds that New Hope's reliance on *Dale* is misplaced. The slight impairment to New Hope's expressive activity does not approximate the level of harm that triggered the Supreme Court's concern in *Dale*. Whereas, according to the Court, requiring admission of homosexuals to the Boys Scouts would be tantamount to promoting homosexual conduct, a clear violation of that organization's values, New Hope has not alleged facts demonstrating a similar harm that providing adoption services to unmarried or same sex couples would cause to their organization. New Hope is not being required to hire employees that do not share their same religious values. They are not prohibited in any way from continuing to voice their religious ideals. Rather, as in *Roberts* and *Bd. of Dirs. of Rotary Int'l.*, "the enforcement of [the regulation] would not materially interfere with the ideas that the organization sought to express." *Dale*, 530 U.S. at 657.

In any case, even if the application of the regulation worked a significant impairment on New Hope's association rights, the state's compelling interest in prohibiting the discrimination at

issue here far exceeds any harm to New Hope's expressive association.  As such, the Court grants OCFS's motion to dismiss as to New Hope's expressive association claim.

## D.    Equal Protection[2]

### 1. Selective Enforcement

"To state a selective enforcement claim, plaintiffs must plead facts that allow the court to reasonably infer 'that (1) ... compared with others similarly situated, [they were] selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"  *Joglo Realties, Inc. v. Seggos*, 229 F. Supp. 3d 146, 152-53 (E.D.N.Y. 2017) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)).  "'[T]he precise standard for determining whether comparators are similarly situated for' purposes of a selective enforcement claim is an unsettled question in this circuit."  *Id.* at 153 (quoting *Mosdos Chofetz Chaim, Inc. v. Vill of Wesley Hills*, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011)).

Some district courts have held that the standard in selective enforcement cases is the same as that in "class of one' cases," which, as explained in more detail below, require plaintiffs to "show an extremely high degree of similarity between themselves and [their comparators]." *Ruston v. Town Bd. for Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (quoting *Clubside, Inc. v.*

---

[2] In its complaint, the language used makes clear that New Hope's equal protection claim was being brought as either a selective enforcement or class-of-one claim.  *See* Dkt. No. 1 at ¶¶ 280-87.  In its response to OCFS's motion to dismiss, New Hope has conceded that it is not alleging a class-of-one equal protection claim.  *See* Dkt. No. 36 at 28.  New Hope then proceeds to present a convoluted theory of an equal protection violation that is entirely inapplicable to the present matter.  As OCFS correctly notes, the complaint is properly construed as alleging a selective enforcement claim.  Nevertheless, the Court will also address the claim that New Hope has presented in its response.

*Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)); *see also Kamholtz v. Yates Cty.*, No. 08-CV-6210,

2008 WL 5114964, *5 (W.D.N.Y. Dec. 3, 2008).

"Other courts have applied a slightly more lenient standard, asking whether plaintiffs are

similarly situated to comparators 'in all material respects.'" *Joglo Realties, Inc.*, 229 F. Supp. 3d

at 153 (quotation and other citation omitted).  To satisfy this standard, "plaintiffs 'must identify

comparators whom a prudent person would think were roughly equivalent, but plaintiffs need not

show an exact correlation between themselves and the comparators.'" *Id.* (quotation omitted).  In

other words, "'[t]he test is whether a prudent person, looking objectively at the incidents, would

think them roughly equivalent and the protagonists similarly situated....  Exact correlation is

neither likely nor necessary, but the cases must be fair congeners.... [A]pples should be compared

to apples.'" *Id.* (quoting *T.S. Haulers. Inc. v. Town of Riverhead*, 190 F. Supp. 2d 455, 463

(E.D.N.Y. 2002)) (other citation omitted).

In the present matter, even applying the more lenient standard, New Hope has failed to

plausibly allege a selective enforcement claim.  Based on the allegations in the complaint, section

421.3(d) applies to all agencies authorized by OCFS to provide adoption services and, therefore,

New Hope has failed to allege a sufficiently similar comparator as required to state an equal

protection claim.  *See King v. N.Y.S. Div. of Parole*, 260 Fed. Appx. 375, 380 (2d Cir. 2008)

(affirming dismissal of claim because the plaintiff "failed to identify a single individual with

whom he can be compared for Equal Protection purposes").  New Hope's allegations of disparate

treatment state that "Section 421.3(d) treats New Hope's speech and exercise of its religious views

differently from persons similarly situated to it because" (1) "faith-based or secular adoption

providers who hold different views on marriage, the family, and human sexuality are permitted to

continue operating" and (2) "parents adopting children are permitted to take into account

protected classes and characteristics but in facilitating the adoption New Hope is not." Dkt. No. 1 at ¶¶ 282-83. Neither of these allegations support a selective enforcement claim.

To allege a sufficient comparator, a plaintiff must allege, at a minimum, that it is similarly situated to such a comparator in all material respects. Here, New Hope fails to allege that any other "faith based or secular adoption provider" violated section 421.3(d) and was nonetheless permitted to continue operating its adoption program. It has not alleged that other authorized agencies are being permitted to summarily exclude individuals authorized to adopt from the pool of prospective adoptive parents. Additionally, it has not alleged that any other authorized agencies are refusing to apply the relevant statutory and regulatory factors when determining whether approval of a family's application to adopt would be in a child's best interest. Instead, New Hope alleges only that the general applicability of section 421.3(d) incidentally touches on its beliefs. Such allegations are insufficient to support the inference that New Hope is (1) intentionally being treated differently from other authorized adoption agencies without a rational basis, *see Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010), or (2) intentionally being treated differently because of a protected consideration, *See Joglo Realties, Inc.*, 229 F. Supp. 3d at 152-53.

Based on the foregoing, the Court grants OCFS's motion to dismiss as to New Hope's selective enforcement claim.

### 2. Intentional Discrimination

"The Equal Protection Clause prohibits the government from subjecting individuals to 'selective treatment ... based on impermissible considerations such as ... religion.'" *American Atheists, Inc. v. Port Auth. of N.Y. and N.J.*, 936 F. Supp. 2d 321, 338 (S.D.N.Y. 2013) (quoting *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 166 (2d Cir. 2001)) (other citation omitted).

"'To prove an equal protection violation, claimants must prove purposeful' or intentional 'discrimination by a government actor directed at a suspect class, such as' a religious group." *Id.* (quoting *Congregation Rabbinical Coll. of Tartikov, Inc.*, 915 F. Supp. 2d 574, 615 (S.D.N.Y. 2013)) (other citations omitted); *see also Thomas v. City of New York*, 143 F.3d 31, 37 (2d Cir. 1998). This intentional discrimination may be demonstrated in one of three ways: "by pointing to [1] a law that expressly classifies on the basis of [religion], [2] a facially neutral law or policy that has been applied in an unlawfully discriminatory manner, or [3] a facially neutral policy that has an adverse effect and that was motivated by discriminatory animus." *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009) (quotation omitted).

If claimants can demonstrate such intentional discrimination on the basis of religion, the government action is "subject to strict judicial scrutiny." *Id.* at 77. Absent evidence of intentional discrimination, the government action is subject to rational basis review. *See Abascal v. Jarkos*, 357 Fed. Appx. 388, 391 (2d Cir. 2009); *Lown v. Salvation Army, Inc.*, 393 F. Supp. 2d 223, 237 (S.D.N.Y. 2005). Rational basis also applies to classifications that do not involve fundamental rights. *See Heller v. Doe by Doe*, 509 U.S. 312, 319-20 (1993) ("A classification must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification"); *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339 (1987) (applying rational basis to "a statute [that] is neutral on its face ... and passes the *Lemon* test"); *Red Earth LLC v. United States*, 657 F.3d 138, 147 (2d Cir. 2011). And, absent allegations of "'adverse treatment of individuals compared with other similarly situated individuals' based on religion," an Equal Protection claim fails. *Incantalupo v. Lawrence Union Free Sch. Dist.*, 380 Fed. Appx. 59, 62 (2d Cir. 2010) (quoting *Miner v. Clinton County*, 541 F.3d 464, 474 (2d Cir. 2008)).

In the present matter, the Court first notes that the facts upon which New Hope relies in support of its equal protection claim are the same as those alleged in support of its First Amendment claims. As such, New Hope's equal protection claim is subject to dismissal as duplicative of its First Amendment claims. *See Barnes v. Fedele*, 760 F. Supp. 2d 296, 302 (W.D.N.Y. 2011) (dismissing the plaintiff's equal protection claim as duplicative of his First Amendment free-exercise claim) (citations omitted); *Conyers v. Abitz*, 416 F.3d 580, 586 (7th Cir. 2005) (dismissing equal protection and Eighth Amendment claims based on same circumstances as a free exercise claim because the free exercise claim "gains nothing by attracting additional constitutional labels"); *Frisenda v. Incorporated Vill. of Malverne*, 775 F. Supp. 2d 486, 518 (E.D.N.Y. 2011) ("Similarly, to the extent that plaintiff also may be attempting to assert an equal protection claim based upon retaliation for First Amendment activity (rather than under a class-of-one theory), such a claim is completely duplicative of the First Amendment retaliation claim and, therefore, should not go forward") (citations omitted); *Whitehead v. City of New York*, 953 F. Supp. 2d 367, 377 (E.D.N.Y. 2012) (same); *see also Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that courts should analyze similar claims under the most "explicit source[s] of constitutional protection"). Indeed, the allegations in New Hope's equal protection claim rely almost exclusively on the fact that OCFS's conduct and application of section 421.3(d) violate its various First Amendment rights. *See* Dkt. No. 1 at ¶ 282 ("Section 421.3(d) treats New Hope's speech and exercise of its religious views differently from persons similarly situated to it because faith-based or secular adoption providers who hold different views on marriage, the family, and human sexuality are permitted to continue operating"); *id.* at ¶ 283 ("Section 421.3(d) treats New Hope's speech and exercise of its religious views differently from persons similarly situated to it because parents adopting children are permitted to take into account protected classes and

characteristics but in facilitating the adoption New Hope is not"); *id.* at ¶ 284 ("Section 421.3(d) violates New Hope's fundamental rights, including its free exercise, free speech, and expressive-associational rights"); *id.* at ¶ 286 ("Forcing New Hope to recommend and facilitate placement with same-sex couples or unmarried couples, in violation of its religious beliefs, does not serve any interest in a narrowly tailored way"); *id.* at ¶ 287 ("Defendant has alternative, less restrictive means to achieve any legitimate interests rather than forcing New Hope to abandon its First Amendment rights"); *id.* at ¶ 289 ("In addition, there is no rational basis for requiring New Hope to violate its religious beliefs in order to continue performing adoption services").  Based on the foregoing, the Court grants OCFS's motion to dismiss as to New Hope's equal protection claim.

Even assuming that this aspect of New Hope's equal protection claim was not duplicative of its First Amendment claims, it is nevertheless still subject to dismissal because New Hope has failed to allege any facts plausibly suggesting that section 421.3(d) or OCFS expressly classifies on the basis of religion, that section 421.3(d), which is a facially neutral law, has been applied in an unlawfully discriminatory manner, or that a facially neutral policy that has an adverse effect and that was motivated by discriminatory animus.  *See Pyke*, 567 F.3d at 76.

"Discriminatory purpose implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group."  *Hayden v. County of Nassau*, 180 F.3d 42, 50 (2d Cir. 1999) (internal quotation marks and emphasis omitted).  Though the desire to discriminate need not be the sole motivating factor, *see Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977), it must be "a significant reason for a public body's actions," *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 786 (2d Cir. 2007).

Here, rather than allege a discriminatory purpose because of New Hope's religious beliefs, the complaint makes clear that OCFS's actions were in spite of them. After reviewing New Hope's adoption program, OCFS praised many aspect of the program and expressed a desire to resolve the issues identified in a way in which New Hope is able to continue providing adoption services. Such facts clearly fail to demonstrate a discriminatory purpose.

In establishing discriminatory effect, a plaintiff is not "obligated to show a better treated, similarly situated group of individuals." *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001) (holding that a plaintiff who alleges "that a facially neutral statute or policy with an adverse effect was motivated by discriminatory animus ... is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection"). Indeed, the courts "recognize[ ] that a government that sets out to discriminate intentionally in its enforcement of some neutral law or policy will rarely if ever fail to achieve its purpose." *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 546 (S.D.N.Y. 2006).

Again, for all the reasons set forth above, nothing in the complaint plausibly alleges that OCFS was motivated by a discriminatory animus. The complaint make clear that the only purpose behind OCFS's actions was to prevent unlawful discrimination on the basis of marital status and sexual orientation. The complaint further alleges that OCFS enforced or was in the process of enforcing section 421.3(d) against other faith-based providers, including "several Catholic providers, a Jewish provider, an LDS [(Latter Day Saints)], and a Muslim provider" who shared New Hope's beliefs "concerning life, marriage, the family, and human sexuality." Dkt. No. 1 at ¶¶ 202-03. Such consistent enforcement of this neutral regulation against other authorized agencies engaging in the same discriminatory conduct as alleged here renders New Hope's allegation of discriminatory animus implausible.

Since New Hope has failed to allege intentional discrimination, rational basis review applies. As set forth above, OCFS has several legitimate governmental interests in enforcing section 421.3(d) and, therefore, New Hope's equal protection claim is subject to dismissal on this alternative ground.

**E.        Unconstitutional Conditions**

"Pursuant to this 'unconstitutional conditions' doctrine, as it has come to be known, the government may not place a condition on the receipt of a benefit or subsidy that infringes upon the recipient's constitutionally protected rights, even if the government has no obligation to offer the benefit in the first instance." *Alliance for Open Society Intern., Inc. v. U.S. Agency for Intern. Dev.*, 651 F.3d 218, 231 (2d Cir. 2011) (citation omitted); *see also Perry v. Sindermann*, 408 U.S. 593 (1972). "As the Supreme Court recently reiterated, 'the government may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech even if he has no entitlement to that benefit.'" *Id.* (quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 59, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006)).

New Hope alleges that OCFS "has violated the unconstitutional conditions doctrine by conditioning New Hope's perpetual authorization to provide adoption services on its willingness to relinquish its First Amendment rights." Dkt. No. 1 at ¶ 295. The Court views New Hope's unconstitutional conditions claim as a mere repackaging of its various First Amendment claims and, therefore, the Court similarly repackages its resolution of those claims. Having already found that New Hope has failed to plausibly allege any violation of its constitutional rights, the Court grants OCFS's motion to dismiss as to New Hope's unconstitutional conditions claim. *See Catholic Charities of Maine, Inc. v. City of Portland*, 304 F. Supp. 2d 77, 95 (D. Me. 2004).

### IV. CONCLUSION

Undoubtedly, New Hope and all authorized adoption agencies perform essential services that greatly impact the lives of thousands of children who, without such organizations, would grow up without a home. As New Hope notes in its complaint, there are over 440,000 children in foster care in the United States, with over 120,000 of those children waiting to be adopted. *See* Dkt. No. 1 at ¶¶ 29-30. In federal fiscal year 2017, New York had 27,268 children served in foster care, with 19,213 in foster care as of September 30, 2017. *See id.* at ¶ 31. Of those, over 4,400 New York children were waiting to be adopted. *See id.* at ¶ 32. Further, during fiscal year 2017, throughout New York, a total of only 1,729 children were adopted. *See id.* at ¶ 33.

It is clear from the materials before the Court that OCFS does not contend that New Hope is not acting in the best interests of the children when placing these children for adoption. In fact, after OCFS conducted is review on September 6, 2018, Director Sara Simon sent New Hope a letter in which she praised New Hope's strengths in certain areas, including its "strong emphasis on assisting the birth parents in making an informed decision for their newborn, providing them time to make the decision, along with a supportive and detailed adoptive family selection process." Dkt. No. 1-6 at 3. The issue which led to the present matter is the refusal to provide adoption services to unmarried same sex couples or same sex couples regardless of marital status.

The gratitude owed to all those working to better the lives of New York's most vulnerable children is too great to convey in words. While such gratitude is ultimately ineffable, the Court still concludes this Memorandum-Decision and Order by recognizing the parties in this case for their many years of sacrifice and labor.

Until recent events, the parties have had a fruitful relationship; a relationship that has benefitted New York's children in immeasurable ways. For this reason, the Court would prefer that the parties seek out some compromise to their current dispute without further judicial

intervention. As the district court noted in *Fulton*, "[c]reative problem solving through concerted and thoughtful discourse without court intervention is often the best method to avoid what may appear to the parties, or to other persons in the public, to be harsh legal results." *Fulton*, 320 F. Supp. 3d at 668.

Ultimately, OCFS stands on firm ground in requiring authorized agencies to abide by New York's non-discrimination policies when administering public services. Under *Smith*, the First Amendment does not prohibit government regulation of religiously motivated conduct so long as that regulation is not a veiled attempt to suppress disfavored religious beliefs. And while New Hope may assert that OCFS's actions were not driven by a sincere commitment to equality, but rather by antireligious bias, the current record does not show religious persecution or bias.

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, the Court hereby

**ORDERS** that OCFS's motion to dismiss (Dkt. No. 34) is **GRANTED**; and the Court further

**ORDERS** that New Hope's motion for a preliminary injunction is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in OCFS's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: May 16, 2019
     Albany, New York

Mae A. D'Agostino
U.S. District Judge