**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

NEW HOPE FAMILY SERVICES, INC.,

                 Plaintiff,

     vs.

SHEILA J. POOLE, in her official capacity as Acting Commissioner for the Office of Children and Family Services for the State of New York,

                 Defendant.

No.: 5:18-cv-1419 (MAD/TWD)

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF NEW HOPE FAMILY SERVICES' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Authorities ................................................................................................iii

Introduction ........................................................................................................ 1

Argument ............................................................................................................ 2

I.    Title 18 NYCRR § 421.3(d) as applied infringes New Hope's right to free speech in a manner that triggers strict scrutiny. ............................... 2

    A.    OCFS seeks to censor and compel New Hope's speech to birthmothers, adoptive couples, and the State. ..................................... 2

    B.    New Hope's speech is not governmental speech. ................................... 6

    C.    Section 421.3(d) also violates New Hope's right to expressive association as applied. .............................................................................. 8

        1.    New Hope together with its employees form a protected expressive association. ................................................................. 8

        2.    New Hope together with the adoptive couples it serves form a protected expressive association. ............................................... 9

II.    Title 18 NYCRR § 421.3(d) as applied impairs New Hope's right to freely exercise its religion in a manner that triggers strict scrutiny. ..................... 10

    A.    Section 421.3(d) must be subjected to strict scrutiny because it intrudes on historic beliefs at the heart of New Hope's "faith and mission." ............................................................................................. 11

    B.    Section 421.3(d) must be subjected to strict scrutiny because it is not "neutral" in either its origin or its enforcement. .......................... 12

        1.    OCFS's promulgation of § 421.3(d) evinced animus against religious beliefs. ....................................................................... 12

        2.    OCFS's enforcement of § 421.3(d) evinced animus against religious beliefs. ....................................................................... 15

III.    Title 18 NYCRR § 421.3(d) cannot satisfy strict scrutiny. ............................ 17

    A.    OCFS cannot identify any relevant compelling state interest. ............ 18

B.    OCFS cannot show that applying § 421.3(d) to close New Hope actually advances any compelling governmental interest................... 20

C.    OCFS cannot show that applying § 421.3(d) to close New Hope is narrowly tailored to avoid any unnecessary impairment of New Hope's First Amendment rights. ........................................... 21

IV.   New Hope is entitled to a preliminary injunction. ........................................ 22

A.    New Hope has shown a probability of success on the merits. .............. 23

B.    New Hope will suffer irreparable injury without a preliminary injunction............................................................................................. 23

C.    The balance of hardships weighs entirely in favor of issuing the New Hope's requested preliminary injunction..................................... 25

Conclusion ........................................................................................................ 25

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*ACLU v. Clapper,*
  804 F.3d 617 (2d Cir. 2015).................................................................. 22

*Agency for International Development v. Alliance for Open Society
  International, Inc.,*
  570 U.S. 205 (2013) ............................................................................. 2

*Bronx Household of Faith v. Board of Education of New York,*
  331 F.3d 342 (2d Cir. 2003).................................................................. 24

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ................................................................ 12, 14, 15, 17

*Elrod v. Burns,*
  427 U.S. 347 (1976) ............................................................................. 24

*Employment Division v. Smith,*
  494 U.S. 872 (1990) ............................................................................. 11

*Greer v. Wing,*
  746 N.E.2d 178 (N.Y. 2001).................................................................. 13

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
  515 U.S. 557 (1995) ............................................................................. 20

*International Dairy Foods Association v. Amestoy,*
  92 F.3d 67 (1996)................................................................................. 23

*International Society For Krishna Consciousness, Inc. v. Barber,*
  650 F.2d 430 (2d Cir. 1981).................................................................. 10

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
  138 S. Ct. 1719 (2018) ......................................................................... 16

*National Institute of Family & Life Advocates v. Becerra,*
  138 S. Ct. 2361 (2018) ......................................................................... 22

*New Hope Family Services, Inc. v. Poole,*
  966 F.3d 145 (2d Cir. 2020)........................................................... passim

*New York Progress & Protection PAC v. Walsh,*
  733 F.3d 483 (2d Cir. 2013)............................................................ 23, 25

*Obergefell v. Hodges,*
  576 U.S. 644 (2015) ...................................................................................... 11

*People v. Cagle,*
  860 N.E.2d 51 (N.Y. 2006)............................................................................ 13

*R.A.V. v. City of St. Paul,*
  505 U.S. 377 (1992) ...................................................................................... 21

*Roberts v. United States Jaycees,*
  468 U.S. 609 (1984) ........................................................................................ 8

*Rumsfeld v. FAIR,*
  547 U.S. 47 (2006) .......................................................................................... 9

*Texas v. Johnson,*
  491 U.S. 397 (1989) ................................................................................... 2, 20

*United States v. Playboy Entertainment Group, Inc.,*
  529 U.S. 803 (2000) ...................................................................................... 19

## INTRODUCTION

The Second Circuit recently issued an order (the "Order") reversing this Court's dismissal of New Hope's motion for preliminary injunction and remanded for further proceedings consistent with that opinion. *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 184 (2d Cir. 2020). That Order also allowed the parties to submit a supplemental brief in support of or in opposition to that motion. *Id.* New Hope now files this Supplemental Memorandum together with a Supplemental Affidavit of New Hope Executive Director Kathleen Jerman ("Jerman Aff.").

New Hope's motion for preliminary injunction was briefed more than a year and a half ago, so supplementation is indeed called for. First, the Second Circuit has clarified the law on multiple points relevant to New Hope's motion. Second, on appeal, OCFS changed its position and acknowledged that it *does* seek to control and limit New Hope's speech about the nature of family, marriage, and the best interests of children. Third, in light of the Second Circuit's clarification of controlling law, New Hope offers additional relevant details about its operations and the people it serves through the Supplemental Affidavit of Kathleen Jerman.

Because this brief is supplemental, New Hope continues to rely on its memorandum in support of its motion for preliminary injunction submitted on December 12, 2018 (ECF No. 15-1) ("Pl. MPI"), on its reply memorandum submitted on January 9, 2019 (ECF No. 33) ("Pl. MPI Reply"), on the facts set out in its verified complaint (ECF No. 1), and in the affidavits of Judith Geyer, Charity Loscombe, Ellie Stultz, Elaine Bleuer, Justin Bleuer, and Jeremy Johnston filed in support of its Motion for Preliminary Injunction. ECF Nos. 15-2 – 15-7.

1

In deciding this motion, this Court "should consider . . . the facts alleged in the verified complaint [("Compl.")], as well as those in sworn affidavits submitted by New Hope." *New Hope*, 966 F.3d at 181. It should also recognize that those facts "are largely unrefuted in OCFS's filings in opposition to injunctive relief." *Id.*

## ARGUMENT

I. **Title 18 NYCRR § 421.3(d) as applied infringes New Hope's right to free speech in a manner that triggers strict scrutiny.**

Section 421.3(d) violates both New Hope's free speech rights and its free exercise rights. We address first the free speech violations.

### A. **OCFS seeks to censor and compel New Hope's speech to birthmothers, adoptive couples, and the State.**

"[T]he 'government may not prohibit the expression of an idea', even one that society finds 'offensive or disagreeable.'" *New Hope*, 966 F.3d at 170 (citing *Texas v. Johnson*, 491 U.S. 397, 414 (1989)). Similarly, "government also cannot tell people that there are things that 'they must say.'" *Id.* (quoting *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013)); *see* Pl. MPI 21.

In its prior briefs and in the Jerman Supplemental Affidavit, New Hope has detailed the three distinct audiences that its employees address with value-filled messages: "counseling birthmothers," "instructing . . . prospective adoptive parents," and "filing its ultimate reports" with the State. *New Hope*, 966 F.3d at 171; *see* Pl. MPI 6-7, 22-24; Pl. MPI Reply 1-2, 8; Jerman Aff. ¶¶ 8-63. The Second Circuit held that New Hope's adoption services are "laden with speech." *New Hope*, 966 F.3d at 171.

It is undisputed that New Hope holds and seeks to "convey[ ] a system of values about life, marriage, family and sexuality to both birthparents and adoptive parents." Compl. ¶ 270. Specifically, New Hope believes and conveys that the "biblical model for the family"—"one man married to one woman for life for their mutual benefit and the benefit of their children—is the ideal and healthiest family structure for mankind and . . . for the upbringing of children." Compl. ¶ 56; Jerman Aff. ¶ 14.

New Hope speaks and advocates that set of beliefs *to birthmothers* who choose to work with New Hope. When New Hope shows portfolios of potential adoptive couples to a birthmother, it inherently and intentionally represents that New Hope believes that each one of these couples could provide a home and family consistent with the best interests of the child. Jerman Aff. ¶ 10. "If New Hope were forced to work with unmarried or same-sex couples to approve them as adoptive parents, in light of its faith-based beliefs about family and the best interests of children, New Hope would be compelled by conscience—informed by its faith—to advise birthmothers whom it serves that it does not believe that an unmarried or same-sex couple could provide the best home for their child." Jerman Aff. ¶ 11.

New Hope speaks and advocates that same set of beliefs *to potential adoptive couples* who choose to work with New Hope for the application, home study, and adoption process. For example, New Hope's counseling of adoptive parents "includes counseling about building a healthy family environment for the child they will adopt." Jerman Aff. ¶ 13. "If New Hope were required to work with unmarried or

same-sex couples in the counseling and home study process, New Hope would be compelled by conscience—informed by its faith—to advise those couples that New Hope does not believe that an unmarried or same-sex couple can provide the best home for adopted children, because the best home for each infant is a family comprised of a mother and father committed to each other—and thus together to their children—for life in marriage." Jerman Aff. ¶ 14.

New Hope engages in vital speech informed by that set of beliefs *to the State*, when it expresses its conclusions—in records and forms required by the State—as to whether approval of a particular couple is "in the best interests of children awaiting adoptions," and as to whether a specific placement is in the best interests of that particular child. Jerman Aff. ¶ 20; *see id.* ¶¶ 21, 33-48. Since New Hope does not believe that placement with unmarried or same sex couples is consistent with the best interests of children, to require it to approve any such couple, or any such placement, is inevitably to censor New Hope by preventing it from saying what it believes to be true, and to compel speech by requiring New Hope to say what it believes to be false. *See New Hope*, 966 F.3d at 176-77, 182.

And all of this is speech about profound human, religious, and philosophical matters and matters of great public interest, disagreement, and debate. It is not possible to dismiss this speech as unimportant, or merely clerical, implementing some "quantitative checklist." *Id.* at 177.

Intuitively, it was always extremely improbable that OCFS would consider it acceptable for New Hope to agree to work with unmarried or same-sex couples, but

then speak its true beliefs and provide advice consistent with those beliefs to birthmothers or to those couples, or to express its true beliefs about the best interests of children in final conclusions disapproving adoption by such couples. *New Hope*, 966 F.3d at 177. As this Court rightly observed during argument, if New Hope spoke what it believes after being forced into that impossible context, it would probably face a lawsuit "the next day." *Id.* at 176; *see* Tr. of Proceedings Before the Hon. Mae A. D'Agostino at 44, February 19, 2019 (attached as Ex. A to Affidavit of Jacob P. Warner). Nevertheless, based on OCFS's arguments and representations, this Court previously concluded that "nothing is preventing New Hope from continuing to share its religious beliefs throughout the entire process," and that "OCFS is not . . . compelling [New Hope] to change the message it wishes to convey." Mem.-Decision & Order 29-30, ECF No. 38.

On appeal, however, OCFS repudiated that position, stating instead that OCFS does not seek to "restrict New Hope's speech *unrelated to its provision of adoption services*," and that "New Hope is not precluded from espousing its beliefs about marriage and family . . . *outside the contours of its adoption program*." Mem. of Law for Appellee in Opp'n to Mot. for Prelim. Inj. at 20-21, *New Hope*, 966 F.3d 145, ECF No. 101 (attached as Exhibit B to Warner Aff.) (emphasis added). As the Second Circuit recognized, OCFS's assertion that New Hope can say what it likes "unrelated to its provision of adoption services" and "outside the contours of its adoption program" is a "meaningless" concession—or at least irrelevant to New Hope's free speech and free exercise claims. *New Hope*, 966 F.3d at 176.

In plain English, OCFS has now disclosed that it *does* contend that § 421.3(d) empowers it to "prevent[ ] New Hope from continuing to share its religious beliefs [on these topics] throughout the entire [adoption] process." *Id.* at 175. This is censorship plain and simple.

As New Hope has explained, § 421.3(d) as applied equally seeks to compel New Hope to say things it believes to be false. To birthmothers: that unmarried or same-sex couples could provide a "best interests" home for their children. To unmarried or same-sex adoptive couples and to the State: that those couples can provide a "best interests" home for a child.

Both the censorship and the compulsion of speech substantially impair New Hope's free speech rights; both must be enjoined unless OCFS can carry its burden to satisfy strict scrutiny. As we review in Section III below, this it cannot do.

**B.    New Hope's speech is not governmental speech.**

The Second Circuit came close to holding that as a matter of law, censorship or compulsion of New Hope's speech cannot be excused on the grounds that New Hope's speech is governmental speech, *New Hope*, 966 F.3d at 171-75, 182. The Court of Appeals warned of the danger of extending the "government speech" doctrine, *id.* at 171, 173, and concluded that "on the pleadings record, none of the three factors that courts rely on in identifying 'government speech' weighs in favor of identifying any speech by New Hope as such," *id.* at 175. Factual details supplied in the Jerman Affidavit simply strengthen that conclusion.

*First*, the Second Circuit concluded that "adoption has not historically been treated by government as a means for it to communicate with the public on various

6

matters. Rather, adoption's singular focus is on identifying a placement that is in the best interests of a child." *New Hope*, 966 F.3d at 174. Reinforcing this, Mrs. Jerman testifies that before the regulation and events at issue, OCFS never made any attempt to control or restrict New Hope's counseling of birthmothers or adoptive parents concerning biblical teachings about the nature of marriage and its relationship to the best interests of children. Jerman Aff. ¶¶ 12, 30.

*Second*, the Court of Appeals found that "nothing in the pleadings suggests that the public understands New Hope's expressive activities . . . to be the State's own message," noting that New Hope's explicitly religious speech throughout the adoption process could not possibly represent government speech. *New Hope*, 966 F.3d at 174; *see id.* at 182. Mrs. Jerman testifies that while numerous government-run adoption services exist in New York, both birthmothers and potential adoptive parents choose New Hope precisely because of its different—and religious—nature and message. Jerman Aff. ¶¶ 50, 68-70; *see also* Loscombe Aff. ¶¶ 8, 12; Stultz Aff. ¶ 31; E. Bleuer Aff. ¶¶ 7-10; J. Bleuer Aff. ¶¶ 8-17; Johnston Aff. ¶ 14.

*Third*, the Second Circuit found that while the adoption process is regulated, it is not regulated to that degree of complete control which has at times supported a designation as government speech. "Nothing in the pleadings indicates that OCFS officials ever review, edit, or reject a private authorized agency's best-interests assessment," *New Hope*, 966 F.3d at 175; *see id.* at 182, and OCFS admits that "[t]he statutory . . . scheme bestows significant authority on authorized agencies," *id.* at 177. Again, Mrs. Jerman provides more detail about the wide latitude for

7

discretion and judgment which is accorded to—and indeed required of—private adoption agencies. Jerman Aff. ¶¶ 19-20, 22, 25-27, 37, 43, 45.

**C.     Section 421.3(d) also violates New Hope's right to expressive association as applied.**

The right to freely associate with like-minded individuals is protected where that association serves the purpose "of engaging in those activities protected by the First Amendment [including] . . . speech . . . and the exercise of religion." *New Hope*, 966 F.3d at 178 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984)).

New Hope has introduced evidence that as an organization it seeks both to practice and communicate the Christian religion, (Jerman Aff. ¶¶ 52-53; Geyer Aff. ¶¶ 30-37, 86, 90, 92-94), and to "convey[] a system of values about life, marriage, family and sexuality to both birthparents and adoptive parents through its comprehensive evaluation, training, and placement programs." *New Hope*, 966 F.3d at 178 (quoting Compl. ¶ 270); *see* Geyer Aff. ¶ 86. All of this is evidentiary. None of it is disputed. OCFS does not deny that New Hope intentionally "conveys a system of values about life, marriage, family, and sexuality." Compl. ¶ 270. Rather, OCFS disagrees with that message, and wants New Hope to *stop* communicating it "[inside] the contours of its . . . adoption services." *New Hope*, 966 F.3d at 176. But this targets the very core of the protected right of expressive association.

**1.     New Hope together with its employees form a protected expressive association.**

New Hope itself, including its employees, is an expressive association that exists not for commercial purposes, and not only to help infants and birthparents and adoptive parents, but with a concurrent mission to spread the Christian faith

and what New Hope believes to be biblical truth about healthy families. Jerman Aff.
¶¶ 59-61; Geyer Aff. ¶¶ 30-37, 90, 92. New Hope and its employees believe that
these truths will profoundly help infants and birthparents and adoptive parents.
Compl. ¶¶ 52-57; Geyer Aff. ¶¶ 32-37; Jerman Aff. ¶ 54. The people who make up
New Hope have associated together in part because they can convey those "shared
beliefs and values more effectively" together. *New Hope*, 966 F.3d at 179; *see*
*Rumsfeld v. FAIR*, 547 U.S. 47, 68-69 (2006); Jerman Aff. ¶¶ 57-59; Compl. ¶¶ 52-
57. New Hope fears that § 421.3(d) instead requires New Hope to muzzle employees,
to prevent them from declaring these beliefs to those to whom New Hope speaks,
and even to punish employees who do so. *See New Hope*, 966 F.3d at 179; Jerman
Aff. ¶ 55. And in turn, the record establishes that if New Hope is blocked from
communicating these messages, and is forced to communicate contrary messages,
then multiple employees who associate with New Hope precisely because of its
beliefs and mission could no longer in good conscience work for New Hope. Jerman
Aff. ¶ 58. Thus, the government's interference in New Hope's speech will "mak[e]
association with New Hope 'less attractive' for those who would otherwise combine
their voices with the agency's in order to convey their shared beliefs and values
more effectively." *New Hope*, 966 F.3d at 179 (quoting *Rumsfeld*, 547 U.S. at 68-69).

### 2.    New Hope together with the adoptive couples it serves form a protected expressive association.

Evidence submitted by New Hope also establishes that New Hope enters into
an expressive association with adoptive parents for the purpose of discussing topics
including infertility, relationships, adoption, and family dynamics within the faith-

based framework that New Hope very openly professes. Jerman Aff. ¶¶ 50-51;

Geyer Aff. ¶¶ 86, 90, 92; *see New Hope*, 966 F.3d at 156-58, 178-180. There is no

requirement that adoptive applicants share New Hope's faith, but all who choose to

work with New Hope are inevitably very aware of that faith framework before they

choose to work with New Hope rather than with one of the many secular adoption

services in the state. Geyer Aff. ¶ 86; Jerman Aff. ¶ 51. Indeed, several prospective

adoptive parents have testified that if New Hope were blocked from teaching,

counseling, and acting based on its religious beliefs about marriage and family,

those individuals would not feel comfortable relying on New Hope to guide them

through the adoption process. J. Bleuer Aff. ¶ 17; E. Bleuer Aff. ¶ 10; Stultz Aff. ¶ 7.

Censorship or compelled speech contrary to New Hope's true beliefs would destroy

not only the expression, but the association.

These facts—all undisputed on the present record—establish a violation of

New Hope's protected right of expressive association. This is an independent basis

for the requested preliminary injunction.

## II.     Title 18 NYCRR § 421.3(d) as applied impairs New Hope's right to freely exercise its religion in a manner that triggers strict scrutiny.

Religious "traditions, practices, and doctrines . . . need not receive [the

Court's] approval or support, but [they] must be tolerated if our freedoms are to be

preserved." *Int'l Soc'y For Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 447

(2d Cir. 1981). It is undisputed that New Hope's conviction that a family with "one

man married to one woman for life . . . is the ideal and healthiest family structure

for mankind and specifically for the upbringing of children" is a religious conviction,

Compl. ¶ 56, is part of a coherent view of human nature shared by many religions, and is a belief which the Supreme Court has acknowledged as "based on decent and honorable religious or philosophical premises," and as fully protected by the First Amendment. *See New Hope*, 966 F.3d at 161 (quoting *Obergefell v. Hodges*, 576 U.S. 644 (2015)). OCFS does not dispute that § 421.3(d) as applied "preclude[s] New Hope from pursuing its adoption ministry consistent with its religious beliefs." *New Hope*, 966 F.3d at 160. This Court has not found otherwise.

The remaining question is whether the state may outlaw this historic religious belief and put New Hope to a choice between violating what it believes to be the teachings of God or closing its 50-year-old ministry. It may not.

OCFS argues that it possesses precisely this power, because it is applying a "neutral law of general applicability" within the meaning of *Employment Division v. Smith*, 494 U.S. 872, 879 (1990). OCFS is mistaken, for two separate reasons.

## A. Section 421.3(d) must be subjected to strict scrutiny because it intrudes on historic beliefs at the heart of New Hope's "faith and mission."

First, as Plaintiff has previously reviewed, *Smith* has never defined the limits of the right of Free Exercise for all purposes, and specifically does not empower even "neutral and generally applicable" laws to extinguish well-established historical practices that go to the heart of the "faith and mission" of a religious organization. *See* Pl. MPI 11-12.There can be no doubt that, for a Christian ministry devoted to the formation of families and the wellbeing of children, their beliefs about the created nature of man, woman, and family do indeed lie at the heart of their "faith and mission." Thus, strict scrutiny must be applied. As demonstrated in Section III

11

below, OCFS cannot carry the burden of strict scrutiny so New Hope has demonstrated a likelihood of success on the merits.

### B.  Section 421.3(d) must be subjected to strict scrutiny because it is not "neutral" in either its origin or its enforcement.

Second, even under the test of *Smith*, § 421.3(d) must survive strict scrutiny because it is not "neutral." "[G]overnment hostility to religion can be 'masked, as well as overt,'" and "facial neutrality" is not "determinative." *New Hope*, 966 F.3d at 163 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993)); *see also* Pl. MPI 16. New Hope has offered facts sufficient to show a likelihood of success in establishing that § 421.3(d) is not "neutral" in either its origin or its enforcement, but is instead permeated with hostility or animus towards historic religious beliefs about marriage and family such as New Hope holds. This hostility has revealed itself in multiple ways.

As the Second Circuit emphasized, while these clues or "tells" must inevitably be reviewed seriatim, the Court should step back and consider "the totality of the evidence" to decide whether that totality reveals so much as a "slight suspicion of religious animosity," and must be alert for "even . . . 'subtle departures from neutrality.'" *New Hope*, 966 F.3d at 163, 165 (citing *Lukumi*, 508 U.S. at 534, 547).

### 1.  OCFS's promulgation of § 421.3(d) evinced animus against religious beliefs.

*First*, OCFS's aggressive overreaching in adopting § 421.3(d) without and contrary to statutory authority evinces zealous determination to silence or exclude a disfavored viewpoint. As the Court of Appeals observed, the mandatory language of § 421.3(d) has no basis in the law it purports to implement, N.Y. Dom. Rel. Law

§ 110; *New Hope*, 966 F.3d at 165, and instead is directly contrary to the apparent intent of that statute. The choice of permissive rather than mandatory language in the statute, the Second Circuit found, "appears to have been deliberate, and even intended to allow for accommodation of religious beliefs." *Id.* Confirming this reading, at the time of his signing, the Governor of New York went out of his way to forestall any concern that the law "might be construed to require faith-based adoption agencies 'to facilitate adoption for same-sex [couples] in violation of'" their religious beliefs. *Id.* "He explained that the statutory text was permissive, *i.e.*, it allowed adoptions by more persons than before, but '*without compelling any agency to alter its present policies.*'" *Id.* at 166 (citing Gov. Mem., New York Bill Jacket, 2010 S.B. 1523, ch. 509); Compl. ¶ 7 & Ex. 5. Official statements like this "are routinely relied on in construing the reach of New York statutes." *New Hope*, 966 F.3d at 166 n.18; *see, e.g., People v. Cagle,* 860 N.E.2d 51 (N.Y. 2006); *Greer v. Wing*, 746 N.E.2d 178 (N.Y. 2001). OCFS, however, ignored both the permissive language of the statute and this legislative history in its determination to *prohibit* by regulation exactly what the statute *permits* by its terms. This overreach evinced OCFS's hostility towards the beliefs held by New Hope along with other faith-based adoption agencies. OCFS confirmed its contempt for those beliefs during the rulemaking process that led to the adoption of § 421.3(d), dismissing such beliefs as "archaic." Compl. ¶ 166; *New Hope*, 966 F.3d at 163-64.

*Second*, counsel for OCFS admitted in argument to the Court of Appeals that OCFS is aware that it is precisely religious organizations that hold the beliefs that

OCFS is attempting to outlaw by means of § 421.3(d). Tr. of Proceedings Before the Hon. José A. Cabranes, Reena Raggi, and Edward R. Korman at 45, November 13, 2019 (attached as Exhibit C to Warner Aff.).

*Third*, so far as the record shows, OCFS adopted § 421.3(d) not only in disregard of the permissive language of the statutory text and the legislative history, but in the absence of any problem calling for a solution. It is undisputed that no complaint had ever been filed by any applicant against New Hope, (Geyer Aff. ¶ 140), and the State has not contended that any potential adoptive parents had ever been prohibited from adopting as the result of any similar policy of any religious adoption agency. Thus, the adoption of § 421.3(d) was driven by an ideological zeal to quash religious dissenters, not by any neutral goal.

*Fourth*, "the effect of a law in its real operation" can be "strong evidence of its object," *New Hope*, 966 F.3d at 169 (quoting *Lukumi*, 508 U.S. at 535), and the undisputed evidence is that many other faith-based agencies (of several faiths) that shared New Hope's beliefs concerning family and the best interests of children were removed from OCFS's list of approved agencies following OCFS's adoption of its "comply-or-close method for enforcing § 421.3(d)." *New Hope*, 966 F.3d at 169; *see* Compl. ¶¶ 202-03. While discovery of course remains to be taken, based on the facts presently available, it is reasonable to infer that these closures resulted from OCFS's enforcement of § 421.3(d), and are "evidence of its object."

*Fifth*, the regulation is not "generally applicable" because the law allows or even requires adoption services to engage in many forms of "discrimination" while

14

categorically prohibiting only consideration of a factor that OCFS knows is associated predominately with religious faiths and organizations. *See* Pl. MPI 17-19; *New Hope*, 966 F.3d at 163-64.

### 2. OCFS's enforcement of § 421.3(d) evinced animus against religious beliefs.

Targeting and animus against religious beliefs and organizations continued in OCFS's enforcement of § 421.3(d).

*First*, OCFS's aggressive reversal of its long-time live-and-let-live approach to New Hope evinced ideological hostility rather than neutral regulatory enforcement in the interest of children. For five years after § 421.3(d) was enacted, "OCFS voiced no objection to" New Hope's child-placement policy, *New Hope*, 966 F.3d at 166; Jerman Aff. ¶ 15. Not one "complaint" was filed during that time, *New Hope*, 966 F.3d at 168; Geyer Aff. ¶ 140, and indeed OCFS consistently praised New Hope's operations and effectiveness right up until the moment it threatened closure, Compl. ¶ 187; *New Hope*, 966 F.3d at 168. This is strong evidence that OCFS's abrupt decision to enforce § 421.3(d) in this manner "proscribe[s] more religious conduct than is necessary to achieve [its] stated ends." *Lukumi*, 508 U.S. at 538.

*Second*, hostility was evident in OCFS's abrupt leap to the extreme threat of a closure order. As the Second Circuit observed, "It is plainly a serious step to order an authorized adoption agency such as New Hope—operating without complaint for 50 years, taking no government funding, successfully placing approximately 1,000 children, and with adoptions pending or being supervised—to close all its adoption operations." *New Hope*, 966 F.3d at 168. And aggressive hostility is all the more

15

evident given that OCFS is unable to identify any relevant statutory authority that empowers it to order New Hope to cease its adoption services. *Id.* at 168-69.

*Third*, when enforcing § 421.3(d) by demanding that New Hope and other religious adoption services comply or close, OCFS representatives made statements to both New Hope and others that "presuppose[d] the illegitimacy" of New Hope's religious beliefs, *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018), and demonstrated a determination to coerce New Hope to violate those beliefs. An OCFS representative told New Hope that its choice was to "'compromise'—*i.e.*, abandon" its beliefs, *New Hope*, 966 F.3d at 168, or close. Compl. ¶¶ 188-99; Geyer Aff. ¶¶ 157-62. In response to questions about the closure of another faith-based adoption service, an OCFS spokeswoman baldly declared that there is "no place" in New York for agencies who hold and act on these beliefs. New Hope detailed these statements extensively in its Complaint. Compl. ¶¶ 192, 204. Now, the Court of Appeals has recognized the legal significance of these statements, specifically highlighting them as evincing prohibited hostility against the relevant religious beliefs. *New Hope*, 966 F.3d at 168.

*Fourth*, as all these actions and statements demonstrate, OCFS threatened New Hope with the regulatory destruction of its ministry while assuming the role of an ideological adversary rather than a "neutral decisionmaker" who gives "full and fair consideration" to its "religious objection[s]." *Masterpiece*, 138 S. Ct. at 1731–32. As the Court of Appeals noted, OCFS apparently gave no consideration at all to strong factors that should have weighed towards providing a religious exemption to

16

§ 421.3(d) to accommodate those objections—if indeed there was any purpose behind that regulation other than coercing religious organizations. Those factors importantly included the benefit to children consistently provided by New Hope across the years, and the absence of any identifiable harm from providing such an exemption. *New Hope*, 966 F.3d at 166-67, 169.

In short, New Hope has submitted evidence that hostility and non-neutrality pervaded both the promulgation of § 421.3(d) and its enforcement against New Hope. The "totality" of these factors "raise[s] a plausible suspicion that OCFS acted with hostility towards New Hope because of the latter's religious beliefs." *New Hope*, 966 F.3d at 183. Because each of the relevant facts is uncontradicted and in the record, New Hope has shown a strong probability that New Hope will satisfy the *Smith* test, and that strict scrutiny must therefore be applied. *Id.* at 165.

## III.   Title 18 NYCRR § 421.3(d) cannot satisfy strict scrutiny.

Once New Hope demonstrates—as it has—that § 421.3(d) infringes New Hope's free speech and free exercise, the burden shifts, and the regulation must be enjoined unless the State carries its burden under strict scrutiny—that is, a burden to demonstrate that the application of the regulation *against New Hope specifically* "advance[s] 'interests of the highest order' and [is] narrowly tailored in pursuit of those interests." *Lukumi*, 508 U.S. at 546; *see New Hope*, 966 F.3d at 182 (applying strict scrutiny); *see also* Pl. MPI 19-21. On the record before this Court, OCFS cannot carry that burden, so a preliminary injunction must be granted.

17

### A.     OCFS cannot identify any relevant compelling state interest.

In its prior briefing, OCFS has thrown up various supposed "interests." None

are supported by record evidence, as would be essential to carry the State's burden.

OCFS has suggested that § 421.3(d) is necessary to avoid "trauma" to LGBTQ

children awaiting adoption. McCarthy Decl. ¶ 10; *see New Hope*, 966 F.3d at 183

n.32. This makes no sense for at least two reasons. First, OCFS does not have a

policy of placing LGBTQ adolescents with same-sex adoptive couples, any more

than it has a policy of placing heterosexual adolescents with heterosexual adoptive

parents. Any alleged connection between forcing New Hope to work with same-sex

adoptive couples and avoiding trauma to LGBTQ adolescents is purely hypothetical

and speculative—which cannot satisfy strict scrutiny. Second, this supposed

"interest" is irrelevant to New Hope's work; New Hope places only infants and

toddlers, and has not placed any child older than three in at least 20 years. Jerman

Aff. ¶ 3. Sexual orientation is not an issue relevant to these very young children.

OCFS has suggested that § 421.3(d) is necessary to maximize the number of

families available to adopt. But the only record evidence is that New Hope has

never prevented any legally eligible couple from adopting, *New Hope*, 966 F.3d at

158; Geyer Aff. ¶ 140, and that forcing New Hope (and other faith-based adoption

agencies with similar convictions) to close their adoption services would *reduce* the

resources dedicated to facilitating adoptions in New York, and would actually

*reduce* the number of families willing to adopt. *See* Pl. MPI Reply 4; Loscombe Aff.

¶¶ 3-13; J. Bleuer Aff. ¶ 17; E. Bleuer Aff. ¶ 10; Stultz Aff. ¶ 31 The idea that any

unmarried or same-sex couple who would otherwise have adopted will decide not to

do so because they are shocked to learn that New Hope—a private and overtly Christian ministry—disapproves of such adoptions is far-fetched speculation unsupported by any shred of record evidence. "[A]necdote and supposition" do not suffice. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822-23 (2000).

In briefing before the Second Circuit, OCFS proposed a governmental interest centered on adults rather than children, asserting (without evidence) that there is an "especially high demand" for the children that New Hope provides because it primarily places newborns, such that each placement by New Hope deprives some other adults of an opportunity to adopt. *See New Hope*, 966 F.3d at 167 n.20. Given the repeated emphasis of the relevant statutes on the "best interests of the child to be adopted," *see id.* at 150-53, and the statutory provisions cited therein, it is not clear that any interest of adults could be a "compelling interest" for OCFS in its role as promulgator and enforcer of implementing regulations. In any case, nothing in the record supports any asserted "shortage" of children available to be adopted in New York State—rather the contrary. *See New Hope*, 966 F.3d at 151. And even so, the record evidence is that the large majority of children placed by New Hope suffer from one or more medical or social disadvantages that place them in recognized "hard to place" categories—in some cases, extreme disadvantages. Jerman Aff. ¶¶ 3-7. Any couple who is willing to adopt such a child will face no shortage of children in desperate need of a home; the only possible effect of ordering New Hope to close its doors will be to leave more "hard to place" children in foster or institutional homes, instead of permanent loving homes. The asserted interest is specious.

Finally, OCFS claims an interest in protecting same-sex or unmarried couples from insult and emotional distress. McCarthy Decl. ¶ 8. Again, it is not apparent that the task of protecting adults from emotional harm has been assigned to OCFS by any statute, and OCFS has articulated no statutory basis on which it could lay claim to this as a legitimate—much less compelling—interest *for OCFS*. OCFS holds no roving commission to right perceived wrongs. More fundamentally, as a matter of law protecting adults from insult and emotional distress is flatly excluded as governmental interest that can justify depredation of First Amendment rights. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995) ("the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful"); *Johnson*, 491 U.S. at 414 (the "bedrock principle underlying the First Amendment . . . is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"); Pl. MPI Reply 5-6.

### B.   OCFS cannot show that applying § 421.3(d) to close New Hope actually advances any compelling governmental interest.

A restriction on free speech or free exercise cannot be justified merely by invoking some compelling interest as a protective talisman; to satisfy strict scrutiny, that restriction must actually *"advance"* that interest in these particular circumstances. *See* Pl. MPI 20; *New Hope*, 966 F.3d at 182. OCFS has consistently failed to articulate—and has certainly not tendered any evidence meeting its burden to show—how enforcement of § 421.3(d) to close New Hope (and other faith-based agencies with similar convictions) could "advance" any compelling interest. As

reviewed above, the impact of that closure on children waiting to be adopted will almost certainly be exclusively negative.

The only interest, then, that could actually be "advanced" by shuttering New Hope's adoption ministry is the interest of rebuking and silencing a disapproved message. Indeed, a desire to "rebuke" appears to be very much the spirit behind the OCFS's spokeswoman's public declaration that "[t]here is no place" in New York for agencies that hold to a historic understanding of family and the best interests of children. Compl. ¶ 204. But these are utterly invalid justifications for violating First Amendment rights. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (government may not proscribe speech "because of disapproval of the ideas expressed").

### C. OCFS cannot show that applying § 421.3(d) to close New Hope is narrowly tailored to avoid any unnecessary impairment of New Hope's First Amendment rights.

In addition to the fact that OCFS cannot identify a relevant compelling state interest, enforcement of the regulation must be enjoined unless OCFS carries the further burden of "demonstrat[ing] that its challenged actions are *narrowly tailored* to serve that interest without unnecessarily impairing New Hope's Free Exercise of Religion or Free Speech." *New Hope*, 966 F.3d at 182-83 (emphasis added). OCFS has offered no evidence that could meet this burden. As the Second Circuit held, where OCFS has never contended that any placement by New Hope was contrary to the best interests of the child, *id.* at 148-49; where no applicant has ever lodged any complaint against New Hope, *id.* at 168, 183; where New Hope places only very young children and most often "hard to place" children, Jerman Aff. ¶¶ 3-7; *New Hope*, 966 F.3d at 183 n.32; where there is no evidence that New Hope has ever

21

prevented any applicant from adopting, *New Hope*, 966 F.3d at 158, 183; and given

New Hope's policy of providing references upon request to those whom it cannot in

good conscience work with itself, *id.* at 183[1]—there can be no showing that any

compelling interest could not be served by means that leave in peace New Hope and

the birthmothers and adoptive parents who wish to work with New Hope. This is

precisely what OCFS did for many years before its 2018 review, without any harm

to anyone. *See New Hope*, 966 F.3d at 166; Compl. ¶¶ 165, 188-190.

## IV.   New Hope is entitled to a preliminary injunction.

New Hope has moved that this Court "preliminar[ily] enjoin Defendant . . .

from applying N.Y. Comp. Codes R. & Regs. tit. 18, § 421.3(d) . . . to New Hope, and

prevent OCFS from revoking New Hope's perpetual authorization to place children

for adoption during the pendency of this litigation." New Hope's Notice of Mot. &

Mot. for Prelim. Inj. at 1, ECF No. 15.

To obtain a preliminary injunction, the moving party must ordinarily show:

(1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) the

balance of equities tips in his favor; and (4) an injunction is in the public interest.

*ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015). But where First Amendment

rights are at issue (as here), the test reduces essentially to a single prong: "the

likelihood of success on the merits is the dominant, if not the dispositive, factor."

---

[1] It is doubtful that a requirement to cooperate—by providing referrals—in conduct that its religion teaches is wrong can be made a condition of the enjoyment of rights otherwise protected by Free Exercise or Free Speech. *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018). However, since New Hope has not objected to continuing its practice in this regard, the present case does not present that question.

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). This is so because the "loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury," *New Hope*, 966 F.3d at 181 (quoting *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (1996)); the balance of hardships is entirely one-sided because "the Government does not have an interest in the enforcement of an unconstitutional law," *Walsh*, 733 F.3d at 488; and protection of First Amendment rights is per se "in the public interest," *id*. We expand these points briefly below.

### A.    New Hope has shown a probability of success on the merits.

The burden to establish "probability of success on the merits" is of course logically different than the "sufficiency of the pleadings" standard that governs a motion to dismiss. Nevertheless, where the decisive allegations are both verified and undisputed, the practical difference between the two collapses—because the same allegations which have been held to establish a violation if true are evidentiary and are likely to be established as fact since uncontradicted. *See New Hope*, 966 F.3d at 181. As detailed repeatedly above, New Hope's decisive verified allegations and factual submissions about its faith and its speech—while belittled by OCFS in argument—are in fact "largely unrefuted in OCFS's filings in opposition to injunctive relief." *Id*. Instead, OCFS effectively admitted to the Second Circuit its intention to censor and compel New Hope's speech. *Supra* pp. 5-6.

### B.    New Hope will suffer irreparable injury without a preliminary injunction.

Under our constitutional system, the loss of First Amendment freedoms "for even minimal periods of time" is—as a matter of law—"irreparable injury" that calls

for preliminary injunctive relief. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Bronx Household of Faith v. Bd. of Educ. of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003). No further factual inquiry is necessary. But New Hope has in fact introduced uncontradicted evidence establishing *additional* impending irreparable harm as well, including: loss of key and difficult-to-replace staff members; loss of reputation and referral relationships that will be difficult to rebuild; and in sum the destruction or severe crippling of a 50-year-old ministry which has placed over 1,000 New York children into loving homes. Jerman Aff. ¶¶ 64-109.

For all these same reasons, the requested preliminary injunction does not and cannot include the "no new adoptive couples" limitation that New Hope voluntarily agreed to strictly on a short-term basis, during the pendency of the now-completed appeal. *See New Hope*, 966 F.3d at 160. As reviewed above, the denial of the ability of these couples and New Hope to voluntarily associate together for the value-laden counseling and home-study process would itself violate First Amendment rights. More radically, the full litigation process almost invariably takes years, and as Mrs. Jerman has testified, a preliminary injunction that "protects" New Hope while simultaneously prohibiting it from taking in new adoptive couples will be illusory, leading to the death "by strangulation" of New Hope's adoption ministry long before a final judgment can be rendered. Jerman Aff. ¶ 96. Slow strangulation will deprive New Hope of its free speech and free exercise rights just as surely as will the summary closure which OCFS has already

attempted. Neither is compatible with the First Amendment; both must be prevented by an appropriate preliminary injunction.

### C.   The balance of hardships weighs entirely in favor of issuing New Hope's requested preliminary injunction.

As a matter of law, "the Government does not have an interest in the enforcement of an unconstitutional law." *Walsh*, 733 F.3d at 488. As a matter of fact, there is nothing to balance here, because OCFS has not identified a single adult or child who has been harmed by New Hope's consistent practices over many years, while OCFS has amply demonstrated its intent to force New Hope to close its adoption service without awaiting the outcome of this litigation—unless a preliminary injunction is granted. *New Hope*, 966 F.3d at 158-60. OCFS's general desires to "make a statement" and to protect unidentified LGBTQ individuals from hypothetical emotional distress cannot weigh in this balance for the same reasons that they do not constitute "compelling governmental interests."

## CONCLUSION

For the reasons set forth above, and in Plaintiff's memoranda in support of its motion for preliminary injunction (ECF Nos. 15-1, 33), and based on the facts in the verified complaint and supporting affidavits, Plaintiff respectfully requests that this Court enter a preliminary injunction prohibiting OCFS from enforcing N.Y. Comp. Codes R. & Regs. tit. 18, § 421.3(d) against New Hope, or on any basis attempting to require New Hope to provide adoption services to unmarried or same-sex couples, until entry of a final judgment in this litigation.

Dated: August 28, 2020

_s/Roger G. Brooks_

Robert Genant, NY Bar No. 105257
GENANT LAW OFFICE
3306 Main Street, Ste. B
Mexico, NY 13114
(315) 963-7296
(315) 963-8274 (Fax)
bgenant@genantlaw.com
_Local Counsel_

Roger G. Brooks, NY Bar Roll No. 700663*
Jacob P. Warner, NY Bar Roll No. 702094*
David A. Cortman, NY Bar Roll No. 502661*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (Fax)
rbrooks@adflegal.org
jwarner@adflegal.org
dcortman@adflegal.org
*_Admitted Pro Hac Vice_

_Attorneys for Plaintiff_

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2020, I electronically filed the Supplemental Memorandum with the Clerk of the District Court using the CM/ECF system. Service on counsel for all parties will be accomplished through the Court's electronic filing system.

_s/ Roger G. Brooks_
Attorney for Plaintiff
