**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**NEW HOPE FAMILY SERVICES, INC.,**

                                        **Plaintiff,**

        **vs.**                                              **5:18-CV-1419**
                                                             **(MAD/TWD)**

**SHEILA J. POOLE,** *in her official capacity as Acting*
*Commissioner for the Office of Children and Family*
*Services for the State of New York*,

                                        **Defendant.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**ALLIANCE DEFENDING FREEDOM**            **DAVID A. CORTMAN, ESQ.**
1000 Hurricane Shoals Road, NE            **JACOB P. WARNER, ESQ.**
Suite D1100                               **ERIK W. STANLEY, ESQ.**
Lawrenceville, Georgia 30078
Attorneys for Plaintiff

**ALLIANCE DEFENDING FREEDOM -**          **JONATHAN A. SCRUGGS, ESQ.**
**AZ OFFICE**                             **JEANA HALLOCK, ESQ.**
15100 N. 90th Street                      **JEREMIAH GALUS, ESQ.**
Scottsdale, Arizona 85260                 **ROGER GREENWOOD BROOKS, ESQ.**
Attorneys for Plaintiff

**OFFICE OF ROBERT E. GENANT**            **ROBERT E. GENANT, ESQ.**
3306 Main Street, Suite B
P.O. Box 480
Mexico, New York 13114
Attorneys for Plaintiff

**OFFICE OF THE NEW YORK**                **ADRIENNE J. KERWIN, AAG**
**STATE ATTORNEY GENERAL**
The Capitol
Albany, New York 12224
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

                    **MEMORANDUM-DECISION AND ORDER**

# I. INTRODUCTION

Plaintiff New Hope Family Services, Inc. ("New Hope") commenced this civil rights action on December 6, 2018 challenging the constitutionality of the New York Office of Children and Family Services ("OCFS") interpretation and application of 18 N.Y.C.R.R. § 421.3(d). *See* Dkt. No. 1.  On December 12, 2018, New Hope filed a motion for a preliminary injunction seeking to prevent OCFS from revoking New Hope's perpetual authorization to place children for adoption during the pendency of this litigation.  *See* Dkt. No. 15.  On January 14, 2019, OCFS cross-moved to dismiss the complaint in its entirety.  *See* Dkt. No. 34.  The Court granted OCFS's motion to dismiss in its entirety and denied New Hope's motion for a preliminary injunction as moot.  *See* Dkt. No. 38.  New Hope timely appealed.  *See* Dkt. No. 40.  On July 21, 2020, the Second Circuit Court of Appeals issued an order reversing this Court's dismissal of New Hope's Free Exercise and Free Speech claims and remanded this case for consideration of the motion for a preliminary injunction with specific instructions that the Court is bound to follow, and also noted that any appeal would be returned to the same panel.  *See* Dkt. Nos. 44, 45.  Currently before the Court is Plaintiff's motion for a preliminary injunction.  *See* Dkt. No. 15.

# II. BACKGROUND

## A.    Regulatory Scheme

In September 2010, New York State amended its Domestic Relations Law to codify the right to adopt by unmarried adult couples and married couples regardless of sexual orientation or gender identity.  *See* 2010 S.B. 1523, Ch. 509; N.Y. Dom. Rel. Law § 110.  "New York law authorizes the Commissioner of OCFS to enforce laws and rules pertaining to adoption."  *New Hope Family Servs. v. Poole,* 966 F.3d 145, 153 (2d Cir. 2020) (citing N.Y. Soc. Serv. Law § 34(3)(e)).  Pursuant to that authority, in January 2011, OCFS informed authorized adoption

agencies in New York that the amendment brought the Domestic Relations Law into compliance with existing case law and was "intended to support fairness and equal treatment of families that are ready, willing and able to provide a child with a loving home."  After providing further guidance, adoption agencies were advised that, among other things, "discrimination based on sexual orientation in the adoption study assessment process is prohibited."

In November 2013, OCFS promulgated 18 N.Y.C.R.R. § 421.3(d) which, in accordance with existing law, prohibits "discrimination and harassment against applicants for adoption services on the basis of race, creed, color, national origin, age, sex, sexual orientation, gender identity or expression, marital status, religion, or disability" and requires that agencies authorized by New York to provide adoption services "shall take reasonable steps to prevent such discrimination or harassment by staff and volunteers, promptly investigate incidents of discrimination and harassment, and take reasonable and appropriate corrective or disciplinary action when such incidents occur."  18 N.Y.C.R.R. § 421.3(d).

"Adoption services in New York can only be provided by 'authorized agencies,' *i.e.*, entities incorporated or organized under New York law with corporate or legal authority 'to care for, to place out or to board out children.'"  *New Hope*, 966 F.3d at 150 (quoting N.Y. Soc. Serv. Law §§ 371(10)(a), 374(2)).  Agencies authorized to provide adoption services in New York must receive and respond to inquiries from, conduct orientation sessions for, and offer OCFS-approved applications to prospective parents.  *See* 18 N.Y.C.R.R. § 421.15.  After an adoption application is received, an adoption study must be completed.  *See id.* at § 421.13.  An adoption study must explore the following characteristics of prospective parents:

> (1) capacity to give and receive affection;
>
> (2) ability to provide for a child's physical and emotional needs;

3

(3) ability to accept the intrinsic worth of a child, to respect and
share his past, to understand the meaning of separation he has
experienced, and to have realistic expectations and goals;

(4) flexibility and ability to change;

(5) ability to cope with problems, stress and frustration;

(6) feelings about parenting an adopted child and the ability to make
a commitment to a child placed in the home; and

(7) ability to use community resources to strengthen and enrich
family functioning.

*Id.* at § 421.16(a). An application may only be rejected if (1) an applicant does not cooperate with

the adoption study; (2) an applicant is "physically incapable of caring for an adoptive child;" (3)

an applicant is "emotionally incapable of caring for an adopted child;" or (4) an applicant's

approval "would not be in the best interests of children awaiting adoptions." *Id.* at § 421.15(g).

Once an application is approved, the agency must add the applicant to the adoptive parent registry.

*See id.* at §§ 421.15(i), 424.3(a).

"Authorized agencies can then board such children in foster homes or place them in

prospective adoptive homes based on the agencies' assessment of the children's 'best interests.'

Most relevant here, authorized agency approval, or consent, is required to finalize the adoption of

any child placed by that agency." *New Hope*, 966 F.3d at 151 (quoting N.Y. Dom. Rel. Law §§

111(1)(f), 113(1)). In making placement decisions, the agency must consider, among other things,

(1) the ages of the child and prospective parent(s); (2) "the physical and emotional needs of the

child in relation to the characteristics, capacities, strengths and weaknesses of the adoptive

parent(s);" (3) "the cultural, ethnic or racial background of the child and the capacity of the

adoptive parent to meet the needs of the child with such a background;" and (4) the ability of a

child to be placed in a home with siblings and half-siblings. *See id.* Additionally, agencies must

> [m]ake an effort to place each child in a home as similar to and
> compatible with his or her religious background as possible with
> particular recognition that section 373(3) of the Social Services Law
> requires a court, when practicable, to give custody through adoption
> only to persons of the same religious faith as that of the child.

*Id.* at § 421.18(c). Further, the Social Services Law provides that, "so far as consistent with the

best interests of the child, and where practicable," the religious wishes of the birth parents should

be honored. *See* N.Y. Soc. Serv. Law § 373(7).

**B.    New Hope Family Services**

When an entity seeks to facilitate adoptions in New York, it must qualify as an "authorized

agency" under the law before it may provide those services. *See* N.Y. Soc. Serv. Law §

371(10)(a); N.Y. Soc. Serv. Law § 374(2). New Hope is an "authorized agency" with the

authority to "place out or to board out children...," N.Y. Soc. Serv. Law § 371(10)(a), and "receive

children for purposes of adoption." N.Y. Dom. Rel. Law § 109(4). As an "authorized agency,"

New Hope must be "incorporated or organized under the laws of this state with corporate power

or empowered by law to care for, to place out or to board out children ... [and] shall submit and

consent to the approval, visitation, inspection and supervision of such office as to any and all acts

in relation to the welfare of children performed or to be performed under this title." N.Y. Soc.

Serv. Law § 371(10)(a). Additionally, OCFS must approve an agency's certificate of

incorporation. *See id.* at § 460-a.

In 1965, Evangelical Family Service, Inc., New Hope's predecessor agency, obtained a

two-year certificate of incorporation from New York's Board of Social Welfare authorizing it "to

accept legal custody and guardianship of children; to provide protective service for children; to

5

provide foster care service to child[ren] and unwed mother[s]; to place children for adoption; and [to] function in complete cooperation with all existing social welfare agencies."  *New Hope*, 966 F.3d at 155-56 (quotation omitted).  In 1967, New York made Evangelical Family Service's certificate of incorporation "perpetual."  *Id.* at 156.

## C.     The Complaint

In 1958, Pastor Clinton H. Tasker founded what became New Hope Family Services as a Christian ministry to care for and find adoptive homes for children whose birth parents could not care for them.  *See* Dkt. No. 1 at ¶ 3.  New Hope dedicates a considerable portion of the complaint setting forth its religious beliefs, which the Court will not fully recount here.  The Court fully accepts that New Hope and its employees have these sincerely held religious beliefs.

It is because of these religious beliefs that "New Hope will not recommend or place children with unmarried couples or same sex couples as adoptive parents."  *Id.* at ¶ 153.  New Hope's "Special Circumstances" policy states, in part, as follows:

> If the person inquiring to adopt is single ... [t]he Executive Director will talk with them to discern if they are truly single or if they are living together without the benefit of marriage ... because New Hope is a Christian Ministry it will not place children with those who are living together without the benefit of marriage.
>
> If the person inquiring to adopt is in a marriage with a same sex partner ... ([t]he Executive Director will ... explain that because New Hope is a Christian Ministry, we do not place children with same sex couples).

*Id.* at ¶ 154.

New Hope claims that it has worked with unmarried individuals who are truly single in the past and remains willing to work with such individuals.  *See id.* at ¶ 155.  Further, New Hope claims that because it "handles inquiries from unmarried couples and same-sex couples pursuant

to the policy and practice described above, New Hope has never denied an unmarried couple or same-sex couple's application." *Id.* at ¶ 156. "Whenever a same-sex couple or unmarried couple is interested in a referral, New Hope refers them to the appropriate county social services office or another provider." *Id.*

Until recently, New York adoption law required that authorized agencies could only place children for adoption with "an adult unmarried person or an adult husband and his adult wife." N.Y. Dom. Rel. Law § 110 (2009). As mentioned above, in September 2010, New York amended its law to allow authorized agencies to place children for adoption with "an adult unmarried person, an adult married couple together, or any two unmarried adult intimate partners together." N.Y. Dom. Rel. Law § 110 (2010). New Hope notes that permissive language is used throughout the amended law and claims that "New York has *never* amended its law to *require* authorized agencies to place children for adoption with 'an adult unmarried person,' a same-sex 'adult married couple together,' or 'two unmarried adult intimate partners together.'" Dkt. No. 1 at ¶ 163 (emphasis in original). New Hope contends that "OCFS is attempting to use regulations to require exactly that: on July 11, 2011, OCFS issued a second letter that purported to clarify, but in fact materially changed, the adoption regulations then found in 18 NYCRR 421.16 and subpart (h). In that letter, OCFS declared that 'the intent of' subpart (h) 'is to prohibit discrimination based on sexual orientation in the adoption study assessment process. In addition, OCFS cannot contemplate any case where the issue of sexual orientation would be a legitimate basis, whether in whole or in part, to deny the application of a person to be an adoptive parent.'" *Id.* at ¶ 164 (quoting Office of Children & Family Services, Informational Letter, 11-OCFS-INF-05 (July 11, 2011)).

In 2013, OCFS amended its adoption regulations, declaring that authorized agencies, "providing adoption services shall ... (d) prohibit discrimination and harassment against applicants for adoption services on the basis of race, creed, color, national origin, age, sex, sexual orientation, gender identity or expression, marital status, religion, or disability ...." 18 N.Y.C.R.R. § 421.3 (2018). Following the 2013 changes, OCFS issued another informational letter in 2016 which stated as follows:

> [T]his policy directive requires the formalization of any existing nondiscrimination and harassment policies and procedures, and possibly the revision of such policies and procedures, by requiring that ... [voluntary agencies] ... not engage in or condone discrimination ... on the basis of race, creed, color, national origin, sex, religion, sexual orientation, gender identity or expression, marital status or disability against ... applicants for adoption services, ... prospective foster parents, foster parents, or children in foster care.

Dkt. No. 1 at ¶ 167. New Hope claims that OCFS promulgated these new regulations "purporting to require adoption providers to place children with unmarried and same-sex couples in complete disregard for the law, the scope of OCFS's authority, and the rights of adoption providers." *Id.* at ¶ 168.

In January or February of 2018, Suzanne Colligan of OCFS called New Hope's then Acting Executive Director, Judith A. Geyer. *See id.* at ¶ 182. During the call, Ms. Colligan conveyed that, under a new policy implemented in 2018, OCFS would be conducting comprehensive on-site reviews of each private provider's procedures. *See id.* On July 18, 2018, Ms. Colligan sent an email to Ms. Geyer to schedule the adoption program review and included a list of things she needed to review, including New Hope's policies and procedures. *See id.* at ¶ 183. Based on Ms. Colligan's direction that she would need a copy of New Hope's policies and

procedure manual, Ms. Geyer updated New Hope's formal policies and procedures on adoption

into one consolidated manual.  *See id.* at ¶ 184.

On August 28, 2018, Ms. Geyer received an email from Ms. Colligan, stating in part:

> I also thought that it might be helpful for you to see the application
> we use with agencies requiring reauthorization for corporate
> authority.  Since you are authorized in perpetuity, your agency is not
> required to complete/submit this form.  However, I will be asking
> many of the program questions on it, so you may find it helpful in
> preparing for my visit.

Dkt. No. 1 at ¶ 185.

On September 6, 2018, Ms. Colligan met with Ms. Geyer and Kathy Decesare, New

Hope's Center Director, and took a copy of New Hope's policy and procedure manual with her

when she left.  *See id.* at ¶ 186.  On October 1, 2018, OCFS sent a letter to Ms. Geyer that praised

a number of strengths in New Hope's program, thanked New Hope for its professionalism during

the meeting, and suggested a follow-up meeting to discuss a few opportunities for improvement.

*See id.* at ¶ 187.  On or about October 9, 2018, Ms. Geyer received a call from Ms. Colligan.

During the call, Ms. Colligan stated that she had been reading New Hope's policies and

procedures manual, and that New Hope's policy not to place children with those who are living

together without the benefit of marriage or with same-sex couples violated 18 N.Y.C.R.R. §

421.3.  *See id.* at ¶ 188.  New Hope claims that Ms. Colligan told Ms. Geyer that New Hope

would have to comply with § 421.3 by placing children with unmarried couples and same-sex

couples.  *See id.* at ¶ 189.  Further, Ms. Colligan stated that if New Hope did not comply, New

Hope would be "choosing to close."  *Id.* at ¶ 190.  Ms. Geyer responded that New Hope would be

unwilling to violate its religious beliefs by placing children with unmarried or same-sex couples.

*See id.* at ¶ 191.  Ms. Colligan responded by stating that "'[s]ome Christian ministries have

decided to compromise and stay open.'"  *Id.* at ¶ 192.  Ms. Colligan informed Ms. Geyer that she

would be getting a letter from OCFS mandating compliance by a specific date.  *See id.* at ¶ 194.

On October 11, 2018, Ms. Colligan emailed Ms. Geyer, stating in part as follows:

> You will be receiving a letter from our office soon requesting a
> formal written response regarding your agency's position.  When
> OCFS receives written notification of an agency's intention to close
> a program, OCFS will respond with written instructions to the
> agency with the steps they must take.  These steps include the
> agency's responsibility to seek and obtain agreement with another
> NYS authorized agency to maintain and store their adoption
> records, of which includes the handling of activities outlined in the
> legally bound agreements with birth parents.

*Id.* at ¶ 195.

On October 12, 2018, Ms. Colligan sent an email to Ms. Geyer stating that "[w]e will put

Monday's follow up meeting [to discuss a few minor improvements identified during the visit] on

hold for now.  The purpose of the follow up meeting would be to work on the necessary changes

to your agency policy manual.  Based on our recent phone call, the follow up meeting for those

purposes does not appear needed at this time."  *Id.* at ¶ 196.  On October 17, 2018, Ms. Colligan

indicated in an email to Ms. Geyer that she had mailed out a certified letter.  That email stated that

"[o]nce the letter is returned providing us with written notice of your intent, we will send out a

letter outlining our expectations around the handling of those that you are currently providing

services and the adoption records."  *Id.* at ¶ 197.

On October 26, 2018, Ms. Geyer received an electronic copy of the letter to which Ms.

Colligan had referred.  The letter stated that New Hope's policy pertaining to "not placing

'children with those who are living together without the benefit of marriage' or 'same-sex couples'

violates Title 18 NYCRR § 421.3."  *Id.* at ¶ 198.  The letter further stated:

> OCFS hereby requests a formal written response from [New Hope]
> stating the agency's position in regard to revising this policy to
> eliminate those portions that violate the above-cited regulation.
> Please respond within 15 days of receipt of this letter indicating
> specifically whether [New Hope] intends to revise the present policy
> and continue the existing adoption program, or that [New Hope]
> will not revise the policy so as to comply with the above-cited
> regulation.  Please be aware that should the agency fail to bring the
> policy into compliance with the regulation, OCFS will be unable to
> approve continuation of [New Hope's] current adoption program
> and [New Hope] will be required to submit a close-out plan for the
> adoption program.

*Id.* (quoting Dkt. No. 1-7).  New Hope was given until November 30, 2018 to respond to OCFS's

letter.  *See id.* at ¶ 199.

## D.    Procedural History

On December 6, 2018, New Hope filed its complaint alleging that OCFS has violated

various constitutional rights protected by the First and Fourteenth Amendments.  *See* Dkt. No. 1.

In its first cause of action, New Hope contends that OCFS's interpretation and enforcement of 18

N.Y.C.R.R. § 421.3(d) "targets, shows hostility toward, and discriminates against New Hope

because of its religious beliefs and practices" in violation of the First Amendment's Free Exercise

Clause.  *See id.* at ¶¶ 230-63.  In its second cause of action, New Hope argues that applying

"section 421.3(d) to New Hope requires New Hope to engage in speech and expression that it

does not wish to convey – speech and expression that violates its core religious beliefs – by

compelling it to recommend same-sex couples or unmarried couples as adoptive parents" in

violation of the First Amendment.  *See id.* at ¶¶ 264-78.  In its third cause of action, New Hope

contends that section 421.3(d) treats New Hope's speech and exercise of its religious views

differently from persons similarly situated to it in violation of the Equal Protection Clause of the

Fourteenth Amendment.  *See id.* at ¶¶ 279-90.  Finally, in its fourth cause of action, New Hope

alleges that OCFS "has violated the unconstitutional conditions doctrine by conditioning New Hope's perpetual authorization to provide adoption services on its willingness to relinquish its First Amendment rights." *Id.* at ¶¶ 291-95.

On December 12, 2018, New Hope filed a motion for a preliminary injunction. *See* Dkt. No. 15. On January 14, 2019, OCFS moved to dismiss the complaint in its entirety. *See* Dkt. No. 34. On February 19, 2019, after the motions were fully briefed, the Court held oral arguments on both pending motions. On May 16, 2019, the Court granted OCFS's motion to dismiss the complaint and denied New Hope's motion for a preliminary injunction as moot. *See* Dkt. No. 38. New Hope timely appealed. *See* Dkt. No. 40. On July 21, 2020, the Second Circuit issued a decision reversing the Court's dismissal of New Hope's Free Exercise and Free Speech claims and remanded the case for a decision on the motion for a preliminary injunction. *See* Dkt. No. 44. In its decision, however, the Circuit listed numerous factors and pieces of evidence that this Court should consider in reaching its conclusion. *See New Hope*, 966 F.3d at 180-83. For the following reasons, New Hope's motion for a preliminary injunction is granted.

### III. DISCUSSION

**A.      Standard of Review**

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co.*, 409 F.3d 506, 510 (2d Cir. 2005) (citation omitted). "A decision to grant or deny a preliminary injunction is committed to the discretion of the district court." *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 78 (2d Cir. 1994) (citation omitted).

A party seeking a preliminary injunction must establish "'a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the

merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party.'" *Allied Office Supplies, Inc. v. Lewandowski*, 261 F. Supp. 2d 107, 108 (D. Conn. 2003) (quoting *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003)).

The Supreme Court has observed that the decision of whether to award preliminary injunctive relief is often based on "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Consonant with this view, the Second Circuit has held that a district court may consider hearsay evidence when deciding whether to grant preliminary injunctive relief. *See Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010). Therefore, the strict standards for affidavits under the Federal Rules of Evidence and in support of summary judgment under Rule 56(c)(4) of the Federal Rules of Civil Procedure requiring that an affidavit be made on personal knowledge are not expressly applicable to affidavits in support of preliminary injunctions. *See Mullins v. City of New York*, 634 F. Supp. 2d 373, 384 (S.D.N.Y. 2009) (citations omitted). Nevertheless, courts have wide discretion to assess the affidavit's credibility and generally consider affidavits made on information and belief to be insufficient for a preliminary injunction. *See* 11A Charles Alan Wright et al., Federal Practice and Procedure § 2949 (2d ed. 1995); *Mullins*, 634 F. Supp. 2d at 373, 385, 390 n.115 (declining to fully credit the "defendants' hearsay affidavit" and noting that while the court "may consider hearsay evidence in a preliminary injunction hearing ... , a court may weigh evidence based on whether such evidence would be admissible under the Federal Rules of Evidence").

Even if the plaintiff demonstrates irreparable harm and a likelihood of success on the merits, the remedy of preliminary injunctive relief may still be withheld if equity so requires. "An

award of an injunction is not something a plaintiff is entitled to as a matter of right, but rather it is an equitable remedy issued by a trial court, within the broad bounds of its discretion, after it weighs the potential benefits and harm to be incurred by the parties from the granting or denying of such relief." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999) (citation omitted).

"[B]ecause New Hope seeks a preliminary injunction to stay government action taken in the public interest pursuant to a statutory (and regulatory) scheme, it must establish both a likelihood of success on the merits and irreparable harm in the absence of an injunction." *New Hope*, 966 F.3d at 181 (citing *Alliance for Open Soc'y Int'l, Inc. v. Agency for Int'l Dev.*, 651 F.3d 218, 230 (2d Cir. 2011), *aff'd.*, 570 U.S. 205 (2020); *Alleyne v. N. Y. State Educ. Dep't*, 516 F.3d 96, 101 (2d Cir. 2008)).  "The 'loss of First Amendment freedoms ... unquestionably constitutes irreparable injury.'" *Id.* (quoting *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (1996)). "Thus, 'the dominant, if not the dispositive, factor' in deciding whether to grant a preliminary injunction in this case is New Hope's ability to demonstrate likely success on the merits of its Free Exercise and Free Speech claims." *Id.* (quoting *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)).

**B.      Likelihood of Success on the Merits**

### *1. Free Exercise Claim*

The First Amendment states that "Congress shall make no law respecting an establishment of religion, or preventing the free exercise thereof ...."  U.S. Const. amend. I.  "The Fourteenth Amendment extends the protections of these Establishment and Free Exercise Clauses against state and local governments." *New Hope*, 966 F.3d at 160 (citing U.S. Const. amend. XIV; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)).  "The Free Exercise Clause, in particular, guarantees to all Americans the 'right to believe and profess whatever religious doctrine [they]

14

desire[],' even doctrines out of favor with a majority of fellow citizens." *Id.* at 161 (quoting *Employment Div. v. Smith*, 494 U.S. 872, 877 (1990)).

"'At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons.'" *Commack Self-Service Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 210 (2d Cir. 2012) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993)). "Nonetheless, 'the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Id.* (quoting *Smith*, 494 U.S. at 879). "'[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest.'" *Id.* (quoting *Lukumi*, 508 U.S. at 533) (internal citation omitted). "But the law has permitted government to avoid showing a compelling interest and narrow tailoring if the challenged ban on a religious practice is required by a valid and neutral law of general applicability." *New Hope*, 966 F.3d at 162 (citing *Smith*, 494 U.S. at 879).

"The Supreme Court has instructed that a law is not neutral if its object 'is to infringe upon or restrict practices because of their religious motivation.'" *Id.* (quoting *Lukumi*, 508 U.S. at 533). Both this Court and the Second Circuit have found that the regulation at issue here, 18 N.Y.C.R.R. § 421.3(d), is facially neutral. *See id.* at 163. However, this is only the first step. At the second step, "a court must 'survey meticulously' the totality of the evidence, 'both direct and circumstantial.'" *Id.* "It must consider 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the

legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Id.* (quoting *Lukumi*, 508 U.S. at 540 (internal quotation marks omitted); *accord Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018)). Finally, "the effect of a law in its real operation is strong evidence of its object." *Lukumi*, 508 U.S. at 535.

In its supplemental briefing, New Hope argues that section 421.3(d) is neither neutral in either its origin or its enforcement nor narrowly tailored to advance a compelling interest. *See* Dkt. No. 52 at 17, 22. Specifically, New Hope points to multiple examples of conduct or statements which, when viewed in their totality, create suspicion of religious animosity. *See id.* at 17. Additionally, New Hope argues that OCFS has failed to identify any relevant compelling state interest and that, even if it had, closing New Hope does not meet strict scrutiny. *See id.* at 25-27. In opposition, OCFS argues that section 421.3(d) is neutral and generally applied. *See* Dkt. No. 53-4 at 1, 5-6. OCFS also argues that section 421.3(d) and its enforcement of the regulation through closure of New Hope is narrowly tailored to advance multiple compelling government interests. *See id.* at 6-13.

In examining the issue of neutrality of section 421.3(d), the Second Circuit found that the pleadings "give rise to the 'slight suspicion' of religious animosity[.]" *New Hope*, 966 F.3d at 165. The Second Circuit identified a number of allegations which, in totality, led to its conclusion and urged this Court to consider the same on remand. *See id.* First, the Second Circuit noted the disconnect between the seemingly permissive language used in the Domestic Relations Law and OCFS's mandatory approach in section 421.3(d). *See id.* at 165-66. Second, the Second Circuit noted OCFS's almost five year delay in enforcing section 421.3(d) against New Hope. *See id.* at 166. Third, the complaint alleges that OCFS personnel stated, in effect, that adoption agencies

were essentially required to abandon their religious views if they conflicted with state law.  *See id.* at 167-68.  Fourth, the Second Circuit noted the severity of OCFS's action against New Hope.  *See id.* at 168-69.  Forcing New Hope to close was perceived by the Circuit as an incredibly severe reaction which "add[s] some weight to New Hope's claim of hostility toward its religious beliefs."  *See id.* at 168-69.  Finally, the Circuit noted allegations that OCFS forced the closure of multiple other adoption agencies which shared New Hope's beliefs about family and marriage.  *See id.* at 169.  These allegations, the Circuit explained, seem to be evidence of the "'effect of the law in its real operation'" which can be strong evidence of the object of the law.  *See id.* (citing *Lukumi*, 508 U.S. at 535).

In its decision, the Second Circuit recommended that the Court consider the lack of evidence that section 421.3(d) applies uniformly and neutrally to all authorized adoption agencies.  *See id.* at 181.  In their supplemental briefing, OCFS argues only that "[a]s the Second Circuit recognized, 'a generally applicable anti-discrimination regulation will usually be understood to indicate neutrality rather than religious animosity.'"  *See* Dkt. No. 53-4 at 8.

As previously mentioned, the Second Circuit noted a "disconnect between [section 421.3(d)] and the law it purports to implement, [New York Domestic Relations Law Section 110]."  *New Hope*, 966 F.3d at 165.  The Circuit described the statute as "permissive" and found that it does not contain a mandate "requiring adoption agencies to approve adoption by any persons."  *Id.*  Citing debate transcripts from the New York State Assembly, OCFS argues that it "reasonably interpreted the statute as permitting the agency to require that unmarried and same-sex couples be treated equally[.]"  *See* Dkt. No. 53-4 at 10-12.  However, in light of the Circuit's finding that the statute is "permissive," the Court cannot find OCFS's interpretation reasonable.

17

The plain language of section 110 serves to expand the persons who "may adopt." *See* N.Y. Dom. Rel. Law § 110; *New Hope*, 966 F.3d at 165.  It does not impose any requirement on adoption agencies as to which adoption applications the agency must approve.  *See* N.Y. Dom. Rel. Law § 110.  Additionally, as the Second Circuit explained, examination of the enactment history reveals that included in the bill jacket is a statement from the Governor which states that the law allows more people to adopt than ever before "without compelling any agency to alter its present policies." *New Hope*, 966 F.3d at 166 (quoting Gov. Mem., New York Bill Jacket, 2010 S.B. 1523, ch. 509).  This evidence indicates that the law was permissive, thereby indicating that OCFS's implementation of section 421.3(d) demonstrates some animosity towards particular religious beliefs.

In its supplemental briefing, OCFS provides an explanation for the delay in enforcement of section 421.3(d) against New Hope.  *See* Dkt. No. 53-4 at 6-8.  OCFS essentially argues that they were unaware of New Hope's discriminatory practices until 2018.  *See id.* at 8.  This lack of review is because New Hope was one of a small number of adoption agencies that operated with perpetual corporate authority.  *See id.* at 7-8.  OCFS's previous review process would occur during the corporate re-authorization process, but in 2017, it was discovered that this process resulted in agencies operating with perpetual corporate authority going significant lengths of time without review or visits from OCFS.  *See id.*  As a result of this discovery, OCFS modified its review procedures to include regular reviews for agencies operating with perpetual corporate authority, such as New Hope.  *See id.* at 8.  Also following this discovery, OCFS, as part of a remedial effort, reviewed all approved adoption agencies with perpetual corporate authority, including New Hope.  *See id.*  This evidence appears to cut against a finding that New Hope was targeted for review and action because of their religious beliefs.

18

However, the Second Circuit also considered allegations of certain statements made by OCFS personnel in evaluating hostility towards religious beliefs. *See New Hope*, 966 F.3d at 167-68. Specifically, New Hope alleges that when it protested OCFS's instruction to approve adoptions for same-sex couples or close its adoption service, OCFS responded that "[s]ome Christian ministries have decided to compromise and stay open." *See* Dkt. No. 1 at ¶ 192. New Hope also cites to a statement of OCFS's spokeswoman which she made in commenting on the closure of a Christian adoption agency in Buffalo. *See id.* at ¶ 204. New Hope alleges that OCFS stated that

> New York State law is clear ... discrimination of any kind is illegal and in this case OCFS will vigorously enforce the laws designed to protect the rights of children and same sex couples. In New York State, we welcome all families who are ready to provide loving and nurturing homes to foster or adoptive children. There is no place for providers that choose not to follow the law.

*See id.* In its supplemental briefing, OCFS argues that New Hope has mischaracterized the statement and that the statement only declares that agencies must obey the law. *See* Dkt. No. 53-4 at 13. However, consideration of the statement as a whole suggests that the adoption agency being discussed did not comply with the regulations regarding adoption of children by same sex couples and that OCFS utilized enforcement mechanisms against it.

As to the allegation that OCFS informed New Hope that it could "compromise and stay open," OCFS argues that this is a hearsay statement and is not sufficient to demonstrate likelihood of success on the merits. *See id.* However, the Second Circuit noted that this allegation, which was included in a verified complaint, and has not been contested by OCFS, may be treated as evidence. *See New Hope*, 966 F.3d at 191.

19

Another factor that was noted by the Circuit as bearing on religious hostility is the severity of OCFS's action in ordering the closure of New Hope. *See id.* at 168. During the appeal, the issue of the source of OCFS's authority to close New Hope was never resolved, but was flagged as an issue for the Court to consider as possible evidence of hostility towards New Hope's religious beliefs. *See id.* at 169. OCFS now argues that New Hope has left it with no choice but to force closure of the agency due to its non-compliance with the regulation. *See* Dkt. No. 53-4 at 13. Certainly, OCFS has the authority to enforce section 421.3(d), which presumably provides them authority to close agencies that choose not to comply with state law. However, because the Second Circuit questioned, without deciding, the legitimacy of OCFS's attempt to close New Hope, the Court finds this information to be neutral.

Finally, the Second Circuit noted that New Hope's allegations that other adoption agencies with similar religious beliefs about marriage and family were forced to close by OCFS may be evidence of hostility towards religious beliefs. *See New Hope*, 966 F.3d at 169. In its supplemental briefing, OCFS has denied that it closed any authorized adoption agencies in New York State in 2018 and 2019. *See* Dkt. No. 53-4 at 6. OCFS explains that a number of secular and faith-based adoption agencies voluntarily discontinued adoption services, others were removed for lack of corporate authority, and others lost accreditation or changed names. *See id.* At this point, the Court cannot know how many of the voluntary closures were the result of pressure from OCFS based on their religious beliefs, or if any such pressure was applied by OCFS at all. Thus, the Court finds this information to be neutral.

While not all of the evidence discussed weighs in favor of a finding of hostility when viewed individually, the totality of the evidence indicates that section 421.3(d), as promulgated and enforced by OCFS, is not neutral and appears to be based on some hostility towards New

Hope's religious beliefs.  In light of the Second Circuit's all but explicit direction, the Court finds

that the totality of the evidence weighs in favor of a finding of hostility.  In finding hostility, the

Court relies on a number of factors that the Circuit noted in its decision.  Those factors include

OCFS's implementation of the seemingly permissive language of New York Domestic Relations

Law Section 110 as mandatory requirements in section 421.3(d), the severity of OCFS's actions

and the lack of explanation as to the legal authority to engage in such action, and statements made

by OCFS personnel which demonstrate their motivations in enforcing section 421.3(d).[1]  Because

---

[1] In conducting its analysis, the Court cannot ignore the drastic difference in the circumstances which have historically led to findings of religious hostility and the circumstances of the present case.  In fact, this Court previously made the same observation.  *See* Dkt. No. 38 at 16-24.  The Second Circuit disagreed.  In *Lukumi*, the Supreme Court noted that the sessions surrounding the creation of the law at issue were rife with hostility, with municipal leaders calling the church "an abomination of the Lord."  *See Lukumi*, 508 U.S. at 541.  In *Masterpiece Cakeshop*, the Supreme Court noted hostile comments from members of the Colorado Civil Rights Commission and the commission's inconsistent treatment of religious discrimination and sexual-orientation discrimination to conclude that the commission's treatment of a cake shop owner "violated the [s]tate's duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint."  *Masterpiece Cakeshop*, 138 S. Ct. at 1731.  In *Trump v. Hawaii*, the record contained significant amounts of anti-Muslim animus.  *See Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018) (noting statements by the President that "Islam hates us" and that the country is "having problems with Muslims coming into the country").  In *Buck v. Gordon*, 429 F. Supp. 3d 447, 451 (W.D. Mich. 2019), the court considered statements by the Attorney General prior to her election in which she described an agency in a similar position to that of New Hope as "'hate-mongers' who disliked gay people more than they cared about children."  Here, the only statements upon which the Second Circuit relies indicate, at worst, that OCFS intends to ensure compliance with anti-discrimination law in the adoption process, regardless of an organization's religious beliefs.  The Court finds the argument that these statements indicate hostility tenuous.  Although the Second Circuit found the *Fulton* case distinguishable, in that case, the court, in finding a nearly identical regulation neutral, noted that the regulation did not "'proscribe particular conduct only or primarily when religious motivated;' they proscribe only CSS's ability to turn away qualified Philadelphians on the basis of particular character traits without regard to secular or religious reasons."  *Fulton*, 320 F. Supp. 3d at 683 (quoting *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 275 (3d Cir. 2007)).  However, the Second Circuit rejected that analysis, finding that "New Hope's pleadings easily give rise to the 'slight suspicion' of religious animosity that the Supreme Court, in both *Lukumi* and *Masterpiece Cakeshop*, indicated could raise constitutional concern."  *See New Hope*, 966 F.3d at 165.  Although this Court respectfully disagrees, it is bound by the Second Circuit's

(continued...)

the regulation is not neutral and generally applied, then OCFS must demonstrate that section

421.3(d) is narrowly tailored to advance a compelling governmental interest. *See Commack*, 680

F.3d at 210 (quoting *Lukumi*, 508 U.S. at 533). For the following reasons, the Court finds that

OCFS has failed to make such a showing.

Throughout this litigation, OCFS has argued that section 421.3(d) serves the state's interest

in providing homes to children by increasing the number of prospective adoptive parents. *See*

Dkt. No. 37 at 12. Most recently, OCFS has also argued that the state has a compelling interest in

avoiding discrimination on the basis of marital status or sexual orientation. *See* Dkt. No. 53-4 at

14. Additionally, OCFS argues that there is no way to more narrowly tailor section 421.3(d)

because permitting adoption agencies to refuse to consider applications of prospective families on

grounds unrelated to their ability to parent serves to reduce the number of prospective adoptive

parents. *See* Dkt. No. 37 at 12. New Hope argues that OCFS has failed to identify any relevant

compelling state interest and, alternatively, that applying section 421.3(d) to close New Hope does

not actually advance, nor is it narrowly tailored to advance, any compelling state interest. *See*

Dkt. No. 52 at 23-27.

Certainly, the state has a compelling interest in fighting discrimination. *See Fulton v. City*

*of Phila.*, 922 F.3d 140, 163 (3d Cir. 2019) (collecting cases). However, the regulation is not

narrowly tailored to advance the state's compelling interest. The Second Circuit interpreted the

amendment of the Domestic Relations Law as "signal[ing] an intent for some accommodation of

religious beliefs[.]" *New Hope*, 966 F.3d at 166. By failing to provide such an accommodation to

New Hope, section 421.3(d) is broader than is necessary to advance the state's compelling interest.

---

[1](...continued)
interpretation.

Additionally, no one disputes that the state has a compelling interest in maximizing the number of families available to adopt.  New Hope argues, however, that enforcing section 421.3(d) to close New Hope actually runs contrary to the state's interest in maximizing the number of families available for adoption.  *See* Dkt. No. 52 at 23.  The Court agrees.  In this instance, section 421.3(d) is not narrowly tailored to advance the state's interest.

In its decision, the Second Circuit asked whether New Hope's "recusal-and-referral" practice is the most narrowly tailored means of avoiding discrimination without impairing New Hope's Free Exercise and Free Speech rights.  *See New Hope*, 966 F.3d at 183.  The Circuit noted that the record does not contain evidence of any complaints from referred couples nor does it indicate that couples were unable to adopt as a result of referral.  *See id.*  Absent such evidence, "it is not evident that, pending resolution of the merits of this case, recusal and referral poses such a risk of trauma and social harm to unmarried and same-sex adoption applicants that nothing less than the closure of New Hope's adoption operation can adequately safeguard the State's interests." *Id.*  Accordingly, the Court finds that New Hope has demonstrated that it is likely to succeed on this claim.

### 2. Free Speech Claim

"New Hope claims that OCFS also violated its constitutional right to Free Speech in two ways: (a) by compelling it to say something it does not believe, *i.e.*, that adoption by unmarried or same-sex couples can be in the best interests of a child; and (b) by requiring it to associate with such couples, thereby impeding New Hope's ability to promote its own beliefs and values about religion, marriage, and family." *Id.* at 170.  In opposition, OCFS argues that to the extent the Court finds that New Hope engages in speech in processing adoption applications, that such

speech is government speech.  *See* Dkt. No. 53-4 at 14.  Alternatively, OCFS argues that section 421.3(d) is narrowly tailored to advance compelling state interests.  *See id.* at 14-15.

### a. Compelled Speech

"'At the heart of the First Amendment' is the principle 'that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence.'" *New Hope*, 966 F.3d at 170 (quoting *Agency for Int'l Dev.*, 570 U.S. at 213 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994))).  "Consistent with this principle, freedom of speech means that the 'government may not prohibit the expression of an idea,' even one that society finds 'offensive or disagreeable.'"  *Id.* (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2354 (2020)).  Similarly, the government may not tell people that there are things that they must say.  *See Agency for Int'l Dev.*, 570 U.S. at 213.  "Thus, when government 'direct[ly] regulat[es] ... speech' by mandating that persons explicitly agree with government policy on a particular matter, it 'plainly violate[s] the First Amendment.'"  *New Hope*, 966 F.3d at 170 (quoting *Agency for Int'l Dev.*, 570 U.S. at 213) (alterations in original).

The Court continues to acknowledge the "inextricable link between New Hope's speech and conduct in the placement of a child for adoption."  *Id.* at 176.  On appeal, the Second Circuit identified three types services which are "laden with speech" relevant to New Hope's claims: "counseling birthmothers", "instructing and evaluating adoptive parents", and New Hope's reports regarding whether it is in the best interests of a child to be adopted by a particular applicant.  *See id.* at 171.  New Hope provides adoption services "so that, at their end, New Hope itself can speak on the determinative question for any adoption: whether it would be in the best interests of a child to be adopted by particular applicants."  *Id.*  New Hope argues that, because of its religious beliefs

about marriage and family, "it does not believe and, therefore, cannot state, that adoption by unmarried or same-sex couples would ever be in the best interests of a child." *Id.*

The Court finds that by attempting to force New Hope to say that it is in a child's best interests to be placed with an unmarried or same sex couple, despite New Hope's sincere disagreement with that statement, OCFS is attempting to compel speech. Although OCFS argues that New Hope is not compelled to speak because there is an alternative, closure is surely a harsh alternative for New Hope and, as discussed below, it is not the most narrowly tailored means of advancing the state's compelling interests.

### b. Government Speech

"When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009)). "That freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech." *Id.* (citing *Board of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000)). "Thus, government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas." *Id.* (citing *Johanns v. Livestock Mktg. Assn.*, 544 U.S. 550, 559 (2005)). "The Supreme Court, however, has held that the mere fact that government authorizes, approves, or licenses certain conduct does not transform the speech engaged therein into government speech." *New Hope*, 966 F.3d at 171.

Here, the Court previously found that any expressive conduct or other speech in which New Hope engaged in the course of providing adoption services constitutes government speech. *See* Dkt. No. 38 at 28. The Second Circuit disagreed. *See New Hope*, 966 F.3d at 175. In doing

so, the Circuit noted that none of the traditional indicators of government speech are present here. *See id.* at 174.  "[A]doption has not historically been treated by government as a means for it to communicate with the public on various matters."  *Id. c.f. Pleasant Grove*, 555 U.S. 460; *Walker*, 576 U.S. 200.  Additionally, the record does not "suggest that the public understands New Hope's expressive activities, either in generally providing adoption services or, ultimately, in recommending a child's placement, to be the State's own message."  *New Hope*, 966 F.3d at 174. OCFS has not provided any information or evidence which indicates otherwise on either of these points.  *See* Dkt. No. 53-4 at 14-18.

Finally, the Second Circuit noted that based on the pleadings, a court cannot conclude "that 'from beginning to end' the messages conveyed by New Hope are so controlled by New York as to be the State's own."  *See New Hope*, 966 F.3d at 175 (quoting *Johanns*, 544 U.S. at 560).  In reaching this conclusion, the Circuit considered the amount of discretion afforded to each adoption agency in reaching a conclusion regarding the propriety of placements.  *See id.*  In its supplemental briefing, OCFS that "[a]gency discretion is not unbridled."  *See* Dkt. No. 53-4 at 14. OCFS argues that it has the authority to decide what factors may or may not be considered in evaluating applicants and that compliance with such factors cannot be deemed speech.  *See id.*

Although OCFS may use its judgment to determine what factors adoption agencies may or may not consider in processing adoption application, this does not eliminate the significant discretion that agencies have in determining whether placement with prospective adoptive parents is in the best interests of the child.  *See New Hope*, 966 F.3d at 175.  This discretion and authority has been recognized by OCFS.  *See id.* at 177.  In fact, the applicable regulations do not define what is in the best interests of the child, but rather provides a list of factors which the adoption agency must consider.  *See id.*  There is no single determinative factor, rather this process requires

an exercise of discretion by the agency.  *See id.*  Thus, the Court finds that New Hope's message is

not so controlled by the State of New York as to be government speech.

The Second Circuit also urged caution in extending the doctrine of government speech

beyond its established precedents.  *See id.* at 172-73.  Finding no precedent which would apply to

this case, the Court cannot find that New Hope engaged in government speech in making

recommendations as to the best interests of the child.  *See id.* at 181.

In the alternative, OCFS argues that even if section 421.3(d) compels speech, it is

narrowly tailored to avoid discrimination on the basis of marital status or sexual orientation and to

promote the pool of potential adoptive families.  *See* Dkt. No. 53-4 at 15.  As discussed above,

each of these interests are certainly compelling.  However, section 421.3(d) is not narrowly

tailored to advance those interests.  As the Second Circuit explicitly asked: is New Hope's

"recusal-and-referral" practice a narrowly tailored means for avoiding discrimination without

impairing New Hope's Free Speech rights?  *See New Hope*, 966 F.3d at 183.  Based on the current

record, the Court finds that it is.

As it stands, New Hope has demonstrated likelihood of success as to its claim that section

421.3(d) compels it to speak contrary to its religious beliefs by requiring that New Hope say that

placement with unmarried or same sex couples is in the best interests of the child.  At present,

OCFS has presented New Hope with an ultimatum: make such a statement or close.  However, the

Court finds that the recusal-and-referral approach is more narrowly tailored to the state's interests

while protecting New Hope's Free Speech rights.[2]  Accordingly, the Court finds that New Hope

has demonstrated likelihood of success on the merits of its Free Speech claim.

## IV. CONCLUSION

After careful review of the record, the parties' arguments, and the applicable law, the Court

hereby

**ORDERS** that Plaintiffs' motion to for a preliminary injunction (Dkt. No. 15) is

**GRANTED**; and the Court further

**ORDERS** that OCFS may not revoke New Hope's perpetual authorization to place

children for adoption during the pendency of this litigation;

**ORDERS** that, seeing no request from either party, Plaintiffs are not required to post a

bond or undertaking as security for granting the above-mentioned preliminary injunction at this

time; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  October 5, 2020
           Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[2] Because the Court has found that New Hope is likely to succeed on its Free Speech claim based on the compelled speech theory, the Court need not examine New Hope's arguments with respect to its expressive association arguments.