UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

NEW HOPE FAMILY SERVICES, INC.,

$\qquad$ *Plaintiff,*

-against-                                                 18-CV-1419

SHEILA J. POOLE,                                          MAD/TWD

$\qquad$ *Defendant.*

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

LETITIA JAMES
Attorney General
State of New York
Attorney for Defendant Sheila J. Poole
The Capitol
Albany, New York  12224

Adrienne J. Kerwin
Assistant Attorney General, of Counsel
Bar Roll No. 105154
Telephone:  (518) 776-2608
Fax:  (518) 915-7738 (Not for service of papers)                Date: October 8, 2021

# Table of Contents

TABLE OF AUTHORITIES ..................................................................................................iii

PRELIMINARY STATEMENT ...........................................................................................1

PROCEDURAL BACKGROUND ........................................................................................1

STATEMENT OF FACTS .....................................................................................................2

    A.  Authority to Provide Adoption Services......................................................................2

    B.  Processing of Adoptive Parent Applications...............................................................4

    C.  Matching of Children and Adoptive Parents...............................................................5

    D.  Promulgation of 18 N.Y.C.R.R. § 421.3(d).................................................................6

    E.  New Hope .....................................................................................................................7

STANDARD OF REVIEW ....................................................................................................8

ARGUMENT...........................................................................................................................8

    POINT I - PLAINTIFF CANNOT ESTABLISH A FREE EXERCISE CLAIM ...............8

        A.  Section 421.3(d) is Neutral .........................................................................9

            1. The Enactment History of § 421.3(d) Demonstrates the Regulation's
            Neutral Purpose. ..................................................................................10

            2. The Examples of Alleged Hostility Contained in the Complaint Do
            Not Undermine the Evidence of Neutrality.............................................11

                  a.  *The Court Has Already Correctly Determined that Three Factors Relied
                  Upon by Plaintiff Do Not Undermine the Regulation's Neutrality*......................12

                  b.  *Alleged Statements Made by OCFS Officials Were Benign and, Therefore,
                  Neutral.*..................................................................................13

                  c.  *Domestic Relations Law § 110 is Not Inconsistent with § 421.3(d)*......................13

        B.  Section 421.d(3) is Generally Applicable................................................................17

        C.  Section 421.3(d) is Rationally Related to the State's Interests...............................20

    POINT II - PLAINTIFF CANNOT ESTABLISH A COMPELLED SPEECH
    CLAIM ..............................................................................................................................21

POINT III - PLAINTIFF CANNOT ESTABLISH A FIRST AMENDMENT
ASSOCIATION CLAIM..............................................................................30

    A.  Plaintiff's Expressive Association Claim is Duplicative of its Free Speech
Claim.....................................................................................................31

    B.  Plaintiff's Right to Expressive Association is Not Implicated...............31

    C.  Any Burden on Plaintiff's Right to Expressive Association is Incidental............33

CONCLUSION.......................................................................................................35

# TABLE OF AUTHORITIES

CASES                                                                                                          PAGE(S)

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ................................................................................................... 8

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth,*
   529 U.S. 217 (2001) ................................................................................................. 24

*Boy Scouts of Am. v. Dale,*
   530 U.S. 640 (2000) ................................................................................ 30-31, 32, 33

*Church of Lukumi Babalu Aye, Inc. v. Hialeah,*
   508 U.S. 520 (1993) ............................................................................... 8, 9-10, 11

*Congregation of Rabbinical College of Tartikov, Inc. v. Vill. Of Pomona,*
   915 F. Supp. 2d 574 (S.D.N.Y. 2013) ............................................................... 8, 21

*Dallas v. Stanglin,*
   490 U.S. 19 (1989) ............................................................................................ 32, 34

*DeFabio v. E. Hampton Union Free Sch. Dist.,*
   658 F. Supp. 2d 461 (E.D.N.Y. 2009) ................................................................... 31

*Employment Div., Dept. of Human Resources of Ore. v. Smith,*
   494 U.S. 872 (1990) ............................................................................................ 9, 17

*Fighting Finest v. Bratton,*
   95 F. 3d 224 (2d Cir. 1996) .................................................................................... 34

*Fulton v. City of Philadelphia,*
   141 S. Ct. 1868 (2021) ..................................................................................... passim

*Gibson v Supt. of New Jersey Dept. of Law & Pub. Safety-Division of State Police,*
   2009 U.S. Dist. LEXIS 26829 (D. N.J. Mar. 31, 2009) ......................................... 16

*Govt. Suppliers Consolidating Servs., Inc. v Bayh,*
   753 F. Supp. 739 (S.D. Ind. 1990) ........................................................................ 16

*In re Jacob,*
   86 N.Y.2d 651 (1995) ............................................................................................. 22

*Johanns v. Livestock Mktg Ass'n,*
   544 U.S. 550 (2005) ............................................................................................... 24

*Kerzer v. Kingly Mfg.,*
   156 F. 3d 396 (2d Cir. 1998) ................................................................................... 8

*Legacy Church, Inc. v. Kunkel,*
   472 F. Supp. 3d 926 (D. NM 2020) ................................................................19

*Lyng v. Intl. Union,*
   485 U.S. 360 (1988) ........................................................................................34

*Masterpiece Cakeshop v. Colo. Civil Rights Comm'n,*
   138 S. Ct. 1719 (2018) .........................................................................10, 13, 27

*New Hope Family Services, Inc. v. Poole,*
   387 F. Supp. 3d 194 (N.D.N.Y. 2019) ............................................................20

*New Hope Family Services, Inc. v. Poole,*
   966 F. 3d 145 (2d Cir. 2020) .....................................................................passim

*New Hope Family Services, Inc. v. Poole,*
   493 F. Supp. 3d 44 (N.D.N.Y. 2020) .........................................................passim

*Nobrega v Edison Glen Assoc.,*
   167 N.J. 520, 772 A. 2d 368 (2001) ................................................................16

*Obergefell v. Hodges,*
   576 U.S. 644 (2015) ........................................................................................27

*Resurrection Sch. v. Hertel,*
   2021 U.S. App. LEXIS 25349 (6th Cir. Aug. 23, 2021) ..................................18

*Roberts v. United States Jaycees,*
   468 U.S. 609 (1984) ...................................................................................passim

*Roe v. City of Waterbury,*
   542 F. 3d 31 (2d Cir. 2008) ..............................................................................8

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,*
   547 U.S. 47 (2006) ...............................................................................22-23, 33

*Tabbaa v. Chertoff,*
   509 F. 3d 89 (2d Cir. 2007) .........................................................................33-34

*Texas v. Johnson,*
   491 U.S. 397 (1989) ........................................................................................32

*Time Warner Cable, Inc. v. FCC,*
   729 F. 3d 137 (2d Cir. 2013) .......................................................................21-22

*United States v. O'Brien,*
   391 U.S. 367 (1968) ........................................................................................22

*United States v. Thompson,*
   896 F. 3d 155 (2d Cir. 2018) ...........................................................................32

*Universal City Studios v. Corley,*
  273 F. 3d 429 (2d Cir. 2001) ............................................................................21

*Wagner v. Swarts,*
  827 F. Supp. 2d 85 (N.D.N.Y. 2011) ..................................................................8

*Ward v. Polite,*
  667 F. 3d 727 (6th Cir. 2012) ......................................................................29, 30

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ..........................................................................................21

*WTC Families for a Proper Burial, Inc. v. City of New York,*
  567 F. Supp. 2d 529 (S.D.N.Y. 2008) .................................................................9

**STATE STATUTES**

N.Y. Exec. Law
  §503 ...................................................................................................................14
  § 532-e ..............................................................................................................14

N.Y. Dom. Rel. Law
  § 109(4) ...............................................................................................................2
  § 110 ............................................................................................................passim
  § 113(1) ..............................................................................................................23

N.Y. Not-For-Profit Corp. Law
  § 404(b)(1) ...........................................................................................................7

N.Y. Soc. Serv. Law
  § 20(3)(d) ...........................................................................................................14
  § 371(10) ....................................................................................................2, 7, 12
  § 371(10)(a) .....................................................................................................2, 7
  § 372-b(3) ..........................................................................................................14
  § 372-e(2) ..........................................................................................................14
  § 372-e(4) ..........................................................................................................29
  § 373(2) ..............................................................................................................19
  § 373(7) ..........................................................................................................5, 19
  § 374(2) ................................................................................................................2
  § 378(5) ..............................................................................................................14
  § 383(2) ..............................................................................................................23
  § 384 ..................................................................................................................23
  § 409 ..................................................................................................................14
  § 409-a ...............................................................................................................14
  § 460-a ................................................................................................................2
  § 462(1) ..............................................................................................................14

## STATE REGULATIONS

18 N.Y.C.R.R.

§ 421.3................................................................................................................................5
§ 421.3(d).................................................................................................................passim
§ 421.6..............................................................................................................................23
§ 421.11(a)-(f)....................................................................................................................4
§ 421.13..............................................................................................................................5
§ 421.15(g)..................................................................................................................5, 25
§ 421.16.......................................................................................................................5, 25
§ 421.16(b)..........................................................................................................................5
§ 421.16(h)........................................................................................................................12
§ 421.18(c)..................................................................................................................5, 19
§ 421.18(d)...........................................................................................................5, 18, 25

## RULES

Fed. R. Civ. P. 56(a)......................................................................................................1, 8

Local Rule 56.1(a) ..............................................................................................................1

## MISCELLANEOUS AUTHORITIES

Edward Alessi et al., *Prejudice Events and Traumatic Stress Among Heterosexuals and
Lesbians, Gay Men, and Bisexuals*, 22 J. Aggression, Maltreatment & Trauma 510,
519 (2013)........................................................................................................................27

Mark L. Hatzenbuehler et al., *State-Level Policies and Psychiatric Morbidity in LGB
Populations*, 99 Am. Pub. Health 2275 (2009) .............................................................27

Ilan Meyer & David Frost, *Minority Stress and the Health of Sexual Minorities, Handbook
of Psychol. & Sexual Orientation* 252 (Charlotte Patterson & Anthony D'Augelli,
eds., 2012).......................................................................................................................27

N.Y.S. Register, Nov. 6, 2013, p. 3..................................................................................21

Julia Raifman et al., *Association of State Laws Permitting Denial of Services to Same-Sex
Couples with Mental Distress in Sexual Minority Adults: A Difference-in-Difference-in Difference
Analysis*, 75 JAMA Psychiatry 674 (2018) ..................................................................28

Sharon S. Rotosky et al., *Marriage Amendments and Psychological Distress in Lesbian, Gay,
and Bisexual (LGB) Adults*, 56 J. Counseling Psychol. 56 (2009)...............................28

Defendant, Sheila J. Poole, in her official capacity as Acting Commissioner for the New York State Office of Children and Family Services ("OCFS"), respectfully submits this memorandum of law in support of her motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(a) and Local Rule 56.1(a).

## PRELIMINARY STATEMENT

Plaintiff, New Hope Family Services, Inc. ("New Hope"), an authorized agency that provides adoption services in the State of New York, brings this suit asking the Court to excuse it from OCFS's anti-discrimination regulation. New Hope refuses to process applications from, or place children for adoption with, unmarried cohabitating couples or same sex couples. Such discrimination is prohibited by state regulation. *See* 18 N.Y.C.R.R. § 421.3(d) ("§ 421.3(d)") (prohibiting authorized adoption agencies from discriminating against applicants for adoption services on the basis of, among other things, sex, sexual orientation, gender identity or expression, and marital status). Because the anti-discrimination regulation at issue here is neutral and generally applicable, and does not unconstitutionally compel speech or impose upon expressive association, New Hope cannot establish its entitlement to judgment on its remaining causes of action in this litigation.[1] Accordingly, summary judgment should be granted in favor of Defendant, and the Complaint ("Compl."), ECF No. 1, should be dismissed in its entirety with prejudice.

## PROCEDURAL BACKGROUND

New Hope commenced this action by the filing of a Complaint in December 2018, alleging that § 421.3(d) violates its rights under the First and Fourteenth Amendment. Compl., ECF No. 1.

---

[1] The only claims that remain in this case are New Hope's First Amendment free exercise and free speech/association claims. At the Second Circuit, New Hope did not challenge the dismissal of its equal protection and unconstitutional conditions claim. *New Hope Family Services, Inc. v. Poole*, 966 F. 3d 145 (2d Cir. 2020).

Thereafter, the Court granted Defendant's motion to dismiss and denied New Hope's motion for a preliminary injunction as moot.  ECF No. 38.

On New Hope's appeal, the Second Circuit reversed that portion of the District Court's decision and order that dismissed New Hope's free exercise and free speech claims and vacated the denial of New Hope's motion for a preliminary injunction.  *New Hope Family Services v. Poole*, 966 F.3d 145 (2d Cir 2020).  The Second Circuit remanded the case, directing the District Court to  rule on the merits of New Hope's motion for a preliminary injunction.  ECF No. 45. Following an answer and further submissions, the Court granted New Hope's motion for a preliminary injunction.  ECF Nos. 54, 57.

Following a stay pending the Supreme Court's decision in *Fulton v. City of Philadelphia*, ECF No. 66, the parties requested that they be permitted to forego discovery and proceed directly to dispositive motions.  ECF No. 68.  The Court granted that request.  ECF No. 69.

## STATEMENT OF FACTS

A.  <u>Authority to Provide Adoption Services</u>

An entity must qualify as an "authorized agency" under the law before it may provide adoption services in New York. N.Y. Soc. Serv. Law § 371(10)(a); *see also* N.Y. Soc. Serv. Law § 374(2).  To so qualify, an entity must have the authority "to place out or to board out children…," N.Y. Soc. Serv. Law § 371(10)(a); *see also* N.Y. Soc. Serv. Law § 374(2), and "receive children for purposes of adoption." N.Y. Dom. Rel. Law § 109(4).  It must also be "incorporated or organized under the laws of this state with corporate power or empowered by law to care for, to place out or to board out children . . . and submit and consent to the approval, visitation, inspection and supervision of [the Office of Children and Family Services]." N.Y. Soc. Serv. Law § 371(10)(a).  OCFS must approve the entity's certificate of incorporation. N.Y. Soc. Serv. Law § 460-a. *See* Declaration of Carol McCarthy ("McCarthy Decl."), ¶ 11.

To have the authority to place out children, an agency must first file a Certificate of Incorporation with the New York State Department of State. *Id.*, ¶ 12.  The Certificate of Incorporation establishes the authorized agency as a corporate entity.[2]  *Id.*  If an agency intends to have an adoption program, it must also obtain an approval from OCFS, to be filed in conjunction with its Certificate of Incorporation. *Id.* To obtain the OCFS approval, an agency must submit an application packet and business plan to the appropriate OCFS regional office. *Id.*  Upon receipt, OCFS conducts a site visit, which includes a full review of the proposed adoption program and a fiscal review, and determines whether to issue the approval. *Id.*  It is the acts of (1) filing of the Certificate of Incorporation and (2) OCFS approval that gives the authorized agency the legal authority to operate an adoption program in New York.  *Id.*

In New York State, nearly all authorized agencies have corporate authority for a limited duration and must seek reauthorization from OCFS prior to expiration. OCFS must provide its approval for each reauthorization.  *Id.*, ¶ 14.  In order to assess if it will approve the reauthorization, OCFS conducts a comprehensive review of the authorized agency, which includes an agency visit, completion of an adoption services assessment, and drafting of an Adoption Agency Program Review Report. *Id.*, ¶ 15.  OCFS utilizes this review process to determine if the authorized agency is in compliance with state laws, regulations, and policies.  *Id.*  A small number of authorized agencies have corporate authority in perpetuity, and therefore do not need to re-file with the Department of State.  *Id.*, ¶ 16.

The authorized agency also must be approved, visited, inspected, and supervised by OCFS, or must submit and consent to such oversight. *Id.*, ¶ 17.  The authorized agency remains subject to

---

[2] Corporate authority can be ended by: (1) the corporation itself filing a Certificate of Amendment to remove that authority; (2) the corporation filing a Certificate of Dissolution to end the corporate entity; (3) expiration of the corporate authority, if the authority was limited in duration; or (4) by court order.  *Id.*, ¶ 13.

ongoing approval and supervision. *Id.* Such oversight includes determining whether an agency is complying with state law, regulations, and policies, and such compliance may be a condition for ongoing approval. *Id.* This requirement is distinct from the requirement for corporate authority and applies to all authorized agencies, including those with perpetual corporate authority. *Id.* OCFS may review the adoption program and withhold its approval for failure to meet OCFS standards, regardless of if or when the agency's corporate authority is up for renewal. *Id.* An agency that fails to comply with all relevant laws, regulations and policies and, as a result, loses OCFS approval to continue operating an adoption program, may not provide adoption services in this State. *Id.*

Prior to 2017, it was OCFS's practice to utilize its corporate reauthorization approval process, discussed above, to satisfy its general oversight obligations. McCarthy Decl., ¶ 18. However, as a result of this practice, authorized agencies with perpetual corporate authority did not have their adoption programs visited and reviewed on a regular basis. *Id.*, ¶ 19. In 2017, OCFS discovered and corrected this oversight by visiting and reviewing every authorized agency with perpetual corporate authority. *Id.* OCFS revised its practice to require a site visit for every adoption program every year; these annual visits consist of a substantially similar review to the one done at the time of corporate reauthorization. *Id.* If the authorized agency is seeking corporate reauthorization that year, the reauthorization visit replaces the agency visit. *Id.*

During OCFS's program reviews, it routinely works with authorized agencies to ensure compliance so as to maintain the greatest number of resources available to families who wish to surrender or adopt a child. *Id.*

B.  <u>Processing of Adoptive Parent Applications</u>

Agencies authorized to provide adoption services in New York receive and respond to inquiries from, conduct orientation sessions for, and offer OCFS-approved applications to prospective adoptive parents. 18 N.Y.C.R.R. § 421.11(a)-(f). *See also* McCarthy Decl., ¶ 34. After an

adoption application is received, an adoption study must be completed.  18 N.Y.C.R.R. § 421.13; McCarthy Decl., ¶ 34.  An adoption study must explore various characteristics of prospective adoptive parents including their capacity to give and receive affection and ability to provide for a child's physical and emotional needs.  18 N.Y.C.R.R. § 421.16.  *See also* McCarthy Decl., ¶ 34.

An application may only be rejected if (1) an applicant does not cooperate with the adoption study; (2) an applicant is "physically incapable of caring for an adoptive child;" (3) an applicant is "emotionally incapable of caring for an adopted child;" or (4) an applicant's approval "would not be in the best interests of children awaiting adoptions."[3]  18 N.Y.C.R.R. § 421.15(g). *See also* McCarthy Decl., ¶ 35. Authorized agencies are prohibited from denying an application for adoption services due to the applicant's membership in any of the protected classes enumerated in 18 N.Y.C.R.R. § 421.3. McCarthy Decl., ¶ 35.

C.  <u>Matching of Children and Adoptive Parents</u>

Whether a particular child should be placed with a particular prospective adoptive parent for adoption must be made on the "basis of the best interests of the child."  18 N.Y.C.R.R. § 421.18(d). When making placement decisions, the agency must consider (1) the ages of the child and prospective parent(s); (2) the "physical and emotional needs of the child in relation to the characteristics, capacities, strengths and weaknesses of the adoptive parent(s);" (3) the "cultural, ethnic or racial background of the child and the capacity of the adoptive parent to meet the needs of the child with such a background;" and (4) the ability of a child to be placed in a home with siblings. *Id.* Additionally, agencies must "[m]ake an effort to place each child in a home as similar to and compatible with his or her religious background as possible." *Id.* at § 421.18(c); *see also* N.Y. Soc. Serv. Law § 373(7) (requiring consideration of religious wishes of the birthparents).

---

[3] Additionally, an applicant must be at least eighteen years old.  18 N.Y.C.R.R. § 421.16(b).

D.  Promulgation of 18 N.Y.C.R.R. § 421.3(d)

Section 421.3(d) was promulgated by OCFS in 2013 to prohibit discrimination against adoption applicants and maximize the pool of potential adoptive families available to adopt the thousands of New York children awaiting adoptive families.  McCarthy Decl., ¶¶25-28, 30.  In 2006, as part of a settlement of a lawsuit challenging the treatment of a juvenile transgender female in court-ordered OCFS custody, OCFS agreed to engage in six "Information Meetings" to discuss the care provided to transgender youth in court-ordered OCFS custody.  Declaration of Jara Traina ("Traina Decl."), ¶¶ 4-7.  To meet that obligation, OCFS assembled a work group that ultimately concluded that a policy was necessary to prohibit discrimination against, and harassment of, all LGBTQ youth. Id., ¶¶ 8-9. In 2010, one of the work group members recommended that OCFS establish similar protections against discrimination on the basis of sexual orientation, gender identity or gender expression for other programs and services regulated by OCFS.  Id., ¶ 12.  Thereafter, the work group expanded its scope to include other program areas in furtherance of OCFS's commitment to protect individuals from discrimination based on sexual orientation, gender identity or gender expression, including: (1) Child Protective Services; (2) Juvenile Detention Facilities; (3) Runaway and Homeless Youth Approved Programs; (4) Child Care Agencies; (5) Foster Services; and (6) Adoption Services.  Id., ¶ 13. The work group assembled a package of proposed regulations and amendments, including § 421.3(d), which proceeded through rulemaking and were promulgated in November 2013.  Id., ¶ 15.

As relevant here, that regulation states that "[a]uthorized agencies providing adoption services shall…prohibit discrimination and harassment against applicants for adoption services on the basis of race, creed, color, national origin, age, sex, sexual orientation, gender identity or expression, marital status, religion or disability."  18 N.Y.C.R.R. § 421.3(d).

E. New Hope

New Hope is an authorized agency, *see* Jan. 17, 2008 OCFS letter to New Hope, ECF No. 1-4, p. 2, incorporated under the New York Not-For-Profit Corporation Law for myriad purposes, including placing out children in New York for adoption. N.Y. Not-For-Profit Corp. Law § 404(b)(1). New Hope operates several programs including an adoption program. Compl., ECF No. 1, ¶ 50. As an adoption provider, New Hope provides services to birth mothers seeking adoptive placements for their newborns, infants and young toddlers, *id.* at ¶¶ 71-102, and single individuals and married opposite-sex couples seeking to adopt. *Id.* at ¶¶ 103-134.

Under prior applicable law, New Hope was granted perpetual corporate authority, as discussed above. However, its adoption program is still subject to OCFS approval to provide adoption services. N.Y. Soc. Serv. Law § 371(10). Therefore, notwithstanding its perpetual corporate authority, New Hope may not provide adoption services without the approval of OCFS. N.Y. Soc. Serv. Law § 371(10)(a).

 OCFS conducted a comprehensive review of New Hope in 2018 as part of its effort to review authorized agencies with perpetual corporate authority. McCarthy Decl., ¶ 41. During that review, OCFS discovered that New Hope's policies prohibit the processing of applications from, or placement of children for adoption with, unmarried couples or same sex couples. Declaration of Suzanne Colligan ("Colligan Decl."), ¶ 4. If unmarried or same sex couples seek adoption services from New Hope, New Hope does not accept an application from them, but refers them to other authorized agencies under a "recusal and referral" policy. Compl., ECF No. 1, ¶¶ 153-156 OCFS's 2018 review of New Hope was its first review subsequent to promulgation of 18 N.Y.C.R.R. § 421.3(d). McCarthy Decl., ¶ 42. This review was also the first time that OCFS learned of New Hope's practices with respect to unmarried and same sex couples. *Id.*

OCFS thereafter informed New Hope that such policies are in violation of 18 N.Y.C.R.R. § 421.3 and that OCFS wanted to discuss with New Hope how it could come into compliance. Colligan Decl., ¶ 6. New Hope responded that it did not intend to comply with the regulation because it was "unwilling to compromise [its] beliefs." *Id.*   While OCFS has historically worked collaboratively with New Hope to address various issues, McCarthy Decl., ¶ 43, New Hope has fully refused to comply with § 421.3(d). Compl., ECF No. 1, ¶ 191.

### STANDARD OF REVIEW

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Roe v. City of Waterbury*, 542 F. 3d 31, 35 (2d Cir. 2008).  To defeat a motion for summary judgment, a non-movant must raise issues of material fact "based on specific facts" as demonstrated by affidavits based on personal knowledge, or other admissible evidence.  *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011).  "The bald assertion of some alleged factual dispute will not defeat a properly supported motion."  *Id. See also Kerzer v. Kingly Mfg.*, 156 F. 3d 396, 400 (2d Cir. 1998) ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact.").

### ARGUMENT

### POINT I

### NEW HOPE CANNOT ESTABLISH A FREE EXERCISE CLAIM

To "state a free exercise claim, a plaintiff generally must establish that 'the object of [the challenged] law is to infringe upon or restrict practices because of their religious motivation,' or that the law's 'purpose…is the suppression of religion or religious conduct.'"  *Congregation of Rabbinical College of Tartikov, Inc. v. Vill. Of Pomona*, 915 F. Supp. 2d 574, 619 (S.D.N.Y. 2013) (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533 (1993)). The right to free exercise of religion

does not relieve an individual or entity of the obligation to comply with a "valid and neutral law of general applicability." *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990). Therefore, a law that only incidentally imposes a burden on the exercise of religion need only be supported by a rational basis. *WTC Families for a Proper Burial, Inc. v. City of New York*, 567 F. Supp. 2d 529, 539-540 (S.D.N.Y. 2008).

While the Second Circuit held that the pleading in this case "g[a]ve rise to a sufficient 'suspicion' of religious animosity to warrant 'pause' for discovery before dismissing New Hope's claim as implausible," *New Hope*, 966 F.3d at 163, a careful review of the record now before the Court shows that no factual support for New Hope's claims exists.  Instead, the undisputed facts surrounding OCFS's promulgation of § 421.3(d) establish that the regulation was intended to and does apply to all providers of adoption services for the sole purposes of prohibiting discrimination and increasing the pool of prospective adoptive families.  In addition, none of the other evidence relied on by New Hope supports its claim of hostility toward religion. Further, an examination of the full regulatory framework demonstrates that the regulation is generally applicable. Accordingly, because the regulation plainly has a rational basis to reduce prohibited discrimination and increase the pool of prospective adoptive families, New Hope's free exercise claim lacks merit.

### A.  Section 421.3(d) is Neutral

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021).  The neutrality of a law is determined by the consideration of relevant factors, including:  "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in questions, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Church of*

*Lukumi Babalu Aye,* 508 U.S. at 540; s*ee also Masterpiece Cakeshop, Ltd. v. Colo. Civil rights Comm'n,* 138 S. Ct. 1719, 1731 (2018) (applying the neutrality factors).

The Second Circuit found that § 421.3(d) is neutral on its face because, as written, it does not "discriminate against religion because its prohibitions apply equally to all adoption services, both secular and religious." *New Hope*, 966 F.3d at 163. However, the Second Circuit identified allegations in the Complaint that, if proven true, raised suspicion of hostility sufficient to allege a lack of neutrality. *New Hope*, 966 F.3d at 165-170. Consideration of the relevant legal factors based on the record now before the Court compels a finding that § 421.3(d) is neutral.

1. The Enactment History of § 421.3(d) Demonstrates the Regulation's Neutral Purpose.

The events leading to the promulgation of § 421.3(d) establish the regulation's neutrality. As discussed above, § 421.3(d) was promulgated as part of a package of regulations aimed at prohibiting discrimination in various OCFS programs. Traina Decl., ¶ 15. It grew out of a work group focused on the treatment of transgender youth living in OCFS custody. *Id.*, ¶ 9. Following the development of an OCFS policy to govern the treatment of LGBTQ youth in OCFS custody, *id.*, ¶ 10, the work group expanded its scope to include other program areas in furtherance of OCFS's commitment to protect individuals from discrimination based on sexual orientation, gender identity or gender expression. *Id.*, ¶ 13.

The work group thereafter worked collaboratively with stakeholders to draft OCFS regulations to prohibit the discrimination and/or harassment of anyone involved in services regulated by OCFS on the basis of sexual orientation, gender identity or gender expression. *Id.*, ¶ 14. The work group assembled a package of proposed regulations and amendments, including § 421.3(d), which proceeded through rulemaking and were promulgated in November 2013. *Id.*, ¶ 15.

The decision to create a generally applicable regulation to prohibit discrimination against adoption applicants was based on the desire to protect all children and families in New York State,

regardless of their provider; not to target religion *Id.*, ¶ 17.  At no time was there any discussion

about omitting an accommodation for the purposes of targeting religious providers. *Id.* No

animosity toward religious views was raised or expressed. *Id.* To the contrary, the work group

actively engaged with faith leaders in its work.  *Id.*

Based on the foregoing, the undisputed "historical background" of § 421.3(d), and the

"specific series of events leading to" the promulgation of the regulation, support the only finding

here – that § 421.3(d) was promulgated to prohibit discrimination and not to target religion.  *Church

of Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. at 540.

2. The Examples of Alleged Hostility Contained in the Complaint Do Not Undermine the Evidence
of Neutrality.

New Hope alleges, and the Second Circuit largely agreed, that six allegations in the

Complaint "give rise to the 'slight suspicion' of religious animosity" necessary to state a free exercise

claim: (1) alleged delay by OCFS in enforcing § 421.3(d) against New Hope between 2013 (when §

421.3(d) was promulgated) and 2018 (when OCFS directed that New Hope comply with § 421.3(d));

(2) alleged closure of other religious agencies after the promulgation of § 421.3(d); (3) the alleged

severity of the action threatened by OCFS for New Hope's noncompliance with § 421.3(d); (4)

alleged statements by OCFS officials; (5) alleged "disconnect" between § 421.3(d) and Domestic

Relations Law § 110; and (6) language contained in the rulemaking record. *New Hope*, 966 F.3d at

164-170.

This Court, in considering New Hope's motion for a preliminary injunction after remand,

has already found that the record supports a finding that two of the six examples raised a suspicion

of religious hostility.  *New Hope v. Poole*, 493 F. Supp. 3d 44, 57-60 (N.D.N.Y. 2020).[4]   However,

_____

[4] Although, in summary, the Court listed three examples as potentially indicative of religious hostility
– (1) permissive language of DRL § 110, (2) severity of threatened closure of New Hope's adoption

when viewed in connection with the factual record now before the Court, there is no evidence to support any of the alleged "examples" identified by the Second Circuit or alleged by New Hope, and therefore New Hope cannot prove any hostility toward religion sufficient to show a lack of neutrality.

    a.   *The Court Has Already Correctly Determined that Three Factors Relied Upon by New Hope Do Not Undermine the Regulation's Neutrality*

This Court has already determined that the following three factors[5] do not undermine the regulation's facial neutrality: (1) the alleged delay in enforcing § 421.3(d) against New Hope, *New Hope*, 493 F. Supp. 3d at 58; (2) the alleged "removal" of faith-based agencies from the OCFS website after § 421.3(d) took effect, *New Hope*, 493 F. Supp. 3d at 59; and (3) the severity of OCFS's actions against New Hope, *id.* at 59.[6]  The record now before the Court continues to support these conclusions.

---

program and (3) statements made by OCF officials, *New Hope v. Poole*, 493 F. Supp. 3d at 59, in its discussion, the Court found the severity of threatened closure to be neutral.  *Id.* at 59.

[5] The Court did not address the comment in the rulemaking record relied upon by the Second Circuit.  *New Hope*, 493 F. Supp. 3d at 57. However, OCFS's use of the word "archaic" in the rulemaking process is not evidence of religious targeting or animus in connection with § 421.3(d). In its Regulatory Impact Statement in connection with the package of regulations amended/promulgated by OCFS, OCFS stated that "[t]he amendments also promote fairness and equality in the child welfare adoption program by eliminating archaic regulatory language that implies the sexual orientation of gay, lesbian and bisexual prospective adoptive parents – but not of heterosexual prospective adoptive parents – is relevant to evaluating their appropriateness as adoptive parents." OCFS Rulemaking File, Traina Decl., Exh. G, pp. 22-23, 39. This explicitly refers to the amendment of 18 N.Y.R.R. § 421.16 (h), which required certain considerations of homosexuality in an adoption study.  Id.  It did not, in any way, refer to § 421.3(d), which is the only regulation at issue here.

[6] The penalty faced by New Hope if it does not comply with § 421.3(d) is not more severe than penalties faced by other providers – both secular and faith-based – in similar circumstances. McCarthy Decl., ¶ 23, Exh. A. When an adoption agency refuses to come into compliance with state law or OCFS regulations, OCFS cannot continue to approve the program. And an adoption agency that lacks OCFS approval is not authorized to provide adoption services in New York. Further, OCFS's authority to revoke approval of an adoption program stems from the requirement in N.Y. Social Services Law § 371(10) that  an authorized agency must be "approved" by OCFS. McCarthy Decl., ¶ 6. As a result, contrary to the suggestion of the Second Circuit, the "severity" of the

    *b.  Alleged Statements Made by OCFS Officials Were Benign and, Therefore, Neutral.*

    The statement made by the OCFS Assistant Commissioner for Communications in response to the voluntarily closure of Catholic Charities Buffalo, Declaration of Monica Mahaffey ("Mahaffey Decl."), ¶ 3 simply meant that an adoption or foster care agency cannot refuse to provide services based on sexual orientation under New York State law. *Id.*, ¶ 4.  The statement was not intended to target faith-based providers, or to suggest that religious beliefs are not welcome in New York State. *Id.* It had nothing to do with religion at all. And OCFS refutes that its official made the statement to New Hope that "[s]ome Christian ministries have decided to compromise and stay open." Colligan Decl., ¶ 7.  In fact, it was an employee at New Hope who said that New Hope was unwilling to compromise its beliefs and comply with § 421.3(d).  *Id.*, ¶ 6.  This official was in fact unaware of any faith-based adoption agencies who had changed their policies against providing adoption services to same sex or unmarried couples to come into compliance with an OCFS nondiscrimination regulation, and therefore could not have made such an alleged statement. *Id.*  In any event, contrary to the suggestion of the Second Circuit, these two alleged statements by OCFS personnel are not "similar to statements in Masterpiece Cakeshop."  *New Hope*, 966 F. 3d at 167-168 (referring to *Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1729 (2018)).  In that case, the comments made by the administrative Commission included describing the plaintiff baker's religious views as "despicable pieces of rhetoric" comparable to religious views that justified slavery and the Holocaust.  138 S. Ct. at 1729.  The comments here do not invoke any such hostility toward religion.

    *c.  Domestic Relations Law § 110 is Not Inconsistent with § 421.3(d).*

    The reliance by the Second Circuit and New Hope on an alleged "disconnect" between Domestic Relations Law ("DRL") § 110 and § 421.3(d) as evidence of hostility mischaracterizes the

---

potential closure of New Hope's adoption program cannot weigh in favor of a finding of hostility. *New Hope*, 966 F.3d at 168.

relationship between that statute and regulation.  The Second Circuit stated that "…suspicion [of religious hostility] is raised by an apparent disconnect between 18 NYCRR § 421.3(d) and the law it purports to implement, N.Y. Dom. Rel. Law § 110" because it believed both that the statute "signal[ed] an intent for some accommodation" and that § 421.3(d) was intended to implement that statute.  *New Hope*, 966 F. 3d at 165, 166.  The Court was mistaken on both accounts. Section 421.3(d) does not implement or derive its authority from DRL § 110,[7] and the statute is silent as to the legal obligations of authorized agencies.

The regulation was promulgated, in part, pursuant to the broad authority granted by N.Y. Social Services Law § 372-b(3), which directs OCFS to "promulgate regulations to maintain enlightened adoption policies and to establish standards and criteria for adoption practices," and N.Y. Social Services Law § 372-e(2), which directs OCFS to promulgate regulations "setting forth standards and procedures to be followed by authorized agencies in evaluating persons who have applied to such agencies for the adoption of a child."  As the Second Circuit recognized, "OCFS has wide discretion in promulgating regulations setting forth the 'standards and procedures to be followed by authorized agencies in evaluating' adoption applicants."  *New Hope*, 966 F.3d at 166 (quoting N.Y. Social Services Law § 372-e(2)).  Additionally, as the rulemaking record demonstrates, § 421.3(d) and the other regulations promulgated with it were promulgated pursuant to numerous statutory provisions, including Executive Law §§ 503 and 532-e and Social Services Law §§ 20(3)(d), 462(1), 372-b(3), 372-e(2), 378(5), 409 and 409-a.  *See* OCFS rulemaking record, McCarthy Decl., Exh. G.  DRL § 110 is not listed anywhere in the record as providing the authority for the

---

[7] As support for its contrary conclusion, the Second Circuit cited to pages 6-7 of Defendant's brief. *New Hope*, 966 F. 3d at 163.  Those pages do not support such a conclusion.  *See* Appellee Brief, Declaration of Adrienne J. Kerwin ("Kerwin Decl.") at Exh. B.

implementation of § 421.3(d). *Id.* Therefore, the reliance on that statute by both the Second Circuit and New Hope was entirely misplaced.

In any event, there is no "disconnect" between § 421.3(d) and DRL § 110. As relevant here, DRL § 110 states, "[a]n adult unmarried person, an adult married couple together, or any two unmarried adult intimate partners together may adopt another person." N.Y. Dom. Rel. Law § 110. Nothing about this plain language is inconsistent with the plain language or purpose of § 421.3(d): that authorized adoption agencies may not discriminate against applicants for adoption services on the basis of, among other things, sex, sexual orientation, gender identity or expression, and marital status. 18 N.Y.C.R.R. § 421.3(d). The statute defines who may adopt. The regulation prohibits discrimination against those who apply for adoption services.

Notwithstanding the consistent language, the Second Circuit relied upon a statement by the Governor in enacting the 2010 amendment to DRL § 110 that the amendment allowed more people to adopt "without compelling any agency to alter its present policies." *New Hope*, 966 F. 3d at 166; *see* Governor's Approval Memorandum, Declaration of Adrienne J. Kerwin ("Kerwin Decl."), Exh. A, p. 25. This was a true statement at that time because there was no anti-discrimination regulation requiring an authorized agency to serve same sex couples  Nothing in DRL § 110, itself, required authorized agencies to serve unmarried or same sex couples. It was because of this that, three years later, OCFS promulgated § 421.3(d) to protect adoption applicants from discrimination. Traina Decl., generally.

Neither the plain language of DRL § 110 nor the Governor's signing statement require that authorized agencies be granted a religious exemption. In fact, neither a religious accommodation, nor authorized agencies are mentioned in the statute at all. So, the lack of a religious exemption in § 421.3(d) is not inconsistent with DRL § 110.

15

Section 421.3(d) is also not inconsistent with the legislative intent of the 2010 amendment of DRL § 110.  Instead, the legislative history of DRL § 110 is, in fact, fully consistent with the policy considerations and intent of § 421.3(d).  As the legislative debate shows, DRL § 110 was amended to increase the pool of adoptive families, and a religious accommodation was not contemplated.  *See* transcript of legislative comment, Kerwin decl., Exh. A, pp. 000049-51; 000053-58.  *See also id.* at pp. 000058-60 (the debate before the Assembly cited the *American Association of Pediatrics* and the *Journal of Pediatrics* to support the adoption of children by gay parents, citing the many positive cognitive, academic, social, emotional and psychological experienced by such children).

In any event, even if the Governor's statement were viewed as contradicting the clear intent of the Legislature, it should not be considered.  The actual legislative history of a statute is stronger evidence of a statute's purpose than a governor's signing statement.  *See Gibson v Supt. of New Jersey Dept. of Law & Pub. Safety-Division of State Police*, 2009 U.S. Dist. LEXIS 26829, *13, n 4 (D. N.J. Mar. 31, 2009) ("signing statements need not be afforded significant weight in an analysis of legislative history"); *Govt. Suppliers Consolidating Servs., Inc. v Bayh*, 753 F. Supp. 739, 767, n 35 (S.D. Ind. 1990) ("Statements made by individual legislators should also carry a good deal of weight if the motives behind legislation are to be examined, perhaps more weight than the statements of the Governor who legally can only sign or veto the bill."); *Nobrega v Edison Glen Assoc.*, 167 N.J. 520, 533, 772 A. 2d 368, 376 (2001) ("though we may look to statements by the executive branch in determining legislative intent…we afford little weight to such sources where the legislative history itself speaks clearly").

Since neither the plain language nor the legislative history of DRL § 110 require OCFS provide a religious exemption for authorized agencies, § 421.3(d) is not inconsistent with DRL § 110.  Therefore, the Second Circuit's reliance on DRL §110 was misplaced.

16

Based on the record now before the Court, New Hope cannot establish that § 421.3(d) is hostile toward religion.  Instead, the record demonstrates that the regulation is neutral.

**B. Section 421.d(3) is Generally Applicable**

A law is not generally applicable if it (1) "'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions,'" or "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877 (quoting *Smith*, 494 U.S. at 884) (internal quotations omitted).  Section 421.3(d) does not do either of these things.  Instead, it applies to all providers of adoption services without exception.

The statutory and regulatory provisions that govern adoption services in New York do not single out any specific religious practices or views. They also do not contain exceptions to the nondiscrimination regulation that allow discrimination on the basis of certain factors, but not discrimination based on marital status or sexual orientation for religious reasons. In this way, § 421.3(d) is entirely distinguishable from the anti-discrimination contract provision in *Fulton*, which permitted the granting of individualized exemptions.  141 S. Ct. 1868 at 1878, 1881. The Supreme Court held that the anti-discrimination provision was not generally applicable on that basis.

Here, there is no mechanism for individualized exemptions from compliance with the anti-discrimination policy of § 421.3(d).  Both secular and faith-based agencies must comply with it if they wish to provide adoption services in this state.

Nor does the regulation permit secular conduct that undermines the state's interest in the way that New Hope's exclusionary policy does. There are in fact no comparable secular exceptions. New Hope attempts to distract the Court by pointing to factors relevant to the placement of a child with a family. There are no exceptions to § 421.3(d) that function like New Hope's exclusionary policy as a categorical exclusion preventing an individual's participation in an adoption program or

17

placement of a child with an individual under all circumstances.  The factors relevant to whether

placement of a child with a particular prospective adoptive parent are not "secular exemptions" to

§ 421.3(d)'s anti-discrimination rule.

In its analysis of the factors relevant to adoption services, the Second Circuit conflated the

factors relevant to an adoption application determination and those that relate to child placement

determinations.  *New Hope*, 966 F. 3d at 176-177.  "To determine whether a law provides equal

protection for secular and religious conduct…a court must [first] identify the secular conduct with

which the religious conduct is to be compared."  *Fulton*, 141 S. Ct. at 1921 (concurring opinion)

(citing *Lukumi*, 508 U.S. at 543).  *See also Resurrection Sch. v. Hertel*, 2021 U.S. App. LEXIS 25349,

\*\*40-41 (6th Cir. Aug. 23, 2021) (discussing appropriate comparators in free exercise challenge).

New Hope cannot establish that an authorized agency is permitted to discriminate on the

basis of marital status or sexual orientation, or on the basis of any other protected characteristics, for

a secular reason, so there is no secular comparator. The Second Circuit misunderstood the

regulatory framework in comparing factors relevant to approving adoption applications with factors

relevant to placing a child with a particular family, in its general applicability analysis.  Section

421.3(d) protects adoption applicants from discrimination; it focuses on the individuals who must be

provided adoption services on a nondiscriminatory basis.  Factors relevant to placement ensure that

a child is placed with a family that is in the child's best interests; they focus on the fit between

individual applicants and an adoptive child.  Those factors are unrelated to the equal treatment of

applicants.

Unlike the factors relevant to whether an applicant is qualified to serve as an adoptive

parent, the factors that agencies must consider when placing a particular child with a particular

family are intended to obtain for each child the most appropriate placement from the pool of

approved applicants.  For example, 18 N.Y.C.R.R. § 421.18(d) allows consideration of "the cultural,

18

ethnic or racial background of the child and the capacity of the adoptive parent to meet the needs of the child with such a background" as part of an agency's best-interest placement decision.  Similarly, Social Services Law § 373(2) and (7) favor placing a child with adoptive parents of the same faith "when practicable," and honoring a religious preference of the birth parents "when practicable" and in the child's best interest. *See also* 18 N.Y.C.R.R. § 421.18(c) (implementing same). These regulations serve the best interests of waiting children, but do not exclude applicants from services on the basis of any protected characteristics.

These provisions also do not create exceptions to the nondiscrimination regulation, which prohibits discrimination against adoption applicants on the basis of a variety of characteristics, including race, religion, marital status and sexual orientation. Rather, they require the consideration of the child's characteristics in furthering the state's interest in approving adoption placements that serve a child's best interests. None of these laws or regulations are intended to further the interests of authorized agencies—whether secular or faith based—in serving particular prospective adoptive parents.

Conversely, a determination whether to approve or disapprove an application to become an adoptive parent focuses exclusively on characteristics of the applicant.  The particular needs and characteristics of a child are not relevant at the application stage because there is not yet a child involved in the process.  Instead, the only relevant consideration is whether an applicant has the ability to parent.

The consideration of certain protected characteristics at the placement stage "does not endanger" the state's interest in prohibiting discrimination against adoption applicants "in a similar or greater degree than does" consideration of protected characteristics at the application phase. *Legacy Church, Inc. v. Kunkel*, 472 F. Supp. 3d 926, 1085 (D. NM 2020).

While it is true that agencies must consider statutory and regulatory criteria when evaluating an adoption application, those criteria require consideration of the individual applicant.  None of the criteria, like New Hope's refusal to serve unmarried or same sex couples, prohibits the participation of a group of individuals under all circumstances. Rather, the statutory and regulatory criteria relevant to an adoption study focus on whether that individual will be an appropriate and competent parent. New Hope refuses to even engage in that analysis when it receives an application from an unmarried or same sex couple. That is discrimination, and would similarly be discrimination if, based on the race or religion listed on an application, an agency refused to consider the application.

Nothing in New York's statutory and regulatory scheme permits prospective adoptive parents to be categorically excluded from the adoption process based on any protected characteristic.  Therefore, the scheme does not permit some kinds of discrimination, but not the kind that New Hope engages in.  There is no "exemption" that permits the exclusion of any category of adults from becoming adoptive parents.  As a result, § 421.3(d) is generally applicable.

### C.  Section 421.3(d) is Rationally Related to the State's Interests

Because § 421.3(d) is neutral and generally applicable, it need only be rationally related to the state's interest to withstand New Hope's free exercise challenge.[8]  *New Hope*, 966 F.3d at 162 (stating that a law is only subject to heightened scrutiny when it is not neutral and generally applicable).  It has been determined that the State has compelling interests in (1) combating discrimination and (2) increasing the pool of prospective adoptive families.  *New Hope*, 493 F. Supp. 3d at 60.  For this reason, this Court has found that § 421.3(d) is rationally related to the state's interests.  *New Hope Family Services, Inc. v. Poole*, 387 F. Supp. 3d 194, 216 (N.D.N.Y. 2019).  Accordingly, Defendant is entitled to summary judgment on New Hope's free exercise claim.

---

[8] Even if, arguendo, § 421.3(d) is subject to heightened scrutiny, it satisfies that standard as discussed at Point II(B) below.

POINT II

NEW HOPE CANNOT ESTABLISH A COMPELLED SPEECH CLAIM

The First Amendment prohibits the promulgation of a law "abridging the freedom of speech," U.S. Const. amend. I, and the applicable free speech analysis differs depending on whether the law is "content-based" or "content-neutral." *Universal City Studios v. Corley*, 273 F. 3d 429, 450-451 (2d Cir. 2001). "The principal inquiry in determining content neutrality…is whether the government has adopted a regulation of speech because of disagreement with the message it conveys…A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

As discussed above, § 421.3(d) applies to all authorized agencies and, therefore, its applicability is not based on the content of an agency's speech. *Congregation Rabbinical College of Tartikov*, 138 F. Supp. 3d at 426.  Additionally, the regulation was promulgated to ensure that "discrimination on the basis of sexual orientation, gender identity or expression in essential social services," does not occur, N.Y.S. Register, Nov. 6, 2013, p. 3, when individuals apply to be prospective adoptive parents and in determining if an adoption is in a child's best interests.  The regulation "does not aim at the suppression of speech, does not distinguish between prohibited and permitted activity on the basis of viewpoint, and does not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria."  *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984) (discussing nondiscrimination statute). The goal of preventing discrimination "is unrelated to the suppression of expression." *Id.* at 624. The regulation is therefore content-neutral.

A content-neutral law does not violate the free speech guarantee of the First Amendment if it "(1) 'advances important government interests unrelated to the suppression of speech' and (2) 'does not burden substantially more speech than necessary to further those interests.'" *Time Warner Cable,*

*Inc. v. FCC*, 729 F. 3d 137, 160 (2d Cir. 2013) (stating the factors set forth in *United States v. O'Brien*, 391 U.S. 367, 377 (1968)). As discussed, prohibiting discrimination and expanding the number of people who may adopt children are important government interests; these interests in turn advance the important state interest of providing permanent families in children's best interest. *New Hope*, 493 F. Supp. 3d at 63; *In re Jacob*, 86 N.Y.2d 651, 658, 661 (1995). Toward those ends, § 421.3(d) goes no further than ensuring that the most people entitled to adopt in New York are considered and afforded an equal opportunity as prospective adoptive parents by state-authorized adoption agencies; this is "plainly" a "compelling state interest[] of the highest order." *Roberts v. United States Jaycees*, 468 U.S. at 624.

In reversing the District Court order granting Defendant's motion to dismiss New Hope's free speech claim, the Second Circuit nonetheless held that New Hope stated such a claim by alleging that OCFS "demand[s]" that New Hope "express a State view with which it disagrees, i.e., that it can be in the best interests of a child to be adopted by an unmarried or same-sex couple." *New Hope*, 966 F.3d at 174. However, this characterization of the adoption process incorrectly construes the application of regulatory factors as a purely discretionary process that results in the expression of a viewpoint by the agency.

Preliminarily, although the Second Circuit found otherwise, Defendant continues to maintain that the regulation does not compel speech because the placement of a child with a prospective adoptive parent pursuant to rules prohibiting discrimination is conduct, not speech. The Supreme Court has confirmed the longstanding principle that prohibitions on discrimination regulate conduct, not speech, even if they may impact statements about access to goods or services: "Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only'

22

hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006).

Moreover, even if placement decisions are viewed as conveying a message, any message that New Hope conveys when it places the child with a prospective adoptive parent is properly understood as a message constrained by the relevant regulatory criteria, including the requirement that placements be made without regard to the prospective adoptive parent's marital status or sexual orientation.

New Hope has chosen to operate an adoption program. New Hope can only operate an adoption program within the statutory and regulatory construct enacted to govern adoption services. Adoption is a government program that changes the most fundamental legal relationship that exists between people in our society – that of parent and child. Additionally, adoption is more than just matching children with birth parents. It involves agencies, both public and private, taking temporary custody and guardianship of children, and ensuring their well-being, before an adoption is finalized. N.Y. Soc. Serv. Law §§ 384, 383(2); 18 N.Y.C.R.R. § 421.6; N.Y. Dom. Rel. Law § 113(1). As such, the state stringently regulates those who provide authorized adoption services according to established standards and criteria. To carry out this highly-regulated regime, the State partners with both public and private entities.

By voluntarily engaging in a government-regulated area, New Hope agrees to provide a social service in compliance with State laws. New Hope cannot provide adoption services without following the relevant laws as the State has enacted them.[9] As a result, the determinations made by

---

[9] As the Complaint alleges, New Hope does follow State law in connection with most of its adoption services. For instance, it processes applications from prospective adoptive parents, conducts home studies and lists approved applicants on a list for consideration by birthparents. Compl., ECF No. 1, ¶¶ 110-133. In doing so, it uses state-created criteria. *Id.* Notwithstanding its compliance with most of the State's laws related to approving or disapproving applications to adopt, and those related to

New Hope in connection with the processing of adoption applications and placing children in adoptive families are government speech, which do not trigger First Amendment protections. *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2001) ("…government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules…").

While the Second Circuit rejected Defendant's government speech argument at the motion to dismiss stage, it did indicate the possibility that Defendant may be able to offer proof sufficient to implicate the government speech doctrine. *New Hope*, 966 F.3d at 174. *See also id.* at 175 ("Further proceedings may produce additional evidence that casts [pleadings about factors related to speech] in a different light."). Defendant has done so on this record. There is no difference in how the state governs government authorized agencies and voluntary authorized agencies in the field of adoption. As demonstrated by the declaration of Carol McCarthy, voluntary authorized agencies provide the same adoption services as local departments of social services, and laws, regulations and policies that govern authorized agencies with respect to adoption services do not distinguish between them. McCarthy Decl., ¶ 9. Since adoption is regulated by the state as a social service, it is not reasonable that the public would somehow believe that an authorized agency engages in purely private conduct. And there is nothing in the record before the Court to the contrary.

Additionally, the record before the Court demonstrates that, in approving adoption applications and placing children in adoptive families, the determinations of adoption agencies are in fact "'from beginning to end'" "so controlled by New York as to be the State's own" message. *See New Hope*, 966 F. 3d at 175 (quoting *Johanns v. Livestock Mktg Ass'n*, 544 U.S. 550, 560 (2005)). While the application of some relevant factors, in either the application stage or the placement stage of an

---

placing children with adoptive families, New Hope does not want to comply with the anti-discrimination regulation § 421.3(d).

adoption, requires the exercise of some agency discretion, that discretion is not unbridled.  It must be exercised within the parameters set forth in statute and regulation.  There are factors that agencies must consider, and there are some that they cannot consider.  For instance, agencies must consider if an applicant is capable of providing for a child's physical and emotional needs, 18 N.Y.C.R.R. § 421.16, but cannot consider an applicant's religion in determining whether to approve the applicant as a prospective adoptive parent.  18 N.Y.C.R.R. § 421.3(d).  An agency must disapprove an application if an applicant does not cooperate with a home study, 18 N.Y.C.R.R. § 421.15(g), but cannot disapprove an applicant because of her or his race.  18 N.Y.C.R.R. § 421.3(d). Whether an agency agrees with these requirements is irrelevant.  It must comply with them or not provide adoption services. At the placement stage, the agency must consider the age of the child and prospective parents, 18 N.Y.C.R.R. § 421.18(d), but cannot consider the parents' marital status. The agency must also consider the capacity of the adoptive parent to meet the needs of a child with a particular cultural, ethnic or racial background, *id.*, but cannot determine that the placement is not in the child's best interest solely on the basis of the prospective adoptive parent's race.  McCarthy Decl., Exh. B.

The Second Circuit's discussion of the messages that New Hope shares with prospective adoptive parents about its faith does not change this conclusion. *New Hope*, 966 F. 3d at 174.  That New Hope identifies itself to applicants as a religious ministry, starts meetings with prayer and uses scripture "to explore 'how faith in God can held adoption applicants,'" *id.*, are unrelated to the factors that New Hope, as an agency authorized under state law to provide adoption services, must carry out that service.  OCFS relies on authorized agencies to make determinations on adoption applications and placements in accordance with the law as it exists.

While the Second Circuit is correct that OCFS does not "review, edit or reject a private authorized agency's best-interests assessment before a child's placement in an adoptive home," *New*

*Hope*, 966 F. 3d at 175, it also does not do so for a government authorized agency.  It is precisely *because* OCFS does not review or edit the best-interests assessments of authorized agencies that strict controls need to be placed on the criteria that may be considered by agencies in making those assessments.  Private agencies, like New Hope, are entrusted by the State with a responsibility typically reserved for government actors and for this reason their discretion is not unbridled.

In any event, the Second Circuit misunderstood the District Court's application of the government speech doctrine here. Defendant does not assert that any "message" conveyed by an agency's placement decision is understood as government speech. Rather, the placement decision is viewed as the agency's determination within the strict confines of regulatory parameters. Thus, the public would view the placement of a child with a same sex couple by an agency like New Hope, that expresses the view that children should not be raised by same sex parents, as conveying the message that such placement is in the child's best interest in light of the regulatory restriction prohibiting consideration of the prospective parent's sexual orientation.  McCarthy Decl., ¶ 9.  In other words, the placement decision is understood as having been made within applicable regulatory criteria, even if the agency exercises its discretion within those parameters.

Because determinations related to approving applications to adopt and placing children with adoptive families are government speech or at least speech made within the confines of a closely regulated program, Defendant is entitled to summary judgment on New Hope's free speech claim.

Even if, arguendo, the Court finds that § 421.3 compels speech by New Hope, the state interests served by § 421.3(d) – preventing discrimination and increasing the pool of prospective adoptive parents -- are important and compelling state interests.  *New Hope*, 493 F. Supp. 3d at 60. As promulgated, § 421.3(d) is narrowly tailored to satisfy these interests.  There is no other way to ensure that no one is excluded from a program solely on the basis of a protected characteristic other than by forbidding such discrimination.

New Hope alleges that its recusal and referral policy is a narrower way to satisfy the state's interests. However, that policy, in fact, undermines the state's interests. Instead of promoting equality in adoption services, it operates to further stigmatize same sex couples, who have historically suffered prejudicial treatment. McCarthy Decl., ¶ 47. It also harms children of same sex couples by permitting state-condoned discrimination against their parents and permitting the message that their families are not worthy of equal treatment under the law.

"Our society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth. *Masterpiece Cakeshop*, 138 S. Ct. at 1727. The Supreme Court has specifically recognized the harm to families stemming from the stigma associated with discrimination of same sex couples in services related to family formation. *See Obergefell v. Hodges*, 576 U.S. 644, 668 (2015) (discussing the harm to children "of knowing their families are somehow lesser" because the law did not allow their same sex parents to marry). OCFS's regulation prohibiting discrimination against adoption applicants based on marital status and sexual orientation serves the compelling state interest of prohibiting discrimination against, inter alia, same sex and unmarried couples.[10]

A recusal and referral policy discriminates against and harms same sex and unmarried couples. McCarthy Decl., ¶¶ 47, 51-53. Approval of New Hope's recusal and referral policy by OCFS would equate to state-sanctioned disapproval of same sex relationships, and disrespects and marginalizes an historically disadvantaged population.[11]  *Id.*

---

[10] State action protecting the rights of LGBTQ citizens helps reduce harms to such individuals caused by discrimination and prejudice. Ilan Meyer & David Frost, *Minority Stress and the Health of Sexual Minorities, Handbook of Psychol. & Sexual Orientation* 252, 252, 259 (Charlotte Patterson & Anthony D'Augelli, eds., 2012), https://tinyurl.com/MeyerStress.

[11] *See* Edward Alessi et al., *Prejudice Events and Traumatic Stress Among Heterosexuals and Lesbians, Gay Men, and Bisexuals*, 22 J. Aggression, Maltreatment & Trauma 510, 519 (2013), https://tinyurl.com/AlessiPrejudice; Mark L. Hatzenbuehler et al., *State-Level Policies and Psychiatric Morbidity in LGB Populations*, 99 Am. Pub. Health 2275 (2009),

Under a recuse and refer policy, families turned away from one agency must then seek out an agency willing to serve them—potentially at great time and expense and exposing them to further harmful discrimination in the process. *Id.*, ¶ 48; Compl., ECF No. 1, ¶ 14 (acknowledging expenses associated with having to find another agency). Without a universally applicable nondiscrimination requirement, there is no guarantee that there would be adoption providers willing to serve them.  *Id.* Although each local department of social services operates an adoption program, these programs only place children in the foster care system. *Id.*, ¶ 49. A prospective adoptive parent seeking to adopt outside of the foster care system cannot do so though the local department of social services. *Id.*  Therefore, if agencies, like New Hope, who facilitate adoptions outside of the foster care system can turn away applicants, the pool of children available to those applicants necessarily decreases.

This is particularly true for prospective adoptive parents seeking to adopt newborns and infants.  New Hope exclusively facilitates domestic adoptions of newborns, infants and young toddlers. *Id.*, ¶ 50; Compl., ECF No. 1, ¶ 76. Therefore, if an agency, like New Hope, refuses to work with same sex or unmarried couples, the number of newborns and infants available to those couples necessarily decreases.  Such a result discriminates against same sex and unmarried couples and removes those couples from the pool of applicants available to adopt a newborn or infant.

Even if there are other agencies willing to work with same sex and unmarried couples, a recuse and refer policy would nonetheless disadvantage these families.  McCarthy Decl., ¶ 51. Typically, agencies that facilitate domestic adoptions of newborns and infants outside of foster care have a greater number of prospective adoptive parents than children in need of placement, resulting

---

https://tinyurl.com/HatzenbuehlerPolicy; Sharon S. Rotosky et al., *Marriage Amendments and Psychological Distress in Lesbian, Gay, and Bisexual (LGB) Adults*, 56 J. Counseling Psychol. 56 (2009), https://tinyurl.com/RotoskyMarriage; Julia Raifman et al., *Association of State Laws Permitting Denial of Services to Same-Sex Couples with Mental Distress in Sexual Minority Adults: A Difference-in-Difference-in Difference Analysis*, 75 JAMA Psychiatry 674 (2018), https://tinyurl.com/RaifmanDenial.

in waiting lists. *Id.* Under a recuse and refer policy, same sex and unmarried couples turned away from agencies like New Hope would be segregated and funneled to the smaller subset of agencies willing to work with them, making waiting lists at those agencies longer and the likelihood of placement slimmer. *Id.* Such couples lose the ability to adopt the children in the custody and guardianship of any agency from whom they are turned away. *Id.* Thus, the likelihood that a prospective adoptive parent will receive a child for an adoptive placement depends on the number of children in the custody and guardianship of the authorized agencies willing to work with them, not the number of children available for adoption statewide. *Id.* This concern is particularly acute because of the disproportionately high rates at which same sex couples adopt. *Id.*, ¶ 53.

Moreover, New Hope's recuse and refer policy insulates its discrimination from regularly available state review, which is ordinarily available to review determinations not to approve an application. N.Y. Soc. Serv. Law § 372-e(4).

On closer examination, the one case cited by the Second Circuit in its discussion of New Hope's recusal and referral policy fails to support a finding that a recusal and referral policy would serve the state's interests. *New Hope*, 966 F. 3d at n. 19 (citing *Ward v. Polite*, 667 F. 3d 727, 735 (6th Cir. 2012)). In *Ward*, the plaintiff was a student in a University's "graduate-level counseling-degree program," who was participating in a required student practicum in which she counseled clients. 667 F. 3d at 729-730. University policy, and ethics rules, prohibited students from discriminating against others based on sexual orientation. *Id.* at 729, 734. When plaintiff was assigned to counsel a gay client, she asked that University faculty assign the client to another practicum student because of her religious views about same sex relationships, and the reassignment was made. *Id.* at 730. Following a disciplinary hearing because of her re-assignment request, plaintiff was expelled. *Id.*

The court held that plaintiff's free speech and free exercise claims were sufficient to go to the jury. *Id.* at 735-737, 740-741. Three important distinctions between *Ward* and the present case

29

demonstrate that New Hope's recusal and referral policy undermines the state's interest.  First, in *Ward*, the Court held that University policy permitted recusal of clients by student counselors for reasons other than that cited by plaintiff, so it was not generally applicable. *Id.* at 735, 736, 738-739, 740. Section 421.3(d) does not permit any authorized agency to refuse to serve an adoption applicant and, instead, refer that applicant elsewhere.

Second, the client did not know of plaintiff's request that the client be re-assigned to a different student counselor. *Id.* at 735. Therefore, the stigma associated with New Hope's categorical refusal to service unmarried or same sex couples was not present in *Ward*.  Finally, the reassignment of the client in *Ward* led to immediate counseling of the client by another student counselor in the University practicum program.  *Id.* at 726, 735.  New Hope's policy does not automatically result in another authorized agency accepting an unmarried or same sex couple's adoption application.  In fact, if discrimination is permitted, no agency would have to work with a same sex or unmarried couple at all.  McCarthy Decl., ¶ 48.

Since New Hope's recuse and referral policy undermines the state's interests in ensuring that people are not categorically excluded from adoption services on the basis of protected characteristics, including sexual orientation, and are available as prospective parents for all children needing homes, it is not an acceptable alternative to § 421.3(d).  As a result, § 421.3(d) is narrowly tailored to satisfy the State's compelling interests, and Defendant is entitled to summary judgment on New Hope's free speech claim.

### POINT III

<u>NEW HOPE CANNOT ESTABLISH A FIRST AMENDMENT ASSOCIATION CLAIM</u>

To establish an expressive association claim, a plaintiff must prove that it is a group that engages in some type of expression and that its "'right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends'" is violated by state

action. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)).  Defendant is entitled to summary judgment on New Hope's expressive association claim for three reasons.  First, New Hope's expressive association claim is duplicative of its free speech claim. Second, New Hope's right to expressive association is not implicated because New Hope is not an expressive association.  Third, even if that right is implicated, any burden on it is merely incidental and thus insufficient to state a claim.

**A.  New Hope's Expressive Association Claim is Duplicative of its Free Speech Claim**

New Hope's expressive association claim should be dismissed because it is duplicative of New Hope's free speech claim.  *DeFabio v. E. Hampton Union Free Sch. Dist.,* 658 F. Supp. 2d 461, 484 (E.D.N.Y. 2009).  New Hope alleges that, because they are "compelled" to make a finding that placement with an unmarried or same sex couple can be in the best interests of a child, it is therefore being forced to associate with such couples.  Compl., ECF No. 1, ¶¶ 264-278.  The Second Circuit reversed dismissal of the expressive association claim, in part, to allow New Hope to develop a record to support its claim that compelled association with such couples "would impede its ability to convey its religious beliefs about adoption in a way distinct from that resulting from the compelled speech of which it complains." *New Hope Family Servs.*, 966 F. 3d at 180.  But New Hope cannot provide any support for that claim.  Therefore, for the same reasons that Defendant is entitled to summary judgment on New Hope's free speech claim, it is entitled to summary judgment on New Hope's expressive association claim.

**B.  New Hope's Right to Expressive Association is Not Implicated**

Not every group can assert an expressive-association right; the right can be asserted only by those engaged in "expressive association." *Id.* at 648. The Second Circuit did not address whether New Hope is an expressive association.

"[T]he fact that an activity contains a 'kernel of expression' does not compel the conclusion that the activity qualifies as a form of 'expressive association' and is shielded by the First Amendment." *United States v. Thompson*, 896 F. 3d 155, 164 (2d Cir. 2018) (quoting *Dallas v. Stanglin*, 490 U.S. 19, 25 (1989)). The group's conduct must instead be intended "'to convey a particularized message.'" *Id.* (quoting *Texas v. Johnson*, 491 U.S. 397 (1989)).

Thus in *Dale,* the Supreme Court found that the Boy Scouts engaged in a form of expressive association because the very purpose of the Scouts was "'to instill values in young people.'" *Dale*, 530 U.S. at 649 (quoting mission statement). And because the Boy Scouts accomplished this goal by having leaders who "inculcate [the youth members] with the Boy Scouts' values—both expressly and by example," the forced inclusion of a leader whom the Boy Scouts felt did not represent its values impaired its expressive-association right. *Id.* at 649-50, 656. Key to the Court's conclusion was the fact that the Boy Scouts existed to "transmit such a system of values;" it was therefore an association that engaged in expressive activity. *Id.* at 650.

Likewise, in *Roberts*, a "not insubstantial part" of the Jaycees' activities constituted "protected expression on political, economic, cultural, and social affairs." 468 U.S. at 626. The organization took public positions on diverse issues and members regularly engaged in lobbying and other activities the Court found "worthy of constitutional protection under the First Amendment." *Id.* at 626-27.

In contrast here, New Hope is not open to membership and was not organized for the purpose of engaging in expressive activities.  In fact, New Hope does not allege that it limits its adoption services to people who share its religious beliefs, and no such proof is in the record. Compl., ECF No. 1, generally. C*f. id.*, ¶ 60 (stating that New Hope provides pregnancy resources services "without consideration of the recipient's…religious belief"). While New Hope's provision of adoption services likely entails verbal and written communications, its mission is not to engage in

protected speech or to inculcate values to its members, but to "care for and find adoptive homes for children whose birthmothers or parents c[an] not care for them." Compl., ECF No. 1, ¶ 3. This is a far cry from the forms of expressive association that the Supreme Court has found entitled to First Amendment protection. Consequently, New Hope is not a group that engages in "expressive association" within the meaning of the First Amendment. *Dale*, 530 U.S. at 648. Instead, it is a business providing a social service, including adoption, in compliance with state law.

To be sure, requiring New Hope to provide equal access to its services without regard to marital status or sexual orientation will compel it to associate with unmarried and same sex couples in the sense of interacting with them for the purpose of assisting them to become adoptive parents. But just as the right of association was not infringed by a rule requiring law schools to interact with military recruiters by allowing them on campus and providing the same incidental services provided to other recruiters, *see Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, New Hope's right of association is not infringed here. The right of association is infringed only when a group is organized for expressive purposes and is forced to alter its selection of members or constituents, interfering with the critical means by which a group "express[es] those views, and only those views, that it intends to express." *Dale*, 530 U.S. at 648. As noted, the Second Circuit allowed this claim to go forward because of the possibility that New Hope might substantiate its claim that its expressive activities are burdened by working with same sex and unmarried couples. But New Hope has failed to do so. Accordingly, Defendant is entitled to summary judgment on New Hope's expressive association claim.

### C. Any Burden on New Hope's Right to Expressive Association is Incidental

Even if OCFS's nondiscrimination regulation implicates New Hope's expressive association right, any burden on that right is merely incidental, and is thus insufficient to state a claim. "Mere incidental burdens on the right to associate do not violate the First Amendment; rather, to be

33

cognizable, the interference with plaintiffs' associational rights must be direct and substantial or significant." *Tabbaa v. Chertoff*, 509 F. 3d 89, 101 (2d Cir. 2007) (internal quotation and alteration from original omitted); *accord Fighting Finest v. Bratton*, 95 F. 3d 224, 228 (2d Cir. 1996) (citing *Lyng v. Intl. Union*, 485 U.S. 360, 367 & n.5 (1988)). Here, they are neither. The nondiscrimination rule does not burden any expressive association right that may exist here in either a direct or substantial way.

Although New Hope asserts a viewpoint about the marital status and sexual orientation of adoptive parents, it cannot show how its message is affected merely by providing services to them as required by state law. *Dallas v. Stanglin*, 490 U.S. 19, 24 (1989) (dance hall patrons do not associate for expressive purposes). Indeed, were the rule otherwise, no organization that engaged in expressive activities could be required to serve members of the general public in a nondiscriminatory manner. New Hope cannot show that serving such couples directly or substantially interferes with its alleged associational rights.

Nor can New Hope substantiate the Second Circuit's concern that compliance with the nondiscrimination rule would make employment with New Hope less desirable and impact its hiring practices in a way that would affect its associational rights. *See New Hope Family Servs.,* 966 F.3d at 179.

Finally, OCFS is not enforcing its nondiscrimination regulation for the very purpose of altering New Hope's expression. OCFS's enforcement. As discussed above, 421.3(d) is enforced to prohibit discrimination and increase the pool of prospective adoptive parents. Thus, even if the nondiscrimination regulation impairs New Hope's right to expressive association in some minimal way, enforcement of the regulation would not unconstitutionally violate that right. *Roberts*, 468 U.S. at 624 (finding no constitutional violation where state's compelling interest in public accommodation law outweighed any minimal impact on organization's expressive activities).

34

Nothing in the record before the Court supports a finding that New Hope exists for expressive purposes or that § 421.3(d) interferes with New Hope's right to expressive association in any direct or significant way.  As a result, Defendant is entitled to summary judgment on New Hope's expressive association claim.

## CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment should be granted in its entirety.

Dated:  Albany, New York
         October 8, 2021

                                        LETITIA JAMES
                                        Attorney General
                                        State of New York
                                        Attorney for Defendant Sheila J. Poole
                                        The Capitol
                                        Albany, New York  12224

                                        By: **s/** *Adrienne J. Kerwin*
                                        Adrienne J. Kerwin
                                        Assistant Attorney General, of Counsel
                                        Bar Roll No. 105154
                                        Telephone:  (518) 776-2608
                                        Fax:  (518) 915-7738 (Not for service of papers)
                                        Email: Adrienne.Kerwin@ag.ny.gov

TO (via ECF):  Mark Lippelman
               Roger Greenwood Brooks
               David A. Cortman
               Erik W. Stanley
               Jeremiah Galus
               Jonathan A. Scruggs
               Robert E. Genant
               Jacob P. Warner