**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

NEW HOPE FAMILY SERVICES, INC.,

                        Plaintiff,

      vs.

SHEILA J. POOLE, in her official capacity as
Acting Commissioner for the Office of Children
and Family Services for the State of New York,

                      Defendant.

---

No.: 5:18-cv-1419 (MAD/TWD)


**MEMORANDUM OF LAW IN
SUPPORT OF NEW HOPE FAMILY
SERVICES' MOTION FOR
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Authorities .................................................................................................... iii

Introduction.................................................................................................................. 1

Statement of Material Facts ........................................................................................ 2

Summary Judgment Standard ..................................................................................... 12

Argument .................................................................................................................... 12

I.     The Regulation as applied infringes New Hope's right to free speech and freedom of association in a manner that triggers strict scrutiny. .................................. 12

     A.    New Hope engages in protected speech reflecting its "ideas and beliefs" towards three distinct audiences. ........................................................... 12

          1.    New Hope speaks protected speech to birthmothers. .............................. 13

          2.    New Hope speaks protected speech to adoptive couples.......................... 13

          3.    New Hope speaks protected speech to the State..................................... 14

     B.    Strict scrutiny must be applied because the Regulation would force New Hope to change the content of its speech, and would impose content and viewpoint-based censorship on New Hope's speech. .......................................... 14

     C.    Section 421.3(d) also violates New Hope's right to expressive association......... 16

          1.    The Regulation disrupts the "expressive association" consisting of New Hope's board members, employees, and volunteers. ...................... 16

          2.    The Regulation disrupts the "expressive association" consisting of New Hope's representatives and the adoptive couples it serves.............. 17

II.    The Regulation as applied impairs New Hope's right to freely exercise its religion in a manner that triggers strict scrutiny............................................................ 18

     A.    Section 421.3(d) must be subjected to strict scrutiny because it intrudes on historic beliefs at the heart of New Hope's "faith and mission."......................... 19

     B.    Section 421.3(d) must be subjected to strict scrutiny because numerous exceptions mean that it is not "generally applicable."......................................... 21

     C.    Section 421.3(d) must be subjected to strict scrutiny because it is not "neutral."................................................................................................... 22

1.   OCFS's promulgation of Section 421.3(d) evinced animus against religious beliefs. ............................................................................... 23

2.   OCFS's enforcement of Section 421.3(d) evinced animus against religious beliefs. ............................................................................... 25

III.   Title 18 NYCRR § 421.3(d) cannot satisfy strict scrutiny ................................................. 29

A.   OCFS cannot identify any relevant compelling state interest. .............................. 30

B.   OCFS cannot show that applying Section 421.3(d) to close New Hope is narrowly tailored to avoid any unnecessary impairment of New Hope's First Amendment rights. ............................................................................................... 31

IV.   The Court should issue a permanent injunction that protects the right of New Hope and similarly situated adoption and foster care services to operate in a manner consistent with their beliefs. ........................................................................................ 33

Conclusion ........................................................................................................................................ 33

## TABLE OF AUTHORITIES

**<u>Cases</u>**

*Agency for International Development v. Alliance for Open Society*

   *International, Inc.*,

   570 U.S. 205 (2013) .................................................................................. 13, 16

*Boy Scouts of America v. Dale*,

   530 U.S. 640 (2000) .......................................................................................... 19

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,

   508 U.S. 520 (1993) ........................................................................ 22, 24, 27, 29

*Colon v. Coughlin*,

   58 F.3d 865 (2d Cir. 1995) ............................................................................... 13

*Employment Division v. Smith*,

   494 U.S. 872 (1990) .................................................................................... 20, 22

*Fulton v. City of Philadelphia*,

   141 S. Ct. 1868 (2021) .............................................................................. passim

*Greer v. Wing*,

   746 N.E.2d 178 (N.Y. 2001) ............................................................................ 25

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,

   565 U.S. 171 (2012) .......................................................................................... 20

*International Dairy Foods Association v. Amestoy*,

   92 F.3d 67 (1996) .............................................................................................. 35

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,

   138 S. Ct. 1719 (2018) ........................................................................ 21, 24, 30

*McCullen v. Coakley*,

    573 U.S. 464 (2014) ................................................................................... 31

*National Institute of Family & Life Advocates v. Becerra*,

    138 S. Ct. 2361 (2018) ........................................................................... 16, 34

*New Hope Family Services, Inc. v. James*,

    5:21-cv-01031-MAD-TWD (N.D.N.Y. filed Sept. 17, 2021) ................................... 2

*New Hope Family Services, Inc. v. Poole*,

    493 F. Supp. 3d 44 (N.D.N.Y. 2020) .......................................................... passim

*New York Progress & Protection PAC v. Walsh*,

    733 F.3d 483 (2d Cir. 2013) ......................................................................... 35

*People v. Cagle*,

    860 N.E.2d 51 (N.Y. 2006) ........................................................................... 25

*Reed v. Town of Gilbert*,

    576 U.S. 155 (2015) ................................................................................... 30

*Riley v. National Federation of the Blind of North Carolina, Inc.*,

    487 U.S. 781 (1988) ................................................................................... 16

*Roberts v. United States Jaycees*,

    468 U.S. 609 (1984) ................................................................................... 17

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,

    547 U.S. 47 (2006) ..................................................................................... 18

*Spence-Chapin Adoption Serv. v. Polk*,

    274 N.E.2d 431 (N.Y. 1971) ........................................................................ 23

*Tandon v. Newsom*,

    141 S. Ct. 1294 (2021) ................................................................................. 1, 23, 26

*Texas v. Johnson*,

    491 U.S. 397 (1989) ................................................................................................ 13

*Town of Greece v. Galloway*,

    572 U.S. 565 (2014) ................................................................................................ 21

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,

    137 S. Ct. 2012 (2017) ............................................................................................ 20

*United States v. Playboy Entertainment Group, Inc.*,

    529 U.S. 803 (2000) ................................................................................................ 32

*Wisconsin v. Yoder*,

    406 U.S. 205 (1972) ................................................................................................ 31

## **Statutes**

ALA. CODE § 26-10D-5 (2017) ....................................................................................... 34

KAN. STAT. ANN. § 60-5322 (2018) ............................................................................... 34

MICH. COMP. LAWS ANN. § 710.23g (2015) ................................................................. 33

N.D. CENT. CODE ANN. § 50-12-07.1 (2021) ................................................................. 34

N.Y. Dom. Rel. Law § 110 ....................................................................................... 23, 25

N.Y. Dom. Rel. Law § 110 (2009) .................................................................................... 9

N.Y. Dom. Rel. Law § 110 (2011) .................................................................................... 9

N.Y. Soc. Serv. Law § 373(2) ......................................................................................... 23

N.Y. Soc. Serv. Law § 373(7) ......................................................................................... 23

OKLA. STAT. ANN. TITLE. 10A, § 1-8-112 (2018) .......................................................... 34

S.D. Codified Laws § 26-6-38 (2017) ........................................................................ 34

Tenn. Code Ann. § 36-1-147 (2020) ......................................................................... 34

Tex. Hum. Res. Code Ann. § 45.004 (2017) ............................................................ 34

Va. Code Ann. § 63.2-1709.3 (2012) ....................................................................... 33

**Other Authorities**

5A Fed. Prac. & Proc. Civ. § 1339 ............................................................................ 13

Gov. Mem., New York Bill Jacket, 2010 S.B. 1523, ch. 509 ................................. 9, 25

OCFS Informational Ltr., 11-OCFS-INF-01 (Jan. 11, 2011) ..................................... 10

OCFS Informational Ltr., 11-OCFS-INF-05 (July 11, 2011) ..................................... 10

Stephen T. Watson & Harold McNeil, *Catholic Charities ending foster, adoption programs over same-sex marriage rule*, The Buffalo News (Aug. 23, 2018), https://buffalonews.com/news/local/catholic-charities-ending-foster-adoption-programs-over-same-sex-marriage-rule/article_61a0fe9d-a73a-5cef-9726-eec2ad75f87c.html ...................... 29

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................... 13

**Regulations**

18 NYCRR § 421.3(d) ............................................................................... passim

18 NYCRR § 421.10(a) .............................................................................................. 23

35 N.Y. Reg. 3 (Nov. 6, 2013) ................................................................................... 10

## INTRODUCTION

The Second Circuit and this Court held that the facts previously presented by New Hope Family Services ("New Hope") demonstrate a likelihood of success in showing that, as applied, Title 18 NYCRR § 421.3(d) (the "Regulation") violates the Free Speech and Free Exercise rights of New Hope. Those facts remain unchanged, and the decisive facts are not merely evidentiary, but undisputed.

Meanwhile, since the prior rulings were entered, key questions of *law* have been clarified by the Supreme Court in a manner that significantly reinforces New Hope's Free Exercise claim. In *Fulton v. City of Philadelphia*, the Supreme Court *unanimously* held that "it is plain" that the government burdens a foster care provider's religious exercise "by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs." 141 S. Ct. 1868, 1876-79 (2021). More, the Court held that a law that imposes such a burden is not "generally applicable"—and must survive strict scrutiny—if it prohibits religiously motivated conduct while allowing even the possibility of secular exemptions affecting the same governmental interest. *Id.* And in *Tandon v. Newsom*, the Supreme Court held that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." 141 S. Ct. 1294, 1296 (2021) (emphasis in original).

Simply put, the Regulation triggers strict scrutiny but cannot survive that test. The Court should grant New Hope's motion for summary judgment and issue a permanent injunction protecting its constitutional rights. And judicial recognition of New Hope's rights is imperative because New York State issued *new* threats to investigate New Hope for the very same speech and policies at issue here. *New Hope Fam. Servs., Inc. v. James,* 5:21-cv-01031-MAD-TWD (N.D.N.Y. filed Sept. 17, 2021).

1

## STATEMENT OF MATERIAL FACTS

The disputes in this case are fundamentally legal, rather than factual. The following facts are evidentiary; they are also undisputed, and decisive.

### New Hope's mission, history, and beliefs

1.      Since the beginning of the Christian faith, believers have been commanded to care for "orphans and widows." Verified Complaint ("VC"), ECF No. 1, ¶¶ 2, 35 (citing *James* 1:27); Aff. of Judith A. Geyer in Supp. of New Hope Fam. Servs.' Mot. for Prelim. Inj. ("Geyer Aff."), ECF No. 15-2, ¶¶ 10-11, attached as Ex. 1.

2.      In colonial early federal America, it was faith-based organizations that first undertook systematic efforts to provide homes for orphan children, long before government took steps to meet this need. VC ¶¶ 2, 35-38.

3.      New Hope Family Services was founded in 1965 for the express purpose of obeying the scriptural commandment to place orphaned or abandoned children into adoptive homes. VC ¶¶ 40-45; *see* Geyer Aff. ¶ 13, 15.

4.      The need for adoptive homes in New York, and adoption services to facilitate adoptions, is tragically large. "In fiscal year 2017, more than 27,000 children in the State were in foster care. Some 4,400 were awaiting adoption. Nevertheless, only 1,729 were actually adopted that year." *New Hope Fam. Servs. v. Poole*, 966 F.3d 145, 151 (2d Cir. 2020); *see* Geyer Aff. ¶¶ 25-26.

5.      New Hope is a Christian ministry; its religious beliefs motivate its mission and permeate all of its activities. VC ¶¶ 52; Geyer Aff. ¶ 30.

6.      New Hope requires all board members, staff, and volunteers to agree with and sign New Hope's statement of faith, to support its religious mission, and to conduct themselves consistent with Christian faith. VC ¶¶ 52-56; Geyer Aff. ¶ 31.

7.      New Hope's board members, staff, and volunteers devote their time to New Hope because they believe in and want to join their efforts to further New Hope's mission and messages. Suppl. Aff. of Kathleen Jerman in Supp. of New Hope Fam. Servs.' Mot. for Prelim. Inj. ("Jerman Aff."), ECF No. 52-1, ¶¶ 57-63, attached as Ex. 2.

8.      In order to scrupulously ensure its autonomy to operate consistently with its beliefs, New Hope accepts no government funding. VC ¶ 51; Geyer Aff. ¶ 29.

9.      New Hope believes that God created marriage to consist of the union of one man and one woman for life; that a family built around such a marriage is the divinely sanctioned and healthiest environment for raising children; and that placement with a married mother and father is in the bests interest of each child entrusted to New Hope's care. VC ¶ 56; Geyer Aff. ¶ 36.

10.      Due to its these religious beliefs, New Hope does not place children with unmarried couples or same-sex couples. VC ¶¶ 153-154; Geyer Aff. ¶ 137.

### New Hope's record of success in placing children for adoption

11.      Since its founding, New Hope has worked with birthmothers and adoptive parents to place more than 1,000 children into permanent homes. VC ¶¶ 5, 73; Geyer Aff. ¶ 54.

12.      New Hope devotes its efforts exclusively to placing infants and very young children for adoption. VC ¶ 76; Jerman Aff. ¶ 3. Within the last 20 years, New Hope has not placed any child older than three years of age. Jerman Aff. ¶ 3.

13.      New Hope has a record of being willing to place, and finding adoptive parents willing to accept, children who are categorized as "hard to place" due to disability, medical

condition, race, or other factors. In recent decades, the substantial majority of infants placed by New Hope have fallen into one or more "hard to place" categories. Yet New Hope has never failed to find a permanent adoptive home for any child entrusted to its care—even infants with severe medical conditions. Jerman Aff. ¶¶ 5-6.

14.     New Hope does not "reject" unmarried or same-sex applicants, as a formal rejection could complicate those applicants' ability to later obtain approval through any agency. Instead, New Hope informs them that because of its religious beliefs, New Hope cannot be the agency to serve them, and New Hope is willing to provide referrals to other agencies that will. VC ¶ 156; Jerman Aff. ¶ 27.

15.     There is no evidence that New Hope's beliefs, policies, and actions have ever prevented any legally eligible individuals or couples from successfully adopting a child. *See* VC ¶ 156; Jerman Aff. ¶ 27.

### New Hope's value-laden communications

16.     New Hope's ministry is not confined to placing children for adoption. Christian evangelism is also a part of New Hope's ministry to birthmothers and adoptive couples, for those who desire to hear about the Gospel. Jerman Aff. ¶53.

17.     New Hope is committed to conveying a "system of values about life, marriage, family and sexuality to both birthparents and adoptive parents through its comprehensive evaluation, training, and placement programs." VC ¶ 270; Geyer Aff. ¶ 86-87; *New Hope*, 966 F.3d at 156. This system of values includes the belief that "the biblical model for the family as set out in the Bible–one man married to one woman for life . . . is the ideal and healthiest family structure for mankind and . . . for the upbringing of children." VC ¶ 56; Jerman Aff. ¶ 14.

4

18.     New Hope team members believe that Christian truths—about the Gospel and healthy families—will profoundly help infants, birthparents, and adoptive parents. All New Hope team members have associated together in part because they can convey those shared beliefs and values more effectively through their adoption work at New Hope. Jerman Aff. ¶¶ 53-54, 57-63.

19.     If New Hope was blocked from communicating its faith-based messages, or was forced to communicate contrary messages, then multiple employees who associate with New Hope could no longer in good conscience work for New Hope. Jerman Aff. ¶ 58.

20.     New Hope engages in substantive speech directed towards three distinct audiences: when it is "counseling birthmothers," "instructing and evaluating prospective adoptive parents," and "filing its ultimate reports" with the State. *New Hope*, 966 F.3d at 171; Jerman Aff. ¶¶ 8-63.

21.     New Hope engages in value-laden discussion with birthmothers, including counseling on the best interests of children in general, counseling on the best interests of particular children with particular potential adoptive couples, family dynamics, adoption, the adoption process, and the selection of adoptive parents. Geyer Aff. ¶ 67; Jerman Aff. ¶¶ 8-11; Aff. of Charity Loscombe in Supp. of New Hope Fam. Servs.' Mot. for Prelim. Inj. ("Loscombe Aff."), ECF No. 15-3, at ¶¶ 4-8, attached as Ex. 3.

22.     When New Hope presents to a birthmother the portfolio of an adoptive couple, New Hope is representing that it believes that placement with that family would be in the best interests of that child. Jerman Aff. ¶ 10. "If New Hope were forced to work with unmarried or same-sex couples to approve them as adoptive parents, in light of its faith-based beliefs about family and the best interests of children, New Hope would be compelled by conscience—

informed by its faith—to advise birthmothers whom it serves that it does not believe that an unmarried or same-sex couple could provide the best home for their child." Jerman Aff. ¶¶ 8-11.

23.     New Hope's discussions with—and recommendations to—birthmothers include significant discretion and personal judgment informed by beliefs about human nature and family. Jerman Aff. ¶¶ 8-11; 19-32.

24.     Prior to the events at issue in this litigation, OCFS has never tried either to compel or to censor the messages that New Hope conveys to birthmothers or to applicant adoptive parents. Jerman Aff. ¶¶ 12, 18.

25.     New Hope also engages in extensive value-laden speech with candidate adoptive couples. These communications include values and beliefs about marriage, family, and the best interests of children to candidate adoptive parents, through group sessions, individual discussions of marital and parenting issues, and counseling about building a healthy home environment for an adoptive child. These meetings open with prayer, quoting scripture passages concerning children and families, and involve discussion of marital issues, infertility, relationships, adoption, and parenting philosophy. VC ¶¶ 105-120; Jerman Aff. ¶¶ 13-17, 50-52; Geyer Aff. ¶¶ 86, 90, 92; *see* Aff. of Elaine Bleuer in Supp. of New Hope Fam. Servs.' Mot. for Prelim. Inj. ("E. Bleuer Aff."), ECF No. 15-5, at ¶ 10, attached as Ex. 4.

26.     There is no requirement that adoptive applicants share New Hope's faith, but all who choose to work with New Hope are inevitably aware of that faith framework and have chosen to work with New Hope rather than with one of the many secular adoption services in the state. Geyer Aff. ¶ 86; Jerman Aff. ¶ 51.

27.     New Hope also discusses with adoptive couples how to present themselves in a "portfolio" that will be presented to birthmothers as they select adoptive parents for their

children. These discussions include reviewing drafts, making suggestions, and editing the content before it is finalized. VC ¶¶ 125-27; Jerman Aff. ¶ 16.

28.   New Hope's communications with applicant adoptive parents include group discussions involving multiple couples, as well as many private conversations with individual couples. *See* VC ¶ 109.

29.   New Hope's discussions with candidate adoptive couples include significant discretion and personal judgment informed by beliefs about human nature and family. Jerman Aff. ¶¶ 13-17; 19-32.

30.   "If New Hope were required to work with unmarried or same-sex couples in the counseling and home study process, New Hope would be compelled by conscience—informed by its faith—to advise those couples that New Hope does not believe that an unmarried or same-sex couple can provide the best home for adopted children, because the best home for each infant is a family comprised of a mother and father committed to each other—and thus together to their children—for life in marriage." Jerman Aff. ¶ 14.

31.   Many birthmothers and adoptive parents choose to work with New Hope specifically because of its openly Christian nature, and its faith-based convictions, and multiple prospective adoptive parents have testified that if New Hope were blocked from teaching, counseling, and acting based on its religious beliefs about marriage and family, those individuals would not feel comfortable relying on New Hope to guide them through the adoption process. Jerman Aff. ¶ 50; E. Bleuer Aff. ¶ 10; Aff. of Ellie Stultz in Supp. of New Hope Fam. Servs.' Mot. for Prelim. Inj. ("Stultz Aff."), ECF No. 15-4, ¶¶ 3-31, attached as Ex. 5; Aff. of Jeremy Johnston in Supp. of New Hope Family Services' Mot. for Prelim. Inj. ("Johnston Aff."), ECF

No. 15-6, ¶¶ 3-14, attached as Ex. 6; Aff. of Justin Bleuer in Supp. of New Hope Fam. Servs.'
Mot. for Prelim. Inj. ("J. Bleuer Aff."), ECF No. 15-7, ¶¶ 3-17, attached as Ex. 7.

32.     Some couples who have adopted through New Hope in the past have testified that
they are considering adopting again, but would not do so if they were not able to work with an
agency such as New Hope that shares their faith-based beliefs about family.  J. Bleuer Aff. ¶ 16;
Johnston Aff. ¶ 14.

33.     New Hope also engages in value-filled speech directed towards the government.
After it conducts a home study with a candidate couple, New Hope is obliged to either approve
or disapprove that couple to receive a placement, based on "the best interest of any child who
may be placed in the home." VC ¶ 121; Jerman Aff. ¶¶ 20-21, 33-43. Then, after an initial
placement and a supervision period, New Hope must make a final, official recommendation that
the placement be finalized, representing its conclusion that this particular placement is indeed in
the best interests of this particular child. VC ¶¶ 133-141; Jerman Aff. ¶¶ 45-48.

34.     New Hope's speech to the State is not merely clerical. The relevant statutes and
regulations do not define "the best interests of the child," but rather require the agency to
exercise judgment and discretion in considering a wide and non-exhaustive range of factors.
Jerman Aff. ¶¶ 19-32; *New Hope*, 966 F.3d at 177.

***The statutory context, adoption, and enforcement of the Regulation[1]***

35.     Until 2010, New York statute prohibited adoption by any couple other than a
heterosexual, married couple. N.Y. Dom. Rel. Law § 110 (2009).

---

[1] The Second Circuit provided a detailed overview of the legal history leading up to the adoption
of the Regulation, based on the public record. *New Hope*, 966 F.3d at 150-55. This Court may
take judicial notice of that public record.

36.    In September 2010, New York amended its Domestic Relations law to *permit* "any two unmarried adult intimate partners" to adopt together. N.Y. Dom. Rel. Law § 110 (2011).

37.    The amended law contained no mandate requiring adoption agencies to approve adoption by *any* persons. *Id.*

38.    In a signing statement, Governor Patterson emphasized this point, noting that "since the statute is permissive, it would allow for such adoptions without compelling any agency to alter its present policies," and would not "in any way tread[] on the views of any citizen or organization." Gov. Mem., New York Bill Jacket, 2010 S.B. 1523, ch. 509 (submitted in Aff. of Mark Lippelmann in Supp. of New Hope Fam. Servs.' Mot. for Summ. J. ("Lippelmann Aff."), attached as Ex. 8, at Ex. A, p. 5).

39.    By its permissive terms and in light of the Governor's signing statement, the 2010 amendment provided space for reasonable accommodations of agencies with faith convictions that preclude them from placing children with couples newly authorized to adopt by this legislation. *See id.*

40.    On January 11, 2011, OCFS issued an "informational letter" to all authorized agencies attaching a copy of the Governor's signing statement and stating that the amendment to the statute "does not change or alter the standards currently in place for the approval of an individual as an adoptive parent." OCFS Informational Ltr., 11-OCFS-INF-01 (Jan. 11, 2011) (submitted in Lippelmann Aff., Ex. B, p. 3).

41.    But less than a year later, on July 11, 2011, OCFS issued a second informational letter stating that the purpose of certain regulations was to "prohibit discrimination based on sexual orientation" in adoption and declaring that "OCFS cannot contemplate any case where the

issue of sexual orientation would be a legitimate basis . . . to deny the application of a person to be an adoptive parent." OCFS Informational Ltr., 11-OCFS-INF-05 (July 11, 2011) (submitted in Lippelmann Aff., Ex. C, p. 4).

42.     In November 2013, OCFS issued the regulation which it has asserted against New Hope, 18 NYCRR § 421.3(d), which (contrary to Governor Patterson's signing statement) purports to *require* authorized agencies to prohibit discrimination based on criteria including "sexual orientation" and "marital status." *See* 35 N.Y. Reg. 3 (Nov. 6, 2013). OCFS did not identify any statutory provision that authorized this regulatory revision of the law from permissive to mandatory. *See id.*

43.     In its statement of proposed rulemaking, OCFS referred to the prior regulatory structure that left room to accommodate differing beliefs concerning family structure and the best interest of the child as "archaic regulatory language." Lippelmann Aff., Ex. D, p. 5; *New Hope*, 966 F.3d at 163-64; VC ¶ 166.

44.     OCFS raised no objection to New Hope's policies and practices for five years. Indeed, after an extensive site review in 2018, OCFS representative Suzanne Colligan sent New Hope a letter praising it for "a number of strengths" including its "strong emphasis on assisting the birth parents in making an informed decision for their newborn," and providing "a supportive and detailed adoptive family selection process." VC ¶ 187; *see id.* at Ex. 6.

45.     The review letter made no mention of Section 421.3(d) and raised no concern about New Hope's policy of placing infants only with families consisting of a married mother and father. The letter identified only three unrelated areas for follow-up. VC at Ex. 6.

46.     Just a week later, however, Ms. Colligen called and told New Hope's former executive director Judy Geyer that unless New Hope agreed to violate its beliefs by placing

children with unmarried and same-sex couples, it would be "choosing to close." VC ¶¶ 188-90; Geyer Aff. ¶ 158.

47.     When Ms. Geyer responded that New Hope could not violate its religious beliefs in this manner, but would "never choose to close," Ms. Colligan told Ms. Geyer that "[s]ome Christian ministries have decided to compromise and stay open." VC ¶¶ 191-94; Geyer Aff. ¶¶ 156-162.

48.     By letter dated October 16, 2018, OCFS demanded that New Hope agree within 15 days to abandon its policy and facilitate adoptions inconsistent with its religious convictions, or else "submit a close-out plan for [its] adoption program." VC ¶ 198; *see id.* at Ex. 7.

49.     In its filings before the Second Circuit, OCFS clarified its position that if New Hope speaks and teaches its beliefs about family, marriage, and the best interests of children to birthparents or adoptive parents, New Hope will be violating the Regulation. OCFS stated that it does not seek to "restrict New Hope's speech *unrelated to its provision of adoption services*," and that "New Hope is not precluded from espousing its beliefs about marriage and family . . . *outside the contours of its adoption program*." Mem. of Law for Appellee in Opp'n to Mot. for Prelim. Inj. at 20-21, *New Hope*, 966 F.3d 145 (2d Cir. 2020) (No. 19-1715-cv), ECF No. 101 (submitted in Lippelmann Aff., Ex. E, p. 20-21) (emphasis added).

50.     During oral argument on New Hope's motion for preliminary injunction, the Court observed that if New Hope agreed to work with unmarried or same-sex candidate adoptive parents but continued to speak its true beliefs to birthmothers and to those candidates, and continued to express its true beliefs about the best interests of children in final conclusions disapproving adoption by such candidates, it would probably face a lawsuit "the next day." Tr. of

11

Proceedings Before the Hon. Mae A. D'Agostino at 44, February 19, 2019, ECF No. 43

(submitted in Lippelmann Aff., Ex. F); *New Hope*, 966 F.3d at 176-77.

51.     Counsel for OCFS admitted in argument to the Court of Appeals that OCFS is

aware that it is precisely religious organizations that hold the beliefs that OCFS is attempting to

outlaw by means of § 421.3(d). Tr. of Proceedings Before the Hon. José A. Cabranes, Reena

Raggi, and Edward R. Korman at 45, *New Hope*, 966 F.3d 145 (2d Cir. 2020) (No. 19-1715-cv)

(submitted in Lippelmann Aff., Ex. G).

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(a). In deciding a motion for summary judgment, a court may consider facts set forth

upon personal knowledge in affidavits or declarations, and a "verified complaint is to be treated

as an affidavit for summary judgment purposes, . . . provided that it meets the other requirements

for an affidavit under Rule 56(e)." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see also*

5A Fed. Prac. & Proc. Civ. § 1339 (same).

## ARGUMENT

I.     **The Regulation as applied infringes New Hope's right to free speech and freedom of association in a manner that triggers strict scrutiny.**

Section 421.3(d) violates both New Hope's free speech rights and its free exercise rights.

We first address the free speech violations.

### A.     **New Hope engages in protected speech reflecting its "ideas and beliefs" towards three distinct audiences.**

"At the heart of the First Amendment is the principle that each person should decide for

himself or herself the ideas and beliefs deserving of expression, consideration, and adherence."

*New Hope*, 966 F.3d at 170  (quoting *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570

U.S. 205, 213 (2013)) (cleaned up). This principle guarantees that the State "'may not prohibit the expression of an idea,' even one that society finds offensive or disagreeable." *Id.* (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989)).

This Court and the Second Circuit have already recognized that "all New Hope's adoption services" are "laden with speech." *New Hope*, 966 F.3d at 171; *see New Hope Fam. Servs., Inc. v. Poole*, 493 F. Supp. 3d 44, 61 (N.D.N.Y. 2020). Indeed, New Hope engages in protected, substantive speech directed towards three distinct audiences: when it is "counseling birthmothers," "instructing and evaluating prospective adoptive parents," and "filing its ultimate reports" with the State. *See supra* Statement of Facts ("SOF") ¶ 20); *New Hope*, 966 F.3d at 171.

### 1.    New Hope speaks protected speech to birthmothers.

New Hope communicates its values and beliefs about family and the best interests of children to birth parents who choose to work with New Hope. (SOF ¶¶ 16-23). New Hope also communicates its beliefs and discretionary conclusions about specific candidate adoptive parents to birth parents. (*Id.*). When New Hope shows a portfolio of potential adoptive couples to a birthmother, it represents that New Hope believes that placement with that couple would be consistent with the best interests of the child. (SOF ¶¶ 21-22). This is a conclusion fraught with independent judgment and discretion, inevitably informed by beliefs about human nature and family. (SOF ¶ 23; *see id.* ¶¶ 16-22).

### 2.    New Hope speaks protected speech to adoptive couples.

New Hope speaks even more extensively about its values and beliefs about marriage, family, and the best interests of children to candidate adoptive parents, through group sessions, individual discussions of marital and parenting issues, and counseling about building a healthy home environment for an adoptive child. (SOF ¶¶ 16-18, 20, 25-28). Further, New Hope regularly assists prospective adoptive couples in preparing the "portfolio" through which they

present themselves, their families, and their family life to birth parents, including reviewing

drafts, making suggestions, and editing the content before it is finalized. (SOF ¶ 27). Like its

communications to birthmothers, New Hope's communications with candidate adoptive parents

involve significant discretion and independent judgment. (SOF ¶ 29).

### 3. New Hope speaks protected speech to the State.

At the end of the adoption process, New Hope must and does speak to the State on "the

determinative question for any adoption: whether it would be in the best interests of a child to be

adopted by particular applicants." *New Hope*, 966 F.3d at 171; (SOF ¶¶ 33-34). New Hope has a

legal obligation to approve only a placement that it believes is in the best interests of the child.

(*Id.*). New Hope's official recommendation that a placement be finalized signifies its conclusion

and representation that this placement is indeed consistent with this child's best interests. (*Id.*).

Again, this is no mere clerical sign-off, but a conclusion that involves "considerable discretion"

and "independent judgment." *New Hope*, 966 F.3d at 175; (SOF ¶¶ 33-34).

\* \* \*

In sum, New Hope's ministry—its daily work—is permeated throughout by

discretionary, value-laden speech that in New Hope's case is guided at its core by that same faith

which inspired the founding of New Hope and its adoption ministry some 60 years ago. This is

speech that cannot be classed as merely clerical, *New Hope*, 966 F.3d at 177; (SOF ¶¶ 23, 29,

34), nor as "governmental speech," *id.* at 171-75, 182. This speech is entitled to the full

protection of the First Amendment.

### B. Strict scrutiny must be applied because the Regulation would force New Hope to change the content of its speech, and would impose content and viewpoint-based censorship on New Hope's speech.

The question, then, is what level of protection the First Amendment provides. The

controlling principle is that a law that "alters the content of [New Hope's] speech" must survive

14

strict scrutiny or be permanently enjoined. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2371 (2018) (quoting *Riley v. Nat'l Fed'n of Blind of N. C., Inc.*, 487 U.S. 781, 795 (1988)); *see New Hope*, 966 F.3d at 171 n. 24 (quoting this language). A law may "alter" speech by censoring, chilling, or compelling speech. The Regulation does all of those things to each aspect of New Hope's speech detailed above.

To threaten New Hope with loss of its license unless it refrains from speaking its true beliefs, as the State has already done, chills New Hope's ability to speak its biblically based beliefs about marriage, family and children. (SOF ¶¶ 41-42, 46-48). Similarly, the threat in Section 421.3(d) that New Hope will be penalized unless it muzzles its employees and representatives (who indeed make up New Hope) and prevents them from speaking in accordance with those same beliefs (*Id.*), chills the speech of both New Hope and its employees. This impact is not merely undisputed, it is intended. The State has boldly told the Court that New Hope remains free to "espous[e] its beliefs about marriage and family . . . *outside* the contours of its adoption program." (SOF ¶ 49). But where speech is chilled or censored, it is no defense for the State to say that it only censors the ministry's speech from '9 to 5,' such that the ministry remains free to speak its mind on its own, on evenings and weekends. Strict scrutiny must be applied.

Equally, strict scrutiny must be applied because the Regulation compels speech. "[G]overnment also cannot tell people that there are things 'they must say.'" *New Hope*, 966 F.3d at 170 (quoting *Agency for Int'l Dev.*, 570 U.S. at 213). Thus, the State "plainly violates the First Amendment" when it directly regulates speech by mandating that persons agree with government policy on a particular matter. *Id*. Because New Hope does not believe that placement with unmarried or same-sex couples is consistent with the best interests of children, to require it

to recommend or approve any such couple, or to counsel any such couple towards adoption and approval for adoption, is inevitably to censor New Hope by preventing it from saying what it believes to be true, and to compel New Hope to say what it believes to be false. *See New Hope*, 966 F.3d at 176-77, 182.

        **C.**      **Section 421.3(d) also violates New Hope's right to expressive association.**

The right to freely associate with like-minded individuals is protected where that association serves the purpose "of engaging in those activities protected by the First Amendment [including] . . . speech . . . and the exercise of religion." *New Hope*, 966 F.3d at 178 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984)). For largely the same reasons already reviewed, the Regulation violates New Hope's right of expressive association, both with respect to the association consisting of New Hope's board members, employees, and volunteers, and also its association with the adoptive parents with whom it works.

        **1.**      **The Regulation disrupts the "expressive association" consisting of New Hope's board members, employees, and volunteers.**

The undisputed evidence is that one goal of New Hope as an organization is to "convey[] a system of values about life, marriage, family and sexuality to both birthparents and adoptive parents through its comprehensive evaluation, training, and placement programs." (SOF ¶ 17); *see New Hope*, 966 F.3d at 178. New Hope also strives to communicate the Christian faith to all those whom it serves who wish to hear. (SOF ¶ 16). The employees and volunteers who make up New Hope do so in important part because of their desire to participate in communicating these messages. (SOF ¶¶ 18-19). In short, New Hope itself, including its employees, board members, and volunteers, is an expressive association that enables its members to speak those "shared beliefs and values more effectively" together. (SOF ¶¶ 16-19); Jerman Aff. ¶¶ 57-63; VC ¶¶ 52-

16

57; *New Hope*, 966 F.3d at 179; *see Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.* ("*FAIR*"), 547 U.S. 47, 68-69 (2006).

OCFS acknowledges this intended message but wants New Hope and its constituent members to *stop* communicating it "[inside] the contours of its . . . adoption services." *New Hope*, 966 F.3d at 176; (SOF ¶ 49). But this targets the very core of the protected right of expressive association. More, the record establishes that if New Hope is blocked from communicating these messages, and is forced to communicate contrary messages, then multiple employees who associate with New Hope precisely because of its beliefs and mission could no longer in good conscience work for New Hope. (SOF ¶ 19). Thus, the government's interference in New Hope's speech will "mak[e] association with New Hope 'less attractive' for those who would otherwise combine their voices with the agency's in order to convey their shared beliefs and values more effectively." *New Hope*, 966 F.3d at 179 (quoting *Rumsfeld*, 547 U.S. at 68-69). Again, this injures New Hope's protected right of expressive association.

> ## 2.      The Regulation disrupts the "expressive association" consisting of New Hope's representatives and the adoptive couples it serves.

Evidence submitted by New Hope also establishes that New Hope enters into an expressive association with candidate adoptive parents for the purpose of discussing topics including infertility, relationships, adoption, and family dynamics within the faith-based framework that New Hope very openly professes. (SOF ¶¶ 17, 25-26, 31-32); *see New Hope*, 966 F.3d at 156-58, 178-180. There is no requirement that adoptive applicants share New Hope's faith, but all who choose to work with New Hope are inevitably very aware of that faith framework and have chosen to work with New Hope rather than with one of the many secular adoption services in the state. (SOF ¶ 26). It is apparent and not disputed that a forced inclusion of unmarried or same-sex couples in New Hope's group discussions with applicant parents will

inescapably alter the content and message of those discussions to the extent they concern the nature of healthy marriage relationships and the best interests of children, both because of the views that those individuals necessarily hold and will bring into the discussion, and because their inclusion is itself directly inconsistent with New Hope's beliefs. (SOF ¶¶ 9-10, 17, 22, 30-32).

Further, several prospective adoptive parents have testified that if New Hope were blocked from teaching, counseling, and acting based on its religious beliefs about marriage and family, those individuals would not feel comfortable relying on New Hope to guide them through the adoption process. (SOF ¶¶ 31-32). Thus, censorship, compelled speech, and forced inclusion contrary to New Hope's true beliefs would destroy not only the expression, but the association itself.

These facts—all undisputed on the present record—establish an impairment of New Hope's protected right of expressive association. For this reason, too, the Regulation must be subject to strict scrutiny. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000).

## II. The Regulation as applied impairs New Hope's right to freely exercise its religion in a manner that triggers strict scrutiny.

It is undisputed that New Hope's conviction that a family with "one man married to one woman for life . . . is the ideal and healthiest family structure for mankind and specifically for the upbringing of children" is a sincere religious conviction, (SOF ¶ 9), part of a coherent view of human nature shared by many religions. *See New Hope*, 966 F.3d at 161. OCFS does not dispute that § 421.3(d) as applied "preclude[s] New Hope from pursuing its adoption ministry consistent with its religious beliefs." *New Hope*, 966 F.3d at 160. The remaining question is whether the State may put New Hope to a choice between violating what it believes to be the teachings of God or closing its 50-year-old ministry. It may not. OCFS argues that it possesses precisely this power, because it is applying a "neutral law of general applicability" within the

meaning of *Employment Division v. Smith*, 494 U.S. 872, 879 (1990). OCFS is mistaken for two separate reasons.

### A.   Section 421.3(d) must be subjected to strict scrutiny because it intrudes on historic beliefs at the heart of New Hope's "faith and mission."

In some settings, the boundary line between government power and the Free Exercise Clause is traced by the test articulated in *Smith*. But the *Smith* neutrality test is not all-encompassing. The Supreme Court has rejected the idea "that any application of a valid and neutral law of general applicability is necessarily constitutional under the Free Exercise Clause." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 n.2 (2017). On the contrary, "[t]he contention that *Smith* forecloses recognition of" well-established historical religious practices "rooted in the Religion Clauses has no merit." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012).

This limitation to *Smith* has teeth, and it applies here. Since the decision in *Smith*, and without even applying or invoking the *Smith* test, the Supreme Court has rejected as unconstitutional neutral and generally applicable laws that would disrupt the "faith and mission of the [religious organization] itself." *Hosanna-Tabor*, 565 U.S. at 190. Thus, in *Hosanna-Tabor*, the Supreme Court *unanimously* held that the Religion Clauses bar the government from applying a neutral and generally applicable nondiscrimination law to a religious organization when doing so would interfere with the organization's selection of its teachers and ability to operate consistently with its faith convictions. 565 U.S. 171 (2012). And in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719, 1727 (2018), the Court taught that—notwithstanding what might be required of secular officiants through "neutral and generally applicable" laws—it would be unconstitutional to compel clergy "to perform [a same-sex wedding] ceremony." In short, "the Establishment Clause must be interpreted by reference to

19

historical practices and understandings," and "[a]ny test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Town of Greece v. Galloway*, 572 U.S. 565, 576–77 (2014).

Like New Hope's beliefs, its ministry is time-honored—indeed, ancient. Caring for orphans has been a mandate of the Christian faith for 2000 years and a focus of Christian ministry in this nation since its founding. (SOF ¶¶ 1-2). And since New Hope was founded in 1965, the central mission of New Hope Family Services has been to obey and fulfill the Apostle James' command by placing orphaned children into loving families. (SOF ¶ 3). Further, from the perspective of faith, arranging and finalizing an adoption has much in common with performing a marriage. Both involve the formation of family and lifelong relationships which all historic faiths believe to be both ordained and blessed by God. It is undisputed that for a Christian ministry devoted to the formation of families and the wellbeing of children, their beliefs about the nature of man, woman, and family do indeed lie at the heart of their "faith and mission." For this reason, under the principle of *Hosannah-Tabor* and without regard to the *Smith* test, the State may not, consistent with Free Exercise, dictate that New Hope must perform this historic Christian ministry in a manner inconsistent with its faith convictions, or close its doors.[2]

---

[2] In addition to this exception to *Smith* for historic religious practices central to an organization's faith and mission, laws also trigger strict scrutiny notwithstanding *Smith* if they burden a hybrid of religious exercise and other constitutional rights. *See Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 881-82 (1990). Although the Second Circuit has rejected the hybrid-rights doctrine, *Leebaert v. Harrington*, 332 F.3d 134, 143-44 (2d Cir. 2003), other courts disagree and correctly interpret *Smith* as recognizing this doctrine. *See Telescope Media Grp. v. Lucero*, 936 F.3d 740, 753 (8th Cir. 2019). New Hope preserves this issue for appeal.

**B.      Section 421.3(d) must be subjected to strict scrutiny because numerous exceptions mean that it is not "generally applicable."**

Even under the test of *Smith*, Section 421.3(d) must also survive strict scrutiny because it is not "generally applicable." "A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exceptions.'" *Fulton*, 141 S. Ct. at 1877 (quoting *Smith*, 494 U.S. at 884) (cleaned up). "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543–44 (1993).

In *Fulton*, the Supreme Court found the Philadelphia provision to be "not generally applicable" because it authorized exceptions to the antidiscrimination rule it announced. *Fulton*, 141 S. Ct. at 1878-79. The same is true here. By its terms, the Regulation prohibits "discrimination . . . against applicants for adoption services on the basis of race, creed, color, national origin, age, sex, sexual orientation, gender identity or expression, marital status, religion, or disability." 18 NYCRR § 421.3(d) Yet the Regulation not only authorizes but even mandates *multiple* exceptions to that sweeping prohibition.

For example, New York law expressly allows—and in fact requires—adoption agencies to make distinctions based on race and religion when placing children with adoptive parents. Agencies must, "when practicable," place children with persons "of the same religious faith as that of the child." N.Y. Soc. Serv. Law § 373(2); VC ¶¶ 88, 170. Similarly, adoption agencies must direct their recruiting efforts towards "communities of populations which have ethnic, racial, religious, or cultural characteristics similar to those of … the largest number of waiting children." 18 NYCRR § 421.10(a). New York law likewise permits adoption agencies to decline

and refer applicants for multiple other nonreligious reasons apparently prohibited by the terms of the Regulation. An agency may, for example, decline applicants for "poor health" (i.e., "disability") or "limited life expectancy" (i.e., "age"). N.Y. Dom. Rel. Law § 110.

Further, the law permits birthparents to make distinctions based on *anything* they think is in the best interest of their child when selecting adoptive parents and requires adoption agencies to "give effect" to the "religious wishes" of birthparents. N.Y. Soc. Serv. Law § 373(7); *see also Spence-Chapin Adoption Serv. v. Polk*, 274 N.E.2d 431, 436 (N.Y. 1971) ("[T]hat the mother should have the say on issues of race and religion seems reasonable and is accepted doctrine, so long as she has not abandoned the child or is unfit.").

Whatever their justifications, each of these allowed exceptions cut against the State's claimed interest in providing non-discriminatory access to adoption to applicant parents. Where a law or policy permits exceptions for secular reasons, it simply is not "generally applicable" within the meaning of *Smith*. *See Tandon*, 141 S. Ct. at 1296; *Fulton*, 141 S. Ct. at 1976-79. In *Fulton*, the Supreme Court preferred to rely on this "straightforward" observation to conclude that strict scrutiny must be applied, obviating any need to inquire into motives, animus, or targeting. *Fulton*, 141 S. Ct. at 1877. The same is true here.

## C.    Section 421.3(d) must be subjected to strict scrutiny because it is not "neutral."

The facts also adequately establish, however, that the Regulation is not "neutral" within the meaning of the law. "[G]overnment hostility to religion can be 'masked, as well as overt," and "facial neutrality" is not "determinative." *New Hope*, 966 F.3d at 163, *quoting Lukumi*, 508 U.S. at 533. Direct evidence of hostility or targeting is not required; targeting may be inferred where "almost the only conduct" impacted is religiously motivated, because "the effect of a law in its real operation" is "strong evidence of its object." *New Hope*, 966 F.3d at 163 (quoting

*Lukumi*, 508 U.S. at 535). Evidence of targeting is not to be considered *seriatim*; rather, the "totality" of the evidence must be considered together. *New Hope*, 966 F.3d at 163-65. A plaintiff does not face a high burden of proof of targeting or hostility in order to trigger strict scrutiny. Rather, a "slight" or "plausible" suspicion of even "subtle departures from neutrality" suffices. *New Hope*, 966 F.3d at 163, 165, 183, quoting *Masterpiece Cakeshop*, 138 S. Ct. at 1731.

New Hope has introduced facts sufficient to show a plausible suspicion that Section 421.3(d) is not "neutral" in either its origin or its enforcement, thus requiring the application of strict scrutiny.

### 1.   OCFS's promulgation of Section 421.3(d) evinced animus against religious beliefs.

*First* and perhaps most importantly, OCFS's aggressive overreaching in adopting Section 421.3(d) without and contrary to statutory authority evinces zealous determination to silence or exclude a disfavored viewpoint. As the Court of Appeals observed, the mandatory language of Section 421.3(d) has no basis in the law it purports to implement, N.Y. Dom. Rel. Law § 110, and instead is directly contrary to the apparent intent of that statute. *New Hope*, 966 F.3d at 165. The choice of permissive rather than mandatory language in the statute, the Second Circuit found, "appears to have been deliberate, and even intended to allow for accommodation of religious beliefs." *Id*. This Court agreed. *See New Hope*, 493 F. Supp. 3d at 57 (finding that "in light of the Circuit's finding that the statute is "permissive," the Court cannot find OCFS's [argument on neutrality] reasonable.").

Confirming this reading, at the time of his signing, the Governor of New York went out of his way to forestall any concern that the law "might be construed to require faith-based adoption agencies 'to facilitate adoption for same-sex [couples] in violation of" their religious

beliefs. *New Hope*, 966 F.3d at 165. "He explained that the statutory text was permissive, *i.e.*, it allowed adoptions by more persons than before, but '*without compelling any agency to alter its present policies.*'" *Id.* at 166 (citing Gov. Mem., New York Bill Jacket, 2010 S.B. 1523, ch. 509); VC ¶ 7 & Ex. 5. Official statements like this "are routinely relied on in construing the reach of New York statutes." *New Hope*, 966 F.3d at 166 n.18; *see, e.g., People v. Cagle*, 860 N.E.2d 51 (N.Y. 2006); *Greer v. Wing*, 746 N.E.2d 178 (N.Y. 2001). OCFS, however, ignored both the permissive language of the statute and this legislative history in its determination to *prohibit* by regulation exactly what the statute *permits* by its terms. This overreach evinced OCFS's hostility towards the beliefs held by New Hope along with other faith-based adoption agencies. OCFS confirmed its contempt for those beliefs during the rulemaking process that led to adoption of the Regulation, dismissing such beliefs as "archaic." (SOF ¶ 43); *New Hope*, 966 F.3d at 163-64.

   *Second*, OCFS's failure to include a religious exemption in Section 421.3(d)—despite the multiple other contexts in which the applicable regulations permit adoption services to "discriminate" based on protected characteristics (including race and religion) for reasons which the State or OCFS apparently consider legitimate and worthy of respect, *see supra* Section II.B—evinces a value judgment that faith-based reasons are illegitimate, and unworthy of respect. But this elevation of secular reasons for exemptions over religious reasons is impermissible and evinces hostility towards those religious beliefs or practices. *Tandon*, 141 S. Ct. at 1296 (holding that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise.") (emphasis in original).

*Third*, so far as the record shows, OCFS adopted Section 421.3(d) not only in disregard of the permissive language of the statutory text and the legislative history, but in the absence of any problem calling for a solution. It is undisputed that at the time OCFS adopted the Regulation, New Hope had "operated without complaint for 50 years, taking no government funding, successfully placing approximately 1,000 children." *New Hope*, 966 F.3d at 168; (SOF ¶¶ 3, 8, 11); VC ¶¶ 51, 73; Geyer Aff. ¶¶ 29, 140. The State has not contended that any potential adoptive parents had ever been dissuaded from adopting as the result of any similar policy of any religious adoption agency. *New Hope*, 966 F.3d at 169. Thus, the adoption of Section 421.3(d) was driven by an ideological zeal to quash religious dissenters, not by any real-world problem.

> ### 2.   OCFS's enforcement of Section 421.3(d) evinced animus against religious beliefs.

Targeting and animus against religious beliefs and organizations continued in OCFS's enforcement of Section 421.3(d).

*First*, OCFS's aggressive reversal of its long-time live-and-let-live approach to New Hope, in the absence of any complaints or experienced problems, evinced ideological hostility rather than neutral regulatory enforcement in the interest of children. For five years after Section 421.3(d) was enacted, "OCFS voiced no objection to" New Hope's child-placement policy. *New Hope*, 966 F.3d at 166; Jerman Aff. ¶¶ 12, 15, 18, 30, 44, 49. Not one "complaint" was filed during that time, *New Hope*, 966 F.3d at 168; Geyer Aff. ¶ 140, and indeed, OCFS consistently praised New Hope's operations and effectiveness right up until the moment it threatened closure. VC ¶¶ 187-88; *New Hope*, 966 F.3d at 168. This is strong evidence that OCFS's abrupt decision to enforce Section 421.3(d) in this manner "proscribe[s] more religious conduct than is necessary to achieve [its] stated ends." *Lukumi*, 508 U.S. at 538.

*Second*, hostility was evident in OCFS's abrupt leap to the extreme threat of a closure order. As the Second Circuit observed, "It is plainly a serious step to order an authorized adoption agency such as New Hope—operating without complaint for 50 years, taking no government funding, successfully placing approximately 1,000 children, and with adoptions pending or being supervised—to close all its adoption operations." *New Hope*, 966 F.3d  at 168. And aggressive hostility is all the more evident given that OCFS is unable to identify any relevant statutory authority that empowers it to order New Hope to cease its adoption services. *Id*. at 168-69.

In the course of granting a preliminary injunction this Court suggested that the enforcement power granted to OCFS by Section 421.3(d) "presumably" includes "authority to close agencies that choose not to comply with the state law," *New Hope*, 493 F. Supp. 3d at 59, but the Court overlooked the fact that the Second Circuit had already rejected any such "presumption." Quite the contrary, the Second Circuit found that "nothing in . . . any [  ] authority cited by OCFS indicates . . . whether OCFS's enforcement authority . . . extends to judicial-like authority to prescribe the punishment for violations, specifically, the punishment of closure." The Circuit panel further observed that Section 371(10)(a) grants OCFS *supervisory* power over adoption agencies but "makes no mention of closing adoption agencies or invalidating certificates of incorporation authorizing them to provide adoption services," while Section 385, which does grant OCFS the power to order an agency to cease placing children under certain specifically enumerated conditions, does *not* include violation of antidiscrimination laws or regulations in the list of offenses that can authorize such an order. The Second Circuit held that "until the source of any broader authority is identified . . . the severity of OCFS's comply-or-close decision adds some weight to New Hope' claim of hostility toward its religious

beliefs." *New Hope*, 966 F.3d at 169. The State has identified no such "broader authority," so the severity of its closure threat continues to be a factor weighing towards a finding of hostility.

*Third*, OCFS's failure to consider and respect New Hope's referral policy as a solution that protects the State's announced interest without violating New Hope's religious convictions weighs towards a finding of hostility towards those beliefs. The State presented no evidence that New Hope's long-standing practice ever prevented any unmarried or same-sex applicants from obtaining approval and adopting (through any of the overwhelming majority of adoption services willing to work with such applicants), or dissuaded any applicant from pursuing adoption. "[T]he record does not . . . indicate that couples were unable to adopt as a result of [New Hope's practices]." *New Hope*, 493 F. Supp. 3d at 60. On the facts presented here, the Second Circuit found that OCFS's abrupt rejection of New Hope's long-standing referral policy "raise[ ] a sufficient suspicion" that the State's action was motivated not by a goal of effectuating the stated governmental interest, "but to suppress the conduct because of its religious motivation." *New Hope*, 966 F.3d at 167 (quoting *Lukumi*, 508 U.S. at 538) (cleaned up). The facts which led the Second Circuit to that conclusion are evidentiary, and unchanged since that finding.

*Fourth*, the inference or "suspicion" of hostility raised by OCFS's abrupt and severe threat of closure without clear legal authority, coupled with its failure to give any consideration to the efficacy of New Hope's referral policy in protecting the State's declared interest, is heightened by the statement made to the press by a high-level OCFS representative in connection with the closure of another "long-established Christian adoption agency" in New York, that there is "no place" for agencies that could not follow OCFS's new regulatory demand to place children with unmarried or same-sex couples. *New Hope*, 966 F.3d at 168; VC ¶ 204; Stephen T. Watson & Harold McNeil, *Catholic Charities ending foster, adoption programs over same-sex marriage*

*rule*, THE BUFFALO NEWS (Aug. 23, 2018), https://buffalonews.com/news/local/catholic-charities-ending-foster-adoption-programs-over-same-sex-marriage-rule/article_61a0fe9d-a73a-5cef-9726-eec2ad75f87c.html (last visited Oct. 8, 2021). Taken together, these events suggest that the State's true motivation was to show its sharp disapproval of the beliefs held by New Hope and similarly situated faith-based agencies, rather than to protect the ability of all legally eligible citizens to obtain adoption services. Indeed, it is undisputed that OCFS took this farther and actually insisted that New Hope "'compromise'—i.e., abandon its own religious views about family and marriage," *New Hope*, 966 F.3d at 168, or close. (SOF ¶¶ 46-48).

But a world in which there is "no place" for minority religious views and morality is exactly the opposite of the world envisioned by the First Amendment. Governmental statements that evince hostility to or "presupposes the illegitimacy" of disfavored religious beliefs, *Masterpiece*, 138 S. Ct. at 1731, or that are "neither tolerant nor respectful of [New Hope's] religious beliefs," *id.*, support the conclusion that strict scrutiny must be applied here.

*Fifth* and finally, as all these actions and statements demonstrate, OCFS threatened New Hope with the regulatory destruction of its ministry while assuming the role of an ideological adversary rather than a "neutral decisionmaker" who gives "full and fair consideration" to its "religious objection[s]." *Masterpiece*, 138 S. Ct. at 1731–32. As the Court of Appeals noted, OCFS apparently gave no consideration at all to strong factors that should have weighed towards providing a religious exemption to Section 421.3(d) to accommodate those objections. Those factors importantly included the benefit to children consistently provided by New Hope across the years, and the absence of any identifiable harm from providing such an exemption. *New Hope*, 966 F.3d at 166-67, 169.

In short, New Hope has submitted evidence that hostility and non-neutrality pervaded both the promulgation of Section 421.3(d) and its enforcement against New Hope. The "totality" of these factors "raise[s] a plausible suspicion that OCFS acted with hostility against New Hope because of the latter's religious beliefs." *New Hope*, 966 F.3d at 183. Because each of the relevant facts has been made evidentiary, and is uncontradicted, New Hope has demonstrated far more than that "plausible suspicion," and strict scrutiny must therefore be applied.

## III.    Title 18 NYCRR § 421.3(d) cannot satisfy strict scrutiny.

Once New Hope demonstrates that OCFS's application of Section 421.3(d) against New Hope must be subjected to strict scrutiny, then that application is presumptively unconstitutional. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). New Hope has met its burden to show that strict scrutiny must be applied as a result of infringements of free speech, freedom of association, and free exercise of religion. The burden thus shifts entirely; New Hope faces no further burden of proof. The Second Circuit stated that the regulation must be enjoined unless the State carries its burden to demonstrate that the application of the Regulation *against New Hope specifically* advances interests of the highest order and is narrowly tailored in pursuit of those interests. *New Hope*, 966 F.3d at 182.

The Supreme Court has authoritatively reaffirmed that formulation in exactly the present context, holding that, "The question . . . is not whether [New York] has a compelling interest in enforcing its non-discrimination policies *generally*, but whether it has such an interest in denying an exception to [New Hope]." *Fulton*, 141 S. Ct. at 1881 (emphasis added); *see also Wisconsin v. Yoder*, 406 U.S. 205, 236 (1972) (in order to apply neutral minimum schooling requirements to Amish, the government must "show with . . . particularity how its admittedly strong interest . . . would be adversely affected by granting an exemption to the Amish."). This framing is diametrically opposite to the attitude evinced in OCFS's absolutist assertion that there can be "no

29

place" in New York for agencies that hold traditional faith convictions about family, marriage, and the best interests of children. And it is fatal to the State's position.

The burden to demonstrate that the application of the Regulation is "narrowly tailored" includes demonstrating that any less restrictive means "would fail" to equally achieve the identified interest. *McCullen v. Coakley*, 573 U.S. 464, 467, 495 (2014). The State must carry its burdens with evidence, not argument: "Speculation is insufficient to satisfy strict scrutiny." *Fulton,* 141 S. Ct. at 1882; see also *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822-23 (2000) ("[A]necdote and supposition" do not suffice."). Yet here, the State has nothing beyond speculation. It cannot carry its burden at any turn.

### A.    OCFS cannot identify any relevant compelling state interest.

In its prior briefing, OCFS has thrown up various "interests" supposedly served by demanding that New Hope violate its beliefs or cease to place children for adoption. None are supported by record evidence.

OCFS has suggested that enforcing Section 421.3(d) against New Hope is necessary to maximize the number of families available to adopt. This is not only pure speculation, it defies logic and the facts. The only record evidence is that New Hope has never prevented *any* legally eligible couple from adopting, (Geyer Aff. ¶ 140), *New Hope*, 966 F.3d at 158, and that forcing New Hope (and other faith-based adoption agencies with similar convictions) to close their adoption services would *reduce* the resources dedicated to facilitating adoptions in New York, and would actually *reduce* the number of families willing to adopt. [3] This Court has previously

---

[3] Here, there is concrete evidence that New Hope's distinctive faith-based nature *increases* the number of parents willing to adopt and foster in New York, by drawing in parents who would otherwise not be comfortable doing so. *See, e.g.,* Loscombe Aff. ¶¶12-13 (values New Hope's religious beliefs and would not continue providing foster care through other agencies if New Hope is shuttered); Johnston Aff. ¶14 (may adopt a third child, but values New Hope's Christian

concluded that "enforcing section 421.3(d) to close New Hope actually runs contrary to the state's interest in maximizing the number of families available for adoption." *New Hope*, 493 F. Supp. 3d at 60. *See also Fulton*, 141 S. Ct. at 1882 (permitting agency to continue operation "seems likely to increase, not reduce, the number of available foster parents"). The facts remain unchanged.

OCFS has also proposed a governmental interest centered on adults rather than children, asserting (without evidence) that each placement by New Hope deprives some other adults of an opportunity to adopt. Again, this is pure speculation, and indeed counter-factual. New Hope has never deprived any adult an opportunity to adopt. And the only evidence is that New Hope specializes and has a remarkable record of success in placing "hard to place" infants, Jerman Aff. ¶¶ 3-7, and that "the 'supply' [of children awaiting adoption] in New York (unfortunately) greatly exceeds 'demand'." *New Hope*, 966 F.3d at 166-67; Geyer Aff. ¶¶ 25-26.

As to a generalized interest in preventing discrimination, the extensive exceptions reviewed above "undermine[ ] [New York's] contention that its non-discrimination policies can brook no departures." *Fulton*, 141 S. Ct. at 1882.

**B.    OCFS cannot show that applying Section 421.3(d) to close New Hope is narrowly tailored to avoid any unnecessary impairment of New Hope's First Amendment rights.**

In addition to the fact that a relevant compelling state interest cannot be identified, enforcement of the regulation must be enjoined unless OCFS carries the further burden of "demonstrat[ing] that its challenged actions are *narrowly tailored* to serve that interest without unnecessarily impairing New Hope's Free Exercise of Religion or Free Speech." *New Hope*, 966 F.3d at 182-83 (emphasis added). The less restrictive alternative, of course, would be an

---

values and would not adopt through a different agency); J. Bleuer Aff. ¶16 (values New Hope's Christian beliefs and may adopt again, but only through New Hope).

exemption that allows New Hope (and agencies that share the same conviction) to continue to serve children and families in a manner faithful to its beliefs, as it has done for over 50 years and during the pendency of this litigation under the protection of the preliminary injunction. Indeed, numerous states allow adoption agencies to operate in accordance with their religious beliefs.[4] And following the Supreme Court's decision in *Fulton*, the City of Philadelphia agreed to allow Catholic Social Services to operate its foster program in a manner consistent with its faith. *Fulton v. City of Philadelphia*, 2:18-cv-02075-PBT, Consent Decree at 3-5, ECF No. 79.

OCFS has offered no evidence that could meet this burden. As the Second Circuit observed, where the evidence is that OCFS has never contended that any placement by New Hope was contrary to the best interests of the child, *New Hope*, 966 F.3d at 148-49; where New Hope places only very young children and most often "hard to place" children, Jerman Aff. ¶¶ 3-7, *New Hope*, 966 F.3d at 183 n.32; where there is no evidence that New Hope has ever prevented any applicant from adopting, *New Hope*, 966 F.3d at 158, 183; and given New Hope's policy of providing references upon request to those whom it cannot in good conscience work with itself, *id*. at 183[5]—there can be no showing that *any* legitimate interest could not be served by means that leave in peace New Hope and the birthmothers and adoptive parents who wish to work with New Hope. *See New Hope*, 966 F.3d at 166; VC ¶¶ 165, 188-190.

---

[4] *See, e.g.,* VA. CODE ANN. § 63.2-1709.3 (2012); MICH. COMP. LAWS ANN. § 710.23g (2015); TEX. HUM. RES. CODE ANN. § 45.004 (2017) N.D. CENT. CODE ANN. § 50-12-07.1 (2021); S.D. CODIFIED LAWS § 26-6-38 (2017); ALA. CODE § 26-10D-5 (2017); OKLA. STAT. ANN. TITLE. 10A, § 1-8-112 (2018); KAN. STAT. ANN. § 60-5322 (2018); TENN. CODE ANN. § 36-1-147 (2020);

[5] It is doubtful that a requirement to cooperate—by providing referrals—in conduct that its religion teaches is wrong can be made a condition of the enjoyment of rights otherwise protected by Free Exercise or Free Speech. *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018). However, since New Hope has not objected to continuing its practice in this regard, the present case does not present that question.

**IV.     The Court should issue a permanent injunction that protects the right of New Hope and similarly situated adoption and foster care services to operate in a manner consistent with their beliefs.**

Once a violation of First Amendment rights is established, a permanent injunction should issue, because the "loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury," *New Hope*, 966 F.3d at 181 (quoting *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (1996)); the balance of hardships is entirely one-sided because "the Government does not have an interest in the enforcement of an unconstitutional law," *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); and protection of First Amendment rights is per se "in the public interest," *id*.

## CONCLUSION

For the reasons set forth above, and based on the facts set forth in the verified complaint and supporting affidavits, as well as the previously submitted affidavits identified above, *supra* p. 1, Plaintiff respectfully requests that this Court enter a permanent injunction prohibiting the State of New York from requiring New Hope to provide adoption services to unmarried or same-sex couples, and to grant the additional declaratory and other relief requested in Plaintiff's Prayer for Relief (VC 49).

Respectfully submitted this 8th day of October, 2021,

_s/ Mark A. Lippelmann_____

Roger G. Brooks, NY Bar No. 2260537*
Mark A. Lippelmann, AZ Bar No. 036553*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (Fax)
rbrooks@adflegal.org
mlippelmann@adflegal.org
*Admitted Pro Hac Vice*

Robert Genant, NY Bar No. 105257
GENANT LAW OFFICE
3306 Main Street, Ste. B
Mexico, NY  13114
(315) 963-7296
(315) 963-8274 (Fax)
bgenant@genantlaw.com
*Local Counsel*

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 8, 2021, I electronically filed New Hope Family

Services' Memorandum of Law in Support of Motion for Summary Judgment with the Clerk of

the District Court using the CM/ECF system. Service on counsel for all parties will be

accomplished through the Court's electronic filing system.


s/ *Mark A. Lippelmann*
Attorney for Plaintiff